**Exhibit A to Notice**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PLIANT CORPORATION, et al.,[1] | Case No. 06-10001 (MFW) |
| Debtors. | Jointly Administered |

## AMENDED DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION

### April 18, 2006

Date by which Ballots must be received: [_____], 2006
Date by which objections to Confirmation of the Plan must be filed and served: [_____], 2006
Hearing on Confirmation of the Plan: [_____], 2006 at [____] [_.m.] (Prevailing Eastern Time)

SIDLEY AUSTIN LLP

James F. Conlan
Larry J. Nyhan
William A. Evanoff
Jessica C. Knowles
Laura B. Franzon
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors-in-Possession

---

[1] The Debtors are: Uniplast Holdings, Inc. (Tax ID No. XX-XXX9589), Pliant Corporation (Tax ID No. XX-XXX6065), Pliant Corporation International (Tax ID No. XX-XXX3075), Pliant Solutions Corporation (Tax ID No. XX-XXX3872), Pliant Film Products of Mexico, Inc. (Tax ID No. XX-XXX0805), Pliant Packaging of Canada, LLC (Tax ID No. XX-XXX0929), Pliant Investment, Inc. (Tax ID No. XX-XXX0995), Alliant Company LLC (Tax ID No. XX-XXX6811), Uniplast U.S., Inc. (Tax ID No. XX-XXX9066), Uniplast Industries Co. (Tax ID No. N/A), and Pliant Corporation of Canada Ltd (Tax ID No. N/A) each with a mailing address of 1475 Woodfield Road, Suite 700, Schaumburg, Illinois 60173.

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1
    A.    PARTIES ENTITLED TO VOTE ON THE PLAN ..................................4
    B.    SOLICITATION PACKAGE........................................................4
    C.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE ..................5
    D.    CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS
          TO CONFIRMATION...............................................................5
II. OVERVIEW OF THE PLAN ....................................................................................6
    A.    GENERAL OVERVIEW...........................................................6
    B.    SUMMARY OF CLASSIFICATION AND TREATMENT OF
          ALLOWED CLAIMS AGAINST AND INTERESTS IN EACH OF THE
          DEBTORS UNDER THE PLAN ...................................................7
III. GENERAL INFORMATION ...................................................................................9
    A.    OVERVIEW OF CHAPTER 11 ..................................................9
    B.    THE DEBTORS' BUSINESSES AND PROPERTIES .........................10
          1.    Customers. ...............................................................10
          2.    Manufacturing and Raw Materials................................11
          3.    Sales and Marketing...................................................11
          4.    Intellectual Property...................................................11
          5.    Properties. ...............................................................12
    C.    OPERATIONAL STRUCTURE OF THE DEBTORS .........................12
          1.    Specialty Products Group. ...........................................13
          2.    Industrial Films Segment. ...........................................13
          3.    Engineered Films Segment. .........................................13
          4.    Performance Films. ....................................................14
    D.    MANAGEMENT OF THE DEBTORS............................................14
          1.    Board of Directors......................................................14
          2.    Biographies of Directors. ............................................14
          3.    Subcommittees of the Board of Directors.........................16
          4.    Compensation of Directors. .........................................17
          5.    Executive Officers. ....................................................17
          6.    Biographies of the Top Six Executive Officers. .................18
          7.    Compensation of Executive Officers..............................19
          8.    Other Matters Related to Former Directors and Officers of Pliant............22
    E.    COMPENSATION AND BENEFITS PROGRAMS.............................22
    F.    EMERGENCE BONUS PROGRAM.............................................23
    G.    DEBT AND CAPITAL STRUCTURE OF THE COMPANY ..................26
          1.    Prepetition Secured Credit Obligations. ..........................26
          2.    Intercreditor Agreement...............................................28
          3.    DIP Financing and Use of Cash Collateral. ......................28
          4.    Unsecured Note Obligations..........................................29
          5.    Intercompany Claims. .................................................29
          6.    Common Stock and Preferred Stock of Pliant. ...................29
    H.    PENDING LITIGATION AGAINST THE DEBTORS. ........................30
    I.    EVENTS LEADING UP TO CHAPTER 11 .....................................31

| | | |
|---|---|---|
| 1. | Contraction in Trade Terms and Increase in Price of Raw Materials. | 31 |
| 2. | Restructuring Agreement with Certain Principal Stakeholders. | 31 |
| 3. | Role of Certain Parties in Negotiating the Support Agreements and Plan of Reorganization. | 32 |

IV. EVENTS DURING THE CHAPTER 11 CASES .............................................................33
- A. JOINT ADMINISTRATION OF DEBTORS' CHAPTER 11 CASES ...............33
- B. OTHER FIRST-DAY RELIEF .........................................................................33
- C. APPROVAL OF DEBTOR-IN-POSSESSION FINANCING............................33
- D. RECOGNITION BY CANADIAN COURT......................................................34
- E. CASE ADMINISTRATION AND RELATED ACTIVITIES.............................35
  - 1. Retention of Professionals by the Debtors' Estates. ...............................35
  - 2. The Committee and its Advisors. ..........................................................36
  - 3. Other Creditor Constituencies and their Advisors. ................................36
  - 4. Trade Vendor Treatment and Payments to Vendors................................37
  - 5. Schedules of Assets and Liabilities; Statements of Financial Affairs. ..................................................................................................37
  - 6. Disposition of Certain Executory Contracts and Unexpired Leases..........37
  - 7. Employees..............................................................................................37
  - 8. Funding of Certain Non-Debtor Subsidiaries. .......................................38
  - 9. Insurance Motion. ..................................................................................39
  - 10. Filed Claims and Bar Date......................................................................39

V. THE PLAN OF REORGANIZATION..........................................................................39
- A. GENERAL.......................................................................................................39
- B. CLASSIFICATION AND ALLOWANCE OF CLAIMS & EQUITY INTERESTS GENERALLY. ...........................................................................40
  - 1. Classification and Allowance. ................................................................40
- C. PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS ..............40
  - 1. Administrative Expense Claims...............................................................40
  - 2. DIP Facility Claims. ...............................................................................42
  - 3. Priority Tax Claims.................................................................................42
- D. NON-SUBSTANTIVE CONSOLIDATION AND CLASSIFICATION OF CLAIMS ....................................................................................................42
- E. PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS ...............43
  - 1. Priority Non-Tax Claims (Class 1). ........................................................44
  - 2. Other Secured Claims (Class 2)..............................................................44
  - 3. Revolving Credit Facility Claims (Class 3). ...........................................44
  - 4. First Lien Note Claims (Class 4). ...........................................................44
  - 5. Second Lien Note Claims (Class 5). ........................................................45
  - 6. General Unsecured Claims (Class 6). ......................................................45
  - 7. Old Note Claims (Class 7). .....................................................................45
  - 8. Intercompany Claims (Class 8).................................................................47
  - 9. Series A Preferred Stock Interests (Class 9). ..........................................47
  - 10. Series B Preferred Stock Interests (Class 10). ........................................48
  - 11. Outstanding Common Stock Interests (Class 11). ....................................48
  - 12. Other Outstanding Common Stock Interests (Class 12)............................49

F.  IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS THAT ARE IMPAIRED; ACCEPTANCE OR REJECTION OF THE PLAN ............................................................................................49
    1.  Holders of Claims and Interests Entitled to Vote. ....................................49
    2.  Acceptance by an Impaired Class. ..............................................................50
    3.  Nonconsensual Confirmation. .....................................................................50

G.  MEANS OF IMPLEMENTATION .............................................................................50
    1.  Reincorporation of Pliant in Delaware. ......................................................50
    2.  New Pliant Securities and Corporate Governance. .....................................50
    3.  Issuance of Tack-On Notes. ........................................................................52
    4.  Issuance of New Senior Subordinated Notes. .............................................53
    5.  Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors. ...............................................................................53
    6.  Corporate Governance, Directors, Officers and Corporate Action. ............53
    7.  Cancellation of Notes, Instruments, Debentures, Preferred Stock, Outstanding Common Stock and Other Outstanding Common Stock Interests. ....................................................................................55
    8.  Issuance of New Securities and Related Matters. .......................................55
    9.  Exit Financing. ...........................................................................................56
    10.  Restricted Stock Incentive Plan and Deferred Cash Incentive Plan. .........57
    11.  Sources of Cash for Plan Distributions. ......................................................57
    12.  Cram-Down. ...............................................................................................57
    13.  Additional Transactions Authorized Under the Plan. .................................57
    14.  Emergence Bonus Payments. ......................................................................57
    15.  Exercise of Warrants and Stock Options. ....................................................58

H.  PROVISIONS GOVERNING DISTRIBUTIONS .........................................................58
    1.  General Matters. ..........................................................................................58
    2.  Record Date for Distributions. ....................................................................59
    3.  Allocation of Plan Distributions Between Principal and Interest. ..............59
    4.  Setoffs. .......................................................................................................59
    5.  Fractional Shares. .......................................................................................60
    6.  Denomination of Tack-On Notes or New Senior Subordinated Notes. ......................................................................................................60

I.  TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND PENSION PLANS .........................................................................60

J.  PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND DISPUTED INTERESTS .........................................................................................62

K.  CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................62
    1.  Conditions to Effective Date. ......................................................................62
    2.  Waiver of Conditions. .................................................................................63
    3.  Consequences of Non-Occurrence of Effective Date. .................................63

L.  EFFECT OF PLAN CONFIRMATION .......................................................................63
    1.  Binding Effect. ...........................................................................................64
    2.  Releases. .....................................................................................................64
    3.  Discharge of Claims and Termination of Interests. ....................................65
    4.  Preservation of Rights of Action and Settlement of Litigation Claims. ...................................................................................................65

|  | 5. | Exculpation and Limitation of Liability. ...................................................66 |
|  | 6. | Injunction. .......................................................................................66 |
|  | 7. | Term of Bankruptcy Injunction or Stays. .................................................66 |
|  | 8. | Subordination. ..................................................................................66 |
| M. | | MISCELLANEOUS PLAN PROVISIONS ...................................................67 |
|  | 1. | Retention of Jurisdiction. .....................................................................67 |
|  | 2. | Committees. ......................................................................................67 |
|  | 3. | Post-Confirmation Date Retention of Professionals. ..................................67 |
|  | 4. | Bar Date for Certain Administrative Expense Claims. ................................67 |
|  | 5. | Certain Fees and Expenses of Old Indenture Trustee, First Lien Indenture Trustee, Second Lien Indenture Trustee and New Senior Subordinated Notes Indenture Trustee......................................................68 |
|  | 6. | Compensation and Benefits Programs. ....................................................68 |
|  | 7. | Exemption from Transfer Taxes. ............................................................68 |
|  | 8. | Amendment or Modification of the Plan. .................................................68 |
|  | 9. | Severability of Plan Provisions. .............................................................69 |
|  | 10. | Revocation, Withdrawal or Non-Consummation of the Plan. ...................69 |
|  | 11. | Disputes Concerning Canadian Claims against and Interests in Canadian Debtors.............................................................................69 |
|  | 12. | Obligations under Final DIP Order.........................................................69 |
| N. | | DESCRIPTION OF INDENTURE PROVISIONS IMPACTING CLASSIFICATION OF FIRST AND SECOND LIEN NOTE CLAIMS AS UNIMPAIRED ..............................................................................70 |
|  | 1. | Reincorporation of Pliant as a Delaware Corporation. ...............................70 |
|  | 2. | Change of Control.............................................................................71 |
|  | 3. | Incurrence of Additional Indebtedness. ..................................................72 |
|  | 4. | Payment of Cash Repurchase Price to Certain Holders of Series B Preferred Stock and Other Distributions Under the Plan...........................73 |
|  | 5. | Call Option and Payment of Cash Interest With Respect to the New Senior Subordinated Notes. ............................................................74 |
|  | 6. | Issuance of Tack-On Notes and Payment of Bondholder Additional Consideration and Consenting Noteholders' Professional Fees. ...............75 |
|  | 7. | Asset Sales and Liens.........................................................................75 |
| VI. VOTING PROCEDURES AND REQUIREMENTS .............................................76 |
| A. | | VOTING DEADLINE ............................................................................76 |
| B. | | HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE.................77 |
| C. | | VOTE REQUIRED FOR ACCEPTANCE BY A CLASS....................................78 |
|  | 1. | Class of Claims. .................................................................................78 |
|  | 2. | Class of Interests. ..............................................................................78 |
| D. | | VOTING PROCEDURES .......................................................................78 |
|  | 1. | Ballots. .............................................................................................78 |
|  | 2. | Withdrawal or Change of Votes on the Plan. ...........................................79 |
| VII. CONFIRMATION OF THE PLAN .................................................................79 |
| A. | | CONFIRMATION HEARING ...................................................................79 |
| B. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..........................................................................................80 |
|  | 1. | Acceptance. .......................................................................................80 |

| | 2. | Fair and Equitable Test. | 81 |
| | 3. | Feasibility. | 81 |
| | 4. | Best Interests Test. | 84 |
| | 5. | Liquidation Analysis. | 85 |
| VIII. | | PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE | 86 |
| A. | | PROJECTED FINANCIAL INFORMATION | 86 |
| B. | | REORGANIZATION VALUE | 87 |
| IX. | | DESCRIPTION OF CAPITAL STOCK AND DEFERRED CASH INCENTIVE PLAN OF NEW PLIANT | 90 |
| A. | | INTRODUCTION | 90 |
| B. | | SERIES AA PREFERRED STOCK | 90 |
| C. | | DEFERRED CASH INCENTIVE PLAN AND SERIES M PREFERRED STOCK | 92 |
| D. | | NEW COMMON STOCK | 94 |
| E. | | NEW PLIANT STOCKHOLDERS AGREEMENT | 95 |
| F. | | SERIES AA REGISTRATION RIGHTS AGREEMENT | 96 |
| X. | | RISK FACTORS | 96 |
| A. | | GENERAL BANKRUPTCY LAW CONSIDERATIONS | 97 |
| | 1. | Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms. | 97 |
| | 2. | Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms. | 97 |
| B. | | OTHER RISK FACTORS | 98 |
| | 1. | Variances from Projections May Affect Ability to Pay Obligations. | 98 |
| | 2. | Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations. | 99 |
| | 3. | Uncertainty Regarding Exit Facility Credit Agreement May Adversely Affect Success of Reorganization. | 99 |
| | 4. | Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect. | 99 |
| | 5. | Historical Financial Information May Not Be Comparable. | 100 |
| | 6. | Market and Business Risks May Adversely Affect Business Performance. | 100 |
| | 7. | Failure to Maintain Customer Relationships May Adversely Affect Financial Results. | 101 |
| | 8. | Foreign Currency Risk May Adversely Affect Financial Results. | 101 |
| | 9. | Failure to Attract and Maintain Employees May Adversely Affect Financial Results. | 101 |
| | 10. | Cost of Compliance with Government Regulation May Adversely Affect Financial Results. | 102 |
| | 11. | Volatile Resin Prices May Affect Ability to Recover Raw Material Costs. | 102 |
| | 12. | Intellectual Property May Not Be Adequately Protected. | 102 |
| | 13. | Other Manufactures May Have a Competitive Advantage. | 102 |
| C. | | RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES | 103 |
| | 1. | Lack of Established Market for the Securities May Adversely Affect Liquidity. | 103 |

2.    Value of New Common Stock May be Significantly Diluted. ...............103
3.    Lack of Dividends on Securities May Adversely Affect Liquidity. ........104
4.    Holders of Options Who Elect to Exercise May Not Realize a
      Positive Return on Their Investment. .....................................................104
5.    Interest of J.P. Morgan Partners, LLC as Controlling Stockholder
      May Differ from Interests of Other Securities Holders. .........................104

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................105
   A.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS...............105
         1.    Cancellation of Indebtedness Income. ...........................................105
         2.    Net Operating Losses and Other Attributes. ...................................106
         3.    Annual Section 382 Limitation on Use of NOLs...............................107
         4.    Accrued Interest. .............................................................................108
         5.    Federal Alternative Minimum Tax. ..................................................108
         6.    Consequences of the Merger.............................................................108
   B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF
         CLAIMS AND INTERESTS...................................................................109
         1.    General............................................................................................109
         2.    Holders of Class 3 Claims................................................................110
         3.    Holders of Class 7 Claims................................................................110
         4.    Holders of Class 9 and Class 11 Interests........................................112
         5.    Holders of Class 10 Interests. .........................................................113
         6.    Holders of Class 12 Interests. .........................................................114
         7.    Series AA Preferred Stock. ..............................................................114
         8.    Market Discount...............................................................................114
         9.    Non-United States Persons. .............................................................115
         10.   Information Reporting and Backup Withholding. .............................115
   C.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX
         ASSISTANCE ........................................................................................115
   D.    RESERVATION OF RIGHTS ...................................................................115

XII. CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN116
   A.    CANADIAN FEDERAL INCOME TAX CONSEQUENCES TO
         HOLDERS OF CLAIMS AND INTERESTS ..............................................116
         1.    Holders of Class 6 Claims................................................................116
         2.    Holders of Class 9, 10 and 11 Claims...............................................116
   B.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX
         ASSISTANCE ........................................................................................117
   C.    RESERVATION OF RIGHTS ...................................................................117

XIII. CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW
CONSIDERATIONS................................................................................................117
   A.    FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS...............117
         1.    Exemption from Registration Requirements for New Securities. ...........117
         2.    Subsequent Transfers of New Securities. ..........................................117
         3.    Reinstatement of Existing Securities. ................................................118
         4.    Periodic Reports. .............................................................................119
   B.    CANADIAN SECURITIES LAW CONSIDERATIONS.................................119
         1.    Exemption from Registration and Prospectus Requirements. .................119
         2.    Subsequent Transfers of Securities...................................................119

XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..120
    A.    CONTINUATION OF THE CHAPTER 11 CASES ...........................................120
    B.    LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11................................120
XV. CONCLUSION AND RECOMMENDATION....................................................................121

## INDEX OF EXHIBITS

Exhibit A    -    Debtors' Joint Plan of Reorganization

Exhibit B    -    Liquidation Analysis

Exhibit C    -    Selected Historical Financial Statements

Exhibit D    -    Projections

Exhibit E    -    Form of Support Agreement

Exhibit F    -    List of Retained Litigation

Exhibit G    -    Corporate Structure Chart

Exhibit H    -    Compensation and Benefits Programs

Exhibit I    -    Form of Exit Financing Term Sheet

# I. INTRODUCTION

On January 3, 2006 (the "Petition Date"),[2] Pliant Corporation and certain of its subsidiaries, Uniplast Holdings, Inc., Pliant Corporation International, Pliant Solutions Corporation, Pliant Film Products of Mexico, Inc., Pliant Packaging of Canada, LLC, Pliant Investment, Inc., Alliant Company LLC, Uniplast U.S., Inc., Uniplast Industries Co., and Pliant Corporation of Canada Ltd. (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "Chapter 11 Cases"). In all, the Debtors comprise eleven entities (three of which are also Canadian Debtors (as defined herein)). Also on the Petition Date, the Canadian Debtors commenced ancillary proceedings recognizing their chapter 11 proceedings as "foreign proceedings" pursuant to section 18.6 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in Toronto, Canada.

The Debtors submit this Disclosure Statement in connection with the solicitation of acceptances and rejections with respect to the Debtors' Second Amended Joint Plan of Reorganization (the "Plan"), a copy of which is attached as Exhibit A to this Disclosure Statement.

The purpose of this Disclosure Statement is to set forth information (1) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (2) concerning the Plan and alternatives to the Plan, (3) advising the holders of Claims and Interests of their rights under the Plan, (4) assisting the holders of Claims and Interests in making an informed judgment regarding whether they should vote to accept or reject the Plan and (5) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated [_____], 2006, the Bankruptcy Court approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against, or Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims and Interests should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan and all exhibits and appendices hereto and thereto.

The Debtors may supplement or amend this Disclosure Statement or any Exhibits attached thereto at any time prior to the hearing to approve the Disclosure Statement.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES

---

[2] Unless otherwise defined elsewhere in this Disclosure Statement, capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Bankruptcy Code.

OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS AND HOLDERS OF INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING

STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE X, "RISK FACTORS" AND IN PLIANT'S ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2005. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS, NOR ANY OF THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. WHILE THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

## A.    PARTIES ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by the Plan, but will receive no distribution under the Plan, are also not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Plan."

The following sets forth which classes are entitled to vote on the Plan and which are not:

- The Debtors are seeking votes from the holders of Claims and Interests in Class 3 (Revolving Credit Facility Claims), Class 7 (Old Note Claims), Class 8 (Intercompany Claims), Class 9 (Series A Preferred Stock Interests), Class 10 (Series B Preferred Stock Interests) and Class 11 (Outstanding Common Stock Interests).

- The Debtors are not seeking votes from holders of Claims and Interests in Class 12 (Other Outstanding Common Stock Interests) because those Claims and Interests are impaired under the Plan and the holders are receiving no distribution on account of such Claims and Interests. These holders will be deemed to have voted to reject the Plan.

- The Debtors are not seeking votes from holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 4 (First Lien Note Claims), Class 5 (Second Lien Note Claims) and Class 6 (General Unsecured Claims) because those Claims are unimpaired under the Plan, and the holders of Claims in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article V, Sections B and C.

## B.    SOLICITATION PACKAGE

Accompanying this Disclosure Statement (which is provided on CD-ROM) is a package of hard copy materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Solicitation Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets out the procedures for distributing Solicitation Packages to the holders of Claims against and Interests in the Debtors, establishes the procedures for tabulating ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan;

- the notice of Confirmation Hearing and entry of the Disclosure Statement Order; and

- one or more ballots and a postage-paid return envelope (ballots are provided only to holders of Claims and Interests that are entitled to vote on the Plan), which will be used by creditors and interest holders who are entitled to vote on the Plan.

## C.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. In order for your vote to be counted, you must complete and sign your original ballot and return it in the envelope provided (copies will not be accepted). Each ballot has been coded to reflect the Class of Claims or Interests it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

**In order for your vote to be counted, your ballot must be properly completed in accordance with the voting instructions on the ballot and received no later than the Voting Deadline (as defined in the Solicitation Order) by the Voting Agent (as defined below). Do not return any debt instruments or equity securities with your ballot.**

**Any executed ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a holder of a Claim or Interest who is entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, please call the Voting Agent, Bankruptcy Services, LLC at (646) 282-2500.

If you have any questions about the procedure for voting your Claim or Interest, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain, at your own expense an additional copy of this Disclosure Statement and its appendices and exhibits, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Plan, each holder of Claims and Interests in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the ballots. These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.

## D.    CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION

The Bankruptcy Court has scheduled the Confirmation Hearing on [_____], 2006 at [___ __] (prevailing Eastern time) before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Fifth Floor, Courtroom No. 4, Wilmington, Delaware 19801. The Confirmation Hearing may

be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.  Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [_____], 2006 at [_____], prevailing Eastern Time,** by the following parties:

Counsel to the Debtors:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile:  (312) 853-7036
Attn: Larry J. Nyhan

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Facsimile:  (302) 571-1253
Attn: Robert S. Brady

The United States Trustee:
U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, DE 19801
Facsimile: (302) 573-6497
Attn: Mark S. Kenney

Counsel to the Official Committee of Unsecured Creditors:

Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
Facsimile: (973) 597-2375
Attn:  Kenneth A. Rosen

Ashby & Geddes, P.A.
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Fax:  (302) 654-2067
Attn: Don A. Beskrone

## II.  OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.  For a more detailed description of the terms and provisions of the Plan, see Article V, "The Plan of Reorganization."  The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

## A.    GENERAL OVERVIEW

The Plan is based primarily upon a prepetition compromise and agreement with the holders of more than 66 2/3% of Pliant's 13% Senior Subordinated Notes, the holders of a majority of the outstanding shares of Pliant's mandatorily redeemable preferred stock and the holders of a majority of the outstanding shares of Pliant's common stock.  At its core, the Plan provides that (i)

$320 million in aggregate principal amount of Pliant's 13% Senior Subordinated Notes will be exchanged for a combination of 30% of new common stock, $260 million of new Series AA Preferred Stock, certain additional consideration, and up to $35 million of new debt,[3] (ii) $289 million (as of December 31, 2005) of Pliant's mandatorily redeemable preferred stock will be exchanged for a combination of up to $75.5 million of new Series AA Preferred Stock and up to 28% of new common stock, (iii) holders of outstanding common stock will receive at least 42% of new common stock, and (iv) the Debtors' first lien and second lien noteholders' claims and the claims of trade and other general unsecured creditors will remain unimpaired. As part of the Plan, Pliant will be reincorporated in Delaware, and the new common stock, Series AA Preferred Stock and new debt will be issued by Pliant Corporation, a Delaware corporation ("New Pliant").

## B.   SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AGAINST AND INTERESTS IN EACH OF THE DEBTORS UNDER THE PLAN

The following chart summarizes the projected distributions to holders of Allowed Claims against and Interests in each of the Debtors under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary form the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| Class | Claim/Interest | Treatment | Estimated Allowed Amount (in millions) | Estimated Recovery (%) |
|-------|----------------|-----------|----------------------------------------|------------------------|
| N/A | Administrative Expense Claims | Unimpaired | $114.6 | 100% |
| N/A | DIP Facility Claims | Unimpaired | N/A[4] | 100% |
| N/A | Priority Tax Claims | Unimpaired | $0.3 | 100% |
| 1 | Priority Non-Tax Claims | Unimpaired | $0[5] | 100% |

---

[3] The new debt will consist of either $20 million of additional First Lien Notes issued in consideration of the accrued and unpaid interest on the 13% Senior Subordinated Notes or $35 million of new senior subordinated notes issued in exchange for the 13% Senior Subordinated Notes.

[4] As of the date of the filing of this Disclosure Statement, the Debtors have not borrowed any funds under the DIP Facility Agreement and have paid all fees due to the DIP Facility Lenders on a current basis. To the extent the Debtors borrow funds under the DIP Facility Agreement in the future, any resulting DIP Facility Claims shall be paid in full as set forth in the Plan.

[5] As of the date of the filing of this Disclosure Statement, the Debtors estimate that they will not owe any amounts on account of Priority Non-Tax Claims when they emerge from chapter 11.

| 2 | Other Secured Claims | Unimpaired | $7.4 | 100% |
|---|---|---|---|---|
| 3 | Revolving Credit Facility Claims | Impaired[6] | $137.6 | 100% |
| 4 | First Lien Note Claims | Unimpaired | $294.5 | 100% |
| 5 | Second Lien Note Claims | Unimpaired | $273.7 | 100% |
| 6 | General Unsecured Claims | Unimpaired | $24.5 | 100% |
| 7 | Old Note Claims | Impaired | $344.8 | 55.2-56.5% See Note A |
| 8 | Intercompany Claims | Impaired | N/A | See Note B |
| 9 | Series A Preferred Stock Interests | Impaired | N/A | See Note C |
| 10 | Series B Preferred Stock Interests | Impaired | N/A | See Note D |
| 11 | Outstanding Common Stock Interests | Impaired | N/A | See Note E |
| 12 | Other Outstanding Common Stock Interests | Impaired | N/A | 0% |

Note A: Each Holder of an Allowed Old Note Claim shall receive:

(a)      its Pro Rata share of Tack-On Notes as consideration for the accrued and unpaid interest payment due on December 1, 2005; provided, however, that in the event that the grant of Tack-On Notes as provided in Section 3.2(g) of the Plan results in First Lien Impairment or Second Lien Impairment, such Holder shall not receive Tack-On Notes but shall instead receive its Pro Rata share of New Senior Subordinated Notes which, together with the consideration identified in (b) and (c) below, shall be issued in exchange for the Old Notes;

(b)      its Pro Rata share of Bondholder Series AA Preferred Stock;

(c)      its Pro Rata share of Bondholder Common Stock; and

(d)      if Class 7 accepts the Plan, Bondholder Additional Consideration; provided, however, that in the event that the grant of Bondholder Additional Consideration pursuant to Section 3.2 (g) of the Plan results in First Lien Impairment or Second Lien Impairment, such Holder shall not be entitled to any Bondholder Additional Consideration.

In addition, Class 7 shall receive Cash in an amount equal to the Consenting Noteholders' Professional Fees, which cash shall be paid directly by Pliant to the relevant professionals incurring such fees; provided, however, that in the event the payment of the Consenting Noteholders' Professional Fees is challenged and the Bankruptcy Court finds First Lien Impairment or Second Lien Impairment then the Consenting Noteholders' Professional Fees shall not be paid.

---

[6] The Debtors reserve the right to seek a determination at the hearing on Confirmation that the Revolving Credit Facility Claims are Unimpaired and deemed to have accepted the Plan.

Note B: On the Effective Date, at the option of the Debtors, all Intercompany Claims in Class 8 shall either be (i) Reinstated, in full or in part, or (ii) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan, provided, however, that prior to such discharge and extinguishment such Intercompany Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Debtors. Any and all Class 8 Claims, or portions thereof, being extinguished and, to the extent, if any, such Claims are being contributed to capital or treated in another manner as permitted in the Plan, are set forth in Exhibit M to the Plan.

Note C: Each Holder of an Allowed Series A Preferred Stock Interest shall receive its Pro Rata share of: (i) the Series A/Series AA Preferred Stock and (ii) the Series A Common Stock.

Note D: Each former director or officer of the Debtors who is a Holder of an Allowed Series B Preferred Stock Interest shall receive an amount equal to $5,258 per share in Cash on account of each vested share, or portion thereof, of Series B Preferred Stock held by such Holder. Holders of Series B Preferred Stock who are current directors or officers of the Debtors as of the Effective Date shall agree to forego any distribution as provided for in Section 3.3(b) of the Plan in consideration for their eligibility to participate in one or more of the Reorganized Debtors' incentive programs. All unvested Series B Preferred Stock Interests shall be cancelled, annulled and extinguished, and the Holders thereof shall not be entitled to any distribution on account of such unvested shares.

Note E: Each Holder of an Allowed Outstanding Common Stock Interest shall receive its Pro Rata share of New Equity Common Stock. In addition, each Holder of an Allowed Outstanding Common Stock Interest resulting from the subordination under section 510(b) of the Bankruptcy Code of a Claim shall be only entitled to receive a distribution of New Equity Common Stock in respect of the capital stock held by such Holder that is related to such Claim.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims have not been classified and are excluded from the foregoing Classes (as set forth in Article II of the Plan).

## III. GENERAL INFORMATION

## A. OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity security holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to holders of Allowed Claims and Interests against each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

## B.    THE DEBTORS' BUSINESSES AND PROPERTIES

Pliant (f/k/a Huntsman Packaging Corporation), the ultimate corporate parent of the other Debtors and other non-debtor affiliates, was founded in 1992. Pliant and its Debtor and non-debtor affiliates (collectively, the "Company") are among North America's leading manufacturers of value-added films and flexible packaging for food, personal care, medical, agricultural and industrial applications. As of the Petition Date, the Company operated 23 principal manufacturing and research and development facilities in the United States, Canada, Australia, Mexico and Germany and employed approximately 3,000 employees worldwide.

The Company supplies numerous industries in North America with more than 20 percent of their film and packaging needs. Among the products manufactured by the Company are personal care films, medical films, agricultural films, stretch films, PVC films, barrier films and custom films. Among other things, these films are used in bread and bakery bags, cookie, cracker and cereal box liners, stand-up pouches for non-carbonated beverages, disposable diapers, feminine care products, adult incontinence products, disposable surgical drapes and gowns, and protective packaging for medical supplies.

As of December 31, 2005, the Company reported total assets having a book value of $820.905 million. In addition, the Company had net sales from continuous operations of approximately $1,072.8 million for the year ending December 31, 2005. A chart depicting the Company's corporate structure is annexed hereto as Exhibit G.

1.    Customers.

The Company's films are components of flexible packaging for some of the largest food companies in the world, including household names such as Campbell's, George Weston Bakeries (Thomas'®, Brownberry®, and Boboli®), Kraft/Nabisco Foods, Mission Foods, and Starbucks® Coffee. The Company also sells films directly to grocery retailers such as Kroger,

Publix, and Safeway, as well as mass merchants such as Wal-Mart and Costco Wholesale. The Company's customers also include many of North America's largest flexible packaging converters, such as Alcan Packaging (which recently acquired customers Lawson Mardon and Pechiney), Printpack and Sonoco, and the largest national distributors of industrial films – Bunzl, Unisource and Xpedx. In addition, the Company manufactures and supplies film to some of the largest non-food film consumers in North America, including 3M, Baxter, Becton-Dickinson, Johnson & Johnson, Kimberly-Clark, Procter and Gamble, and Tyco Healthcare. No single customer accounted for more than 10% of the Company's net sales for the year ended December 31, 2004 or the year ended December 31, 2005.

     2.    <u>Manufacturing and Raw Materials.</u>

     The Company manufactures its film products using both blown and cast extrusion processes. In each process, thermoplastic resin pellets are combined with other resins, plasticizers or modifiers in a controlled, high temperature, pressurized process to create films with specific performance characteristics. These two basic film manufacturing processes produce films with uniquely different performance characteristics. Blown films offer enhanced physical properties, such as increased tear and puncture resistance and better barrier protection. Cast films are generally clearer, softer and more uniform in thickness. The Company also produces a significant amount of printed film rollstocks and bags. The Company employs both flexographic and rotogravure printing equipment in its printing operations.

     The products that the Company produces require a variety of raw materials, including polyethylene, PVC, polypropylene and other resins and additives (collectively, "<u>Resins</u>"). The Company purchases most of its Resin from major oil companies and petrochemical companies in North America. For the year ending December 31, 2004 and the year ending December 31, 2005, Resin costs comprised approximately 61% and 65%, respectively, of the Company's manufacturing costs.

     3.    <u>Sales and Marketing.</u>

     Due to the Company's broad range of product offerings and customers, its sales and marketing efforts are generally product or customer specific. Most of the Company's salespeople are dedicated to a specific product line and sometimes to specific customers. While the majority of the Company's Specialty Films, Printed Products, Engineered Films, Industrial Films and Performance Films are sold by its own direct sales force, certain types of films in these segments are sold through independent third-party brokers.

     4.    <u>Intellectual Property.</u>

     Patents, trademarks and licenses are significant to the businesses of the Debtors. The Debtors have patents on many of their products and processes that are routinely renewed by the Debtors prior to their expiration. The Debtors also rely on unpatented proprietary know-how, continuing technological innovation and other trade secrets. In addition, the Debtors license certain intellectual property from third parties.

5.      Properties.

The Company's executive offices are located at 1475 Woodfield Road, Suite 700, Schaumburg, Illinois 60173. This executive office space is leased by the Company. The Company also leases warehouse and office space at various other locations.

In addition, as set forth below, the Company operates 23 principal manufacturing and research and development facilities in the United States, Canada, Australia, Mexico and Germany. With the exception of six of these facilities, all are owned by the Company. As of the date of the filing of this Disclosure Statement, the Company has not adopted any plans to close any of these facilities.

| Location | Products |
|---|---|
| | |
| Chippewa Falls, Wisconsin | Converter and personal care films |
| Danville, Kentucky (two plants) | Converter, polyethylene stretch and custom films |
| Deerfield, Massachusetts | Converter films |
| Orillia, Canada (two plants)* | Converter films |
| Dalton, Georgia | Converter, barrier and custom films |
| Bloomington, Indiana* | Barrier and custom films |
| Odon, Indiana | Barrier and custom films |
| Barrie, Canada* | PVC and polyethylene films |
| Calhoun Georgia | PVC films |
| Lewisburg, Tennessee | Polyethylene stretch films |
| Phillipsburg, Germany | PVC films |
| Preston, Australia* | PVC films |
| Toronto, Canada | PVC and polyethylene stretch films |
| Harrington, Delaware | Personal care, medical and converter films |
| McAlester, Oklahoma | Personal care, medical and converter films, and printed rollstock |
| Washington, Georgia | Personal care, medical and agricultural films |
| Kent, Washington | Printed bags and rollstock |
| Langley, British Columbia* | Printed bags and rollstock |
| Macedon, New York | Printed bags and rollstock |
| Mexico City, Mexico* | Barrier, personal care and custom films, printed bags and rollstock |
| Newport News, Virginia | Research facility and pilot plant |

* Indicates a leased building. In the case of Orillia, Canada, only one of the two plants is leased.

## C.    OPERATIONAL STRUCTURE OF THE DEBTORS

Pliant currently has fifteen (15) domestic and foreign subsidiaries. The integrated operations of Pliant and its domestic and foreign subsidiaries are divided into four operating segments corresponding generally to major product groups: (a) the Specialty Products Group, (b) the Industrial Films Segment, (c) the Engineered Films Segment, and (d) the Performance Films Segment.

1.      Specialty Products Group.

The Specialty Products Group consists of (i) the Specialty Film division and (ii) the Printed Products Films division. The Company's Specialty Films division produces personal care films, medical films, and agricultural films. The Company is one of North America's leading producers of personal care films used in disposable diapers, feminine care products and adult incontinence products.

In addition, the Company is a specialized niche manufacturer of medical films. The Company's medical films are used in disposable surgical drapes and gowns. The Company also produces protective packaging for medical supplies, such as disposable syringes, intravenous fluid bags and disposable medical devices.

Moreover, the Company is one of North America's largest producers of polyethylene mulch films that are sold to fruit and vegetable growers and to nursery operators. The Company's mulch films are used extensively throughout North America and Latin America. Commercial growers of crops such as peppers, tomatoes, cucumbers and strawberries are the primary consumers of the Company's mulch films. These crops are typically planted on raised beds that are tightly covered with mulch film. The mulch film eliminates or retards weed growth, significantly reduces the amount of water required to sustain the plants, controls soil bed temperatures for ideal growing conditions and allows easy application of fertilizer.

The Company's Printed Products Films division provides printed rollstock, bags and sheets used to package food and consumer goods. Printed bags and rollstocks are sold to bakeries, fresh and frozen food processors, manufacturers of personal care products, textile manufacturers and other dry goods processors. Bread and bakery bags represent a significant portion of the Company's Printed Products Films business. The Company's Printed Products Films division produces approximately four billion bread and bakery bags each year.

2.      Industrial Films Segment.

The Company's Industrial Films Segment manufactures polyethylene stretch films and PVC films. Stretch films are used to bundle, unitize and protect palletized loads during shipping and storage. Stretch films continue to replace more traditional packaging, such as corrugated boxes and metal strapping, because of stretch film's lower cost, higher strength and ease of use.

The Company's PVC films are used by supermarkets, delicatessens and restaurants to wrap meat, cheese and produce. Use of PVC films in these applications is preferred because of the films' clarity, elasticity and cling. The Company also produces PVC films for laundry and dry cleaning bags. Finally, the Company produces PVC films for companies that repackage the films into smaller cutterbox rolls for sale in retail markets in North America, Latin America and Asia.

3.      Engineered Films Segment.

The Company's Engineered Films Segment manufactures films that are sold to converters of flexible packaging who laminate them to foil, paper or other films, print them, and ultimately fabricate them into the final flexible packaging product. The Company's engineered films are a key component in a wide variety of flexible packaging products, such as fresh-cut produce

packages, toothpaste tubes and stand-up pouches. Generally, the Company's engineered films add value by providing the final packaging product with specific performance characteristics, such as moisture, oxygen or odor barriers, ultraviolet protection or desired sealant properties. Because engineered films are sold for their barrier, sealant or other properties, they must meet stringent performance specifications established by the converter, including gauge control, clarity, sealability and width accuracy. The Company is one of North America's leading manufacturers of films sold to converters and is an innovator in introducing new engineered film products into the market to meet flexible packaging industry trends and specific customer needs.

4.    Performance Films.

The Company's Performance Films Segment manufactures a variety of barrier and custom films, primarily for smaller, but profitable, niche segments in flexible packaging and industrial markets. For example, the Company is a leading manufacturer of barrier films for cookie, cracker and cereal box liners and of barrier films for liners in multi-wall pet food bags, and photoresist coatings for the electronics industry.

## D.    **MANAGEMENT OF THE DEBTORS**

1.    Board of Directors.

The Board of Directors of Pliant currently consists of seven members, five of whom were designated by Pliant's institutional common stockholders and warrant holders, one of whom was designated by The Christena Karen H. Durham Trust (the "Durham Trust") and one of whom is Pliant's Chief Executive Officer. Two of these seven members are independent directors. In addition to these seven members, the trust has the right to designate a second director and Pliant's board has the right to appoint a member of senior management to the board. These two seats on Pliant's board of directors are currently vacant

Set forth below are the directors of Pliant, as of the date of the filing of this Disclosure Statement.

| **Name** | **Position** |
| --- | --- |
| Harold C. Bevis | Director, President and Chief Executive Officer |
| John D. Bowlin | Director |
| Edward A. Lapekas | Director, Non-Executive Chairman |
| Albert (Pat) MacMillan | Director |
| Stephen McKenna | Director |
| Jeffrey C. Walker | Director |
| Timothy J. Walsh | Director |

2.    Biographies of Directors.

Harold C. Bevis was named President and Chief Executive Officer of Pliant in October 2003. Mr. Bevis also serves on Pliant's Board of Directors. He has over 20 years of global experience with multiple types of technology-driven manufactured products sold across a full range of sales channels. Mr. Bevis joined Pliant from Emerson Electric, where he served as President of Emerson Telecommunications Products, a group of manufacturing companies, beginning in 1998.

Mr. Bevis led the sale of this group to Emerson while he was President and CEO of Jordan Telecommunication Products, Inc., a manufacturer of nonproprietary communications products. Prior to that, Mr. Bevis served as Senior Vice President and General Manager of General Cable Corporation, a large, vertically integrated domestic manufacturer of wire and cable products sold through wholesale and retail channels to companies such as The Home Depot, True Value Hardware, Rexel and Graybar. Mr. Bevis has also held positions of increasing responsibility with General Electric, Booz, Allen & Hamilton, and General Dynamics, where he began his career as an engineer. Mr. Bevis holds a B.S. in Industrial Engineering from Iowa State University and an M.B.A. in Marketing from Columbia University in New York.

John D. Bowlin became one of Pliant's directors on January 31, 2005. Mr. Bowlin was President and Chief Executive Officer of Miller Brewing Company from 1999 until 2003, leading its sale to South African Breweries in 2002. From 1985 until 2002, Mr. Bowlin was employed by Philip Morris Companies, Inc., in various leadership capacities, including President, International, Kraft, Inc. (1996–1999), President and Chief Operating Officer, Kraft Foods, Inc. (1994–1996), President and Chief Operating Officer, Miller Brewing Company (1993–1994), and President, Oscar Mayer Food Corporation (1991–1993). Mr. Bowlin holds an M.B.A. from Columbia University and a B.S. from Georgetown University. He is also a director of the Rayovac Corporation. Mr. Bowlin is one of Pliant's two independent directors. Mr. Bowlin was originally designated to serve on the board by Pliant's institutional common stockholders and warrant holders.

Edward A. Lapekas became one of Pliant's directors on December 19, 2001 and became Pliant's Non-Executive Chairman on October 22, 2003. Mr. Lapekas served as Pliant's interim Chief Executive Officer from August 24, 2003 until October 22, 2003. From November 2002 until March 2003, Mr. Lapekas served as Chairman and Chief Executive Officer of NexPak Corporation, a media packaging company. Prior to that, Mr. Lapekas was Executive Chairman of Packtion Corporation, an e-commerce venture, from October 2000 until June 2001. From May 1996 until July 2000, Mr. Lapekas was employed by American National Can Group, Inc., last serving as Chairman and Chief Executive Officer. Prior to that position, Mr. Lapekas served as Deputy Chairman and Chief Operating Officer of Schmalbach-Lubeca AG. From 1971 until 1991, Mr. Lapekas was employed by Continental Can Company, where he served in various strategy, planning, operating and marketing capacities. Mr. Lapekas is also a director of Silgan Corp. He received a B.A. from Albion College and an M.B.A. from Wayne State University. Mr. Lapekas is one of Pliant's two independent directors and was originally designated to the board by the Durham Trust.

Albert (Pat) MacMillan became one of Pliant's directors on December 19, 2001. Mr. MacMillan is the founder and CEO of Team Resources, a consulting firm with offices in the United States, Venezuela, Peru, Chile and Mexico. Founded in 1980, Team Resources provides client services in the areas of strategy, building team-based organizations and designing leadership development strategies. He also serves on the boards of directors of Unum/Provident and Metokote Corporation, as well as several foundations and non-profit organizations. He received a B.A. in Business and an M.B.A. from the University of Washington. Mr. MacMillan is one of the persons designated to serve on the board by Pliant's institutional common stockholders and warrant holders.

Stephen McKenna became one of Pliant's directors on June 23, 2005. Mr. McKenna has been a Principal of J.P. Morgan Partners, LLC (formerly, Chase Capital Partners) since 2000 and prior to that was an associate of that entity. J.P. Morgan Partners, LLC is a global partnership and

has been the Company's principal stockholder since 2000. Mr. McKenna has extensive experience managing J.P. Morgan Partners, LLC's portfolio companies and is also on the Board of Directors of National Waterworks, Inc. Mr. McKenna holds a B.A. from Dartmouth College and an M.B.A. from the GSB at the University of Chicago. Mr. McKenna is one of the persons designated to serve on the board by Pliant's institutional common stockholders and warrant holders.

Jeffrey C. Walker became one of Pliant's directors on July 1, 2004. Mr. Walker is Managing Partner of J.P. Morgan Partners, LLC (formerly, Chase Capital Partners) and Vice Chairman of JPMorgan Chase. J.P. Morgan Partners, LLC is a global partnership and has been the Company's principal stockholder since 2000. Before co-founding JPMorgan Partners in 1984, Mr. Walker worked in the Investment Banking and Finance Divisions of Chemical Bank and the Audit and Consulting Divisions of Arthur Young & Co. He is also a director of numerous private and public corporations (1-800-Flowers, Metroplex, Doane Pet Care, House of Blues, Metokote and Axis Insurance). Mr. Walker is a Certified Public Accountant and a Certified Management Accountant and holds a B.S. from the University of Virginia and an M.B.A. from the Harvard Business School. Mr. Walker is one of the persons designated to serve on the board by Pliant's institutional common stockholders and warrant holders.

Timothy J. Walsh became one of Pliant's directors on May 31, 2000. He served as Non-Executive Chairman from June 2002 until October 2003. Mr. Walsh is an executive officer of JPMP Capital Corp., which is the general partner of JPMP Master Fund Manager, L.P., which is the general partner of J.P. Morgan Partners (BHCA), L.P., Pliant's principal stockholder. Since 1999, Mr. Walsh has been a Partner of J.P. Morgan Partners, LLC (formerly, Chase Capital Partners). JP Morgan Partners' primary limited partner is J.P. Morgan Chase & Co. (NYSE: JPM), one of the largest financial institutions in the United States. From 1993 to 1999, Mr. Walsh held various positions with J.P. Morgan Partners in Europe and North America. Prior to 1993, he was a Vice President of J.P. Morgan Chase & Co. (formerly, The Chase Manhattan Corporation). Mr. Walsh is also a director of Better Minerals & Aggregates Company, Klockner Pentaplast S.A. and Metokote Corporation. Mr. Walsh received a B.S. from Trinity College and an M.B.A. from the University of Chicago. Mr. Walsh is one of the persons designated to serve on the board by Pliant's institutional common stockholders and warrant holders.

3.    Subcommittees of the Board of Directors.

Pliant's Board of Directors has an audit committee and a compensation committee. The audit committee maintains oversight responsibilities with respect to Pliant's accounting, auditing, financial reporting and internal control processes generally. The members of the audit committee are Timothy J. Walsh and Edward A. Lapekas. The compensation committee maintains oversight responsibilities with respect to the compensation of Pliant's officers and directors. The members of the compensation committee are John D. Bowlin and Timothy J. Walsh. In addition, in December 2005, the Board of Directors of Pliant formed a special subcommittee of the Board of Directors consisting solely of independent directors (the "Special Committee"). The members of the Special Committee are John D. Bowlin and Edward A. Lapekas. The Special Committee is responsible for considering issues relating to the appropriate division of new common stock between the holders of Series A Preferred Stock and the holders of Outstanding Common Stock and the treatment of holders of Series B Preferred Stock contemplated by the Plan. The Special Committee approved, on behalf of Pliant, the economic treatment of all current equityholders under the Plan.

The J.P. Morgan Partners (BHCA) L.P. (together with certain of its affiliates, "JP Morgan Entities") own a majority of the outstanding Common Stock, which is the only security that is entitled to vote in elections of Pliant directors. Under the terms of Pliant's Stockholders Agreement, the JP Morgan Entities, as the holders of more than 50% of the Common Stock held by the "Investor Holders" (as defined in Pliant's Stockholders' Agreement), have the right to designate five directors to the Pliant Board and the Durham Trust, as the holder of more than 50% of the Common Stock held by the "Trust Holders" (as defined in Pliant's Stockholders' Agreement), has the right to designate two directors. Pliant's Stockholders' Agreement further provides that Pliant's Board of Directors will also include Pliant's CEO and another member of senior management appointed by the other members of the board. Rick Durham, one of the directors originally designated by the Durham Trust, resigned in the fall of 2005, and the seat reserved for another member of senior management has not been filled.

As noted above, the Debtors believe that Mr. Bowlin and Mr. Lapekas are independent directors for purposes of applicable securities laws. The Official Committee of Unsecured Creditors questions the Debtors' conclusion because Mr. Bowlin was designated as a director by the JP Morgan Entities. The Debtors believe that, under applicable law, a director's independence or conflict of interest with respect to a majority stockholder turns on the directors' other relationships with the majority stockholder, not on whether the director was designated or elected by the majority stockholder. Directors who are affiliated with the JP Morgan Entities, such as Mr. Walsh, Mr. McKenna and Mr. Walker, are not considered to be independent, but directors such as Mr. Bowlin and Mr. Lapekas, who do not have any such affiliations, are.

4.      Compensation of Directors.

Each director who is not an employee of Pliant or a partner or senior advisor of J.P. Morgan Partners, LLC is entitled to receive director's fees. Currently there are three directors who receive director fees: Messrs. Bowlin, Lapekas and MacMillan. In 2005, Messrs. Bowlin and MacMillan received $22,500 in director's fees. Mr. Lapekas received a fee of $100,000 in 2005 for his service as Non-Executive Chairman of Pliant and a fee of $30,000 in 2005 for serving on the audit committee of Pliant.

5.      Executive Officers.

Set forth below are the senior executive officers of Pliant, as of the date of the filing of this Disclosure Statement, elected by Pliant's Board of Directors and each officer's position within Pliant.

| **Name** | **Position** |
|---|---|
| Harold C. Bevis | President and Chief Executive Officer |
| R. David Corey | Executive Vice President and Chief Operating Officer |
| Joseph J. Kwederis | Senior Vice President, Finance/Chief Financial Officer |
| Greg E. Gard | Senior Vice President, Technology & Innovation |
| Robert J. Maltarich | Senior Vice President and General Manager – Industrial Films |
| Kenneth J. Swanson | Senior Vice President and President, Specialty Products |
| Jim Kingsley | Senior Vice President and General Manager of Engineered Films |
| Drew McLean | Senior Vice President, Sales, Marketing and Customer Service |

James Kaboski                    Vice President, Strategy and Business Development
Thomas E. McShane                Vice President, Corporate Controller
Stephen T. Auburn                Vice President and General Counsel
Chris M. Nielsen                 Vice President and Treasurer

6.      Biographies of the Top Six Executive Officers.

        Harold C. Bevis was named President and Chief Executive Officer in October 2003.
Mr. Bevis also serves on Pliant's Board of Directors.  Mr. Bevis joined Pliant from Emerson
Electric, where he served as President of Emerson Telecommunications Products, a group of
manufacturing companies, beginning in 1998.  Mr. Bevis led the sale of this group to Emerson while
he was President and CEO of Jordan Telecommunication Products, Inc., a manufacturer of
nonproprietary communications products.  Prior to that, Mr. Bevis served as Senior Vice President
and General Manager of General Cable Corporation, a large, vertically integrated domestic
manufacturer of wire and cable products sold through wholesale and retail channels to companies
such as The Home Depot, True Value Hardware, Rexel and Graybar.  Mr. Bevis has also held
positions of increasing responsibility with General Electric, Booz, Allen & Hamilton, and General
Dynamics, where he began his career as an engineer.

        R. David Corey was named Chief Operating Officer in March 2004.  He joined Pliant
as Executive Vice President for Global Operations in November 2003.  Mr. Corey has over 30 years
of experience leading extrusion-based manufacturing businesses.  Mr. Corey was a senior executive
at Emerson Electric where he was President of Dura-Line, a manufacturing business that produced
telecom, gas and water conduit products.  He supervised plants and sales forces in the US, Mexico,
UK, Spain, Brazil, Czech Republic, Malaysia, India and China.  Before holding that position,
Mr. Corey was President of International Wire with operations in the US and Asia.  Prior to that,
Mr. Corey was Senior Vice President and General Manager of Telecom products for General Cable
Corporation.  He earned a B.S. in Business from Eastern Illinois University.

        Joseph J. Kwederis was named Chief Financial Officer on August 31, 2005.  He
joined Pliant as Senior Vice President, Finance in February of 2005.  Prior to joining Pliant,
Mr. Kwederis was Senior Vice President/Chief Financial Officer of Dura-line Corporation from
1999–2004, and Vice President of Finance for International Wire Group from 1996–1999.  From
1974 until 1996 he held positions of increasing responsibility in Accounting and Finance at General
Cable Corporation.  Mr. Kwederis holds a B.S. in Accounting from Rutgers University and an
M.B.A. from the University of Connecticut.

        Greg E. Gard joined Pliant in 1989 and has held numerous technical positions
supporting the various market segments within Pliant.  Today, he serves as Senior Vice President of
Technology and Innovation.  His responsibilities in this regard include Product Development and
Technical Service for Pliant, with particular focus on shortening product development cycles,
improving speed to market, and directing a team of packaging professionals in the development of
packages that protect and preserve while improving functionality and appearance.  Before joining
Pliant, Mr. Gard held engineering and management positions with Cryovac Sealed Air Corporation.
Prior to that position, he worked for several years as an engineer with Dresser Atlas in oil and gas
exploration.  He holds a B.S. degree in electrical and computer engineering from the University of
Wisconsin Madison.  Mr. Gard is actively involved with Clemson University's Packaging Science
program, one of only four academic institutions in the United States that offers a four-year program

leading to a B.S. degree in Packaging Science. Currently, he serves on the Packaging Advisory Board at Clemson.

Robert J. Maltarich joined Pliant in July of 1992 following the acquisition of Goodyear Tire & Rubber Company's Films Division. Since that time, he has held numerous positions within Pliant. From 1992-1993 he served as Marketing Manager Film Products Worldwide, from 1994-1996 he was Director of National Accounts, and from 1997-1998 he was General Manager Custom Films Group. Other positions included Vice President and General Manager Barrier and Custom Films and, most recently, Senior Vice President of Sales, Flexible Packaging. Mr. Maltarich was promoted in October 2002 to Vice President and General Manager, Industrial Films, where he oversees Pliant's Stretch, Custom, and PVC film businesses. Prior to joining Pliant Corporation, Mr. Maltarich held numerous national and international positions in both sales and marketing with Goodyear Tire & Rubber Company. During his 18-year career at Goodyear, he served as General Marketing Manager Film Products Worldwide, General Manager European Film Products, Manager Film Products USA and District Sales Manager. He holds a B.S. degree in Business Administration from the University of Akron.

Kenneth J. Swanson is currently President, Specialty Products of Pliant. Prior to holding this position, Mr. Swanson was the Senior Vice President and General Manager of the Specialty Films Division at Pliant. Since 1992, Mr. Swanson has had various leadership positions with CT Film, Huntsman Packaging, and Pliant. Mr. Swanson has over 18 years experience in the plastics industry and supervises teams domestically and internationally. Prior to 1992, Mr. Swanson held multiple sales and marketing management positions in the injection molding segment of the plastics industry. Mr. Swanson holds a B.S. degree in Business Management from the University of Redlands.

7.    Compensation of Executive Officers.

The following summary compensation table sets forth information about compensation earned in the fiscal years ended December 31, 2005, 2004 and 2003 by Pliant's Chief Executive Officer during 2005 and the four other most highly compensated persons who were serving as executive officers of Pliant (other than the Chief Executive Officer) as of the end of the last fiscal year and two other individuals who would have been in that group of the most highly compensated persons but were not serving as an executive officer as of the end of the last fiscal year. This information was set forth in the Form 10-K for the fiscal year ended December 31, 2005, attached hereto as Exhibit C. For convenience, this information is included below.

### Summary Compensation Table

| Name and principal position | Year | Salary ($) | Bonus ($)(2) | Total Shares Granted/Vested (3) | All other Compensation(4) |
|---|---|---|---|---|---|
| | | **Annual compensation(1)** | | **Long-term compensation** **Restricted Stock Awards** | |
| Harold C. Bevis(5) | 2005 | 675,301 | 424,700 | 480/120 | 6,300 |
| President and Chief Executive | 2004 | 608,333 | 928,974(6) | 480/30 | 1,083 |
| Officer | 2003 | 78,974 | — | — | — |
| | | | | | |
| R. David Corey(7) | 2005 | 377,260 | 128,625 | 48/12 | 161,629(8) |
| Executive Vice President and | 2004 | 333,333 | 224,880(9) | 48/3 | 65,101 |
| Chief Operating Officer | 2003 | 33,175 | — | — | — |

19

| Name and Title | Year | | | | |
|---|---|---|---|---|---|
| Joseph J. Kwederis(10) | 2005 | 187,276 | 63,000 | — | 46,372(11) |
| Senior Vice President and | 2004 | — | — | — | — |
| Chief Financial Officer | 2003 | — | — | — | — |
| Robert J. Maltarich | 2005 | 205,250 | 57,960 | 16/4 | 6,300 |
| Senior Vice President and | 2004 | 198,667 | 73,600 | 16/1 | 3,973 |
| General Manager-Industrial Film | 2003 | 188,000 | 20,595 | — | 4,000 |
| Kenneth J. Swanson | 2005 | 230,063 | 45,700 | 40/10 | 6,300 |
| Senior Vice President, President | 2004 | 219,500 | 150,000 | 40/2.5 | 4,000 |
| Specialty Products | 2003 | 168,500 | 34,518 | — | 4,000 |
| Brian E. Johnson(12) | 2005 | 300,000 | — | — | — |
| Former Executive Vice President | 2004 | 296,633 | 46,900 | — | 4,000 |
| and Chief Financial Officer | 2003 | 267,799 | 47,860 | — | 4,000 |
| James L. Kaboski(13) | 2005 | 184,102 | 111,000(14) | — | 44,563(15) |
| Vice President of Strategy and | 2004 | — | — | — | — |
| Business Development | 2003 | — | — | — | — |

(1)  Perquisites and other personal benefits, securities or property, in the aggregate, are less than either $50,000 or 10% of the total annual salary and bonus reported for the applicable Named Executive Officer.

(2)  All amounts for 2005 include amounts paid in 2006 pursuant to the 2005 Management Incentive Compensation Plan.  All amounts for 2004 include discretionary bonuses paid in 2004 and amounts paid in 2005 pursuant to the 2004 Management Incentive Compensation Plan.

(3)  Pursuant to the 2004 Restricted Stock Incentive Plan, certain executive officers of Pliant were permitted to purchase shares of Series B Redeemable Preferred Stock in September of 2004 for $162.00 per share. One 48th of those shares vest each month, subject to the holder being employed by the Pliant as of such dates.

(4)  All amounts reflect contributions for employer's 401(k) contributions, except as indicated.

(5)  Mr. Bevis was appointed President and Chief Executive Officer in October 2003.

(6)  Includes bonus of $850,000 paid in 2005 pursuant to Mr. Bevis's employment agreement and an additional discretionary bonus of $78,974 paid in 2004.

(7)  Mr. Corey was appointed Executive Vice President of Global Operations in November 2003. He was promoted to Chief Operating Officer in March 2004.

(8)  Includes moving expenses of $155,329 paid in 2005.

(9)  Includes bonus of $200,000 paid in 2005 pursuant to the 2004 Management Incentive Compensation Plan and an additional discretionary bonus of $24,880 paid in 2004.

(10) Mr. Kwederis was appointed Senior Vice President, Finance in February 2005. He was promoted to Chief Financial Officer in August of 2005.

(11) Includes $40,384 of moving expenses paid in 2005.

(12) Mr. Johnson resigned as Executive Vice President and Chief Financial Officer effective September 16, 2004, but remained a non-executive officer employee of the Company until December 31, 2004.  Pursuant to a Release Agreement with Mr. Johnson, during 2005 Pliant made salary continuation payments to Mr. Johnson until December 31, 2005.

(13) Mr. Kaboski was appointed Vice President of Strategy and Business Development in February, 2005.

(14) Includes $55,000 sign-on bonus.

(15) Includes moving expenses of $37,657 paid in 2005.

The following summary compensation table sets forth the current 2006 information related to the estimated compensation levels and eligibility in incentive programs with respect to the seven current most highly paid officers of Pliant.

### Summary Compensation Table

| Name and Title | 2006 Base Salary (1) | 2006 Management Incentive Plan | Long Term Incentive Plan Target Award | Emergence Bonus Plan Target Eligibility (3) | Restricted Stock Incentive Plan and Deferred Cash |
|---|---|---|---|---|---|

| | | Target Award Eligibility (2) | Eligibility for 2006 | | Incentive Plan |
|---|---|---|---|---|---|
| Harold C. Bevis, President and Chief Executive Officer | $650,000 | 100% of Base Salary | N/A | 100% of Base Salary | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New Pliant. |
| R. David Corey, Executive Vice President and Chief Operating Officer | $367,500 | 50% of Base Salary | Accrual of ½ of 2006 MIP Award per LTIP Terms | 50% of Base Salary | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New Pliant. |
| Joseph J. Kwederis, Senior Vice President and Chief Financial Officer | $225,000 | 40% of Base Salary | Accrual of ½ of 2006 MIP Award per LTIP Terms | 40% of Base Salary | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New Pliant. |
| Robert J. Maltarich, Senior Vice President and General Manager - Industrial Film | $207,000 | 40% of Base Salary | Accrual of ½ of 2006 MIP Award per LTIP Terms | N/A | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New Pliant. |
| Kenneth J. Swanson, Sr. Vice President, President Specialty Products | $231,750 | 50% of Base Salary | Accrual of ½ of 2006 MIP Award per LTIP Terms | N/A | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New Pliant. |
| James Kaboski Vice President of Strategy and Business Development | $200,000 | 40% of Base Salary | Accrual of ½ of 2006 MIP Award per LTIP Terms | 40% of Base Salary | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New Pliant. |
| Stephen T. Auburn Vice President and General Counsel | $225,000 | 50% of Base Salary | Accrual of ½ of 2006 MIP Award per LTIP Terms | 50% of Base Salary | Participants and allocations in these plans have not yet been determined. Participants will be named by the Board of Directors of New |

| | | | | | Pliant. |
| --- | --- | --- | --- | --- | --- |

(1) These are base salaries as of January 1, 2006. Ordinary annual increases have been proposed in the ordinary course of business, and approval is pending. In the event that increases are approved, such increases are expected to be retroactive to April 2006. The base salaries identified in this summary compensation table do not include certain standard employee benefits such as healthcare.
(2) Actual 2006 MIP award could be greater or lower than target amount based upon MIP terms.
(3) Actual Emergence Bonus Plan award could be greater or lower than target amount based upon Emergence Bonus Plan terms.

#### 8.   Other Matters Related to Former Directors and Officers of Pliant.

In the past Pliant loaned money to certain former directors and officers to enable such parties to purchase shares of capital stock in Pliant. As of the Petition Date, the obligations of former directors and officers to Pliant generally included: (i) a note issued by Scott K. Sorensen in favor of Pliant in the principal amount of approximately $787,000; (ii) a note issued by Ronald G. Moffit in favor of Pliant in the principal amount of approximately $262,000; (iii) a note issued by Ronald G. Moffit in favor of Pliant in the principal amount of approximately $302,000; (iv) a note issued by Richard P. Durham in favor of Pliant in the principal amount of approximately $2,430,798.20; and (v) a note issued by Jack E. Knott in favor of Pliant in the principal amount of approximately $3,700,000. Pursuant to section 10.2(a) of the Plan, such notes will remain in effect and subject to repayment as of the Effective Date of the Plan pursuant to the terms of such notes. Certain parties dispute whether certain of these notes are recourse or non-recourse, and also whether certain of these notes have been cancelled.

In addition to the foregoing, Richard P. Durham, in his individual capacity and/or through Durham Capital, L.L.C., is the owner of 23,033 shares of outstanding common stock of Pliant. Although Mr. Durham exercised a put right with respect to certain of his shares in 2002, the aforementioned 23,033 shares were never repurchased by Pliant, and Mr. Durham has at all times continued to hold and benefit from his rights as a common shareholder in Pliant. As of the Petition Date, Pliant was prohibited under its credit facilities from repurchasing any of Mr. Durham's shares of outstanding common stock. Pliant has not issued a note or other instrument evidencing any indebtedness on account of Mr. Durham's common stock shares or his repurchase right. Accordingly, as a shareholder of Pliant's outstanding common stock, Mr. Durham's recovery on account of such shares will be in accordance with the recoveries due to Holders of Allowed Interests in Class 11 (Outstanding Common Stock Interests). In addition, pursuant to the terms of the Plan, any alleged claim Mr. Durham may submit on account of his put right will be subordinated under section 510 of the Bankruptcy Code to the level of common stock.

### E.   COMPENSATION AND BENEFITS PROGRAMS

In the ordinary course of business, the Debtors have implemented a number of compensation and benefits programs, which are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefits package. Except as otherwise indicated on Exhibit I of the Plan, the Debtors intend to honor, in the ordinary course of business after their emergence from Chapter 11, all of their employee compensation and benefits programs that are in effect as of the Confirmation Date, as they may be amended or modified from time to time. These employee compensation and benefits programs are listed and generally described in Exhibit H hereto, with the exception of collectively bargained programs (*e.g.*, collectively bargained

agreements and pension and other benefit plans), insured and self-insured programs (*e.g.*, health plans), and customary fringe benefit policies (*e.g.*, vacation, sick leave). The descriptions set forth in Exhibit H are not, and are not intended to be, comprehensive. All such plans and other programs are governed by applicable plan and program terms and conditions, as in effect or amended from time to time. In addition, the Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law. In the event the Debtors terminate any compensation or benefit programs prior to the Confirmation Date, they will file an amendment to Exhibit I to the Plan. Finally, as described in detail in section III.F and section V.G.10, respectively, the Plan also provides for an emergence bonus program and a Restricted Stock Incentive Plan and Deferred Cash Incentive Plan, which shall be used for the purpose of granting awards to officers and other employees of New Pliant.

## F.    **EMERGENCE BONUS PROGRAM**

In addition to those compensation and benefits programs discussed above, on the Effective Date of the Plan, New Pliant shall pay emergence bonus payments to a limited number of officers of the Reorganized Debtors who are and have been principally responsible for the reorganization efforts in order to incentivize such key employees to enable the Debtors to emerge from Chapter 11 and achieve the Debtors' Plan goals expeditiously and in a manner consistent with the Plan. The emergence bonus plan shall contain terms as set forth in Exhibit J to the Plan. Because of the demands of the bankruptcy proceedings, the duties of key management personnel are increased substantially, while there is little or no reduction in their basic day-to-day responsibilities. Standard compensation components, such as base salary and annual incentive compensation eligibility, do not compensate for these substantial increased responsibilities and time commitments because such standard compensation components are intended to make the officers' total cash compensation competitive with market levels for the basic duties and responsibilities that they perform in the ordinary course, without accounting for their enhanced bankruptcy-related responsibilities.

The Compensation Committee of the Debtors' Board of Directors therefore has approved the terms of the Emergence Bonus Plan described herein and in Exhibit J to the Plan. The Official Committee of Unsecured Creditors has questioned whether Mr. Walsh, who is affiliated with the JP Morgan Entities, should participate in the Compensation Committee's consideration of whether the performance criteria contained in the Emergence Bonus Plan have been satisfied because, in the Committee's view, his participation could give management an incentive to maximize the return to the JP Morgan Entities under the Plan of Reorganization, with the expectation that Mr. Walsh will then be disposed to approve compensation awards. The Debtors believe that it is entirely normal for the majority stockholder to have a representative on the Compensation Committee. Moreover, all decisions regarding the terms of the Plan of Reorganization, including emergent capital structure, have been or will be made by the Debtors' Board of Directors or the Special Committee appointed by Pliant's Board, not by Debtors' management. Finally, all relevant decisions of the Compensation Committee have been unanimous, so any bonuses approved by the Compensation Committee have been approved by a director who does not have any alleged conflict of interest related to either management or the JP Morgan Entities.

The following seven officers have been designated by the Compensation Committee for participation in the Emergence Bonus Plan. Set forth below is a brief summary of the enhanced duties and responsibilities of each such individual with respect to the Debtors' reorganization efforts. This summary is intended to set forth some of the primary responsibilities and duties for each individual but is not intended to be comprehensive.

| Name | Key Responsibilities |
|---|---|
| **Harold C. Bevis**<br>*President, CEO, Director* | • Oversees extra Company efforts and key Board and constituent interface for restructuring, including all negotiations with bondholders and other creditors<br>• Overall "quarterback" for Pliant restructuring team |
| **R. David Corey**<br>*EVP Operations, COO* | • Lead Operations executive for restructuring effort<br>• Managing ongoing relationships with trade creditors to ensure continuity of resin supply, transportation/warehousing services, and return of credit terms<br>• Responsible for all restructuring-related employment, labor, and benefits issues |
| **Joseph J. Kwederis**<br>*SVP Finance, CFO* | • Overall Finance lead for Pliant reorganization<br>• Responsible for all financial reports, including:<br>  - Initial Ch. 11 filing, First Day motions, and subsequent motions<br>  - Operating Reports for U.S. Trustee<br>  - Financial reports for DIP lender<br>  - Coordination of materials for disclosure to Creditor advisors<br>  - 2006 financial plan and longer-term financial plan |
| **Stephen T. Auburn**<br>*VP, General Counsel* | • Overall legal "quarterback" for restructuring team – coordinates legal work and efforts of teams of attorneys across four law firms in the U.S. and Canada<br>• Overall responsibility for legal content of Chapter 11 filing, First Day motions and subsequent motions, Disclosure Statement, and Plan of Reorganization<br>• Also manages legal issues related to reorganization, but not directly associated with court proceedings — e.g., associated with suppliers, customers, employees, etc. |
| **James L. Kaboski**<br>*VP, Strategy and Business Development* | • Develops materials to support emergence plans including:<br>  - Overall team workplans and timelines to coordinate efforts across internal/external team members through emergence from Chapter 11<br>  - Business plans, assumptions, and financial projections<br>  - Materials for Disclosure Statement and Plan of Reorganization<br>  - Meetings with external constituencies (e.g., legal and financial advisors to creditors, exit financing lenders) and Board of Director updates<br>  - Materials for disclosure to Creditor advisors via "virtual dataroom" |
| **Thomas E. McShane**<br>*VP, Corporate Controller* | • Preparation of materials to support all financial disclosures including:<br>  - Initial Chapter 11 Filing<br>  - First Day motions and subsequent motions<br>  - U.S. Trustee requirements including Initial Operating Report, regular Monthly Operating Reports, Schedules of Assets and Liabilities ("Schedules"), and Statements of Financial Affairs (SOFAs) |

| | |
|---|---|
| | - Financial/accounting models for 2006-2009 financial plans<br>- Disclosure Statement and Plan of Reorganization |
| **Chris M. Nielsen**<br>*VP, Treasurer* | • Lead team member for all banking relationships, revolving credit facilities, and DIP financing, and for associated reporting to these institutions<br><br>• Lead team member for preparation of SOFAs and Schedules<br><br>• Responsible for forecasting and managing cash and maintaining liquidity during pre-filing period and throughout Chapter 11 case<br><br>• Directed cash management activities during pre-filing period, and implemented new cash management processes to comply with Chapter 11 statutory requirements<br><br>• Prepared material to support Disclosure Statement, Plan of Reorganization, Initial Operating Report, and Monthly Operating Reports |

Each participant in the Emergence Bonus Plan has a Target Emergence Bonus, calculated as a target percentage of the participant's base salary. Target percentages range from 40% to 100% of base salary depending on the participant. The Target Emergence Bonus is payable upon emergence if all three plan goals (discussed below) are met at 100% of Target levels. As discussed below and in Exhibit J to the Plan, participants are eligible for certain bonus payments below Target levels, down to a Threshold payout of 50% of Target payout for a given goal, if certain Emergence Bonus Plan goals are met at below-Target levels that nevertheless meet or exceed minimum Threshold levels. Participants also are eligible for certain bonus payments above Target levels, up to a Maximum payout of 150% of Target payout for a given goal, if that plan goal is met at above-Target levels. The three Emergence Bonus Plan goals are equally weighted, and consist of Emergence Date, Recovery to Trade Creditors, and Capital Structure. A summary of these goals, weighting and corresponding potential award metrics is set forth below:

| Goal | Weighting | Threshold | | Target | | Maximum | |
|---|---|---|---|---|---|---|---|
| | | Metric | Award | Metric | Award | Metric | Award |
| Emergence Date | 33 1/3% | July 3, 2007 | 50% of Target | December, 2006 | 100% of Target | Today – July 31, 2006 | 150% of Target |
| Recovery to Trade Creditors | 33 1/3% | -- | -- | 100% Payment or Consensual Terms | 100% of Target | -- | -- |
| Capital Structure | 33 1/3% | Acceptable Structure | 50% of Target | Target Structure | 100% of Target | Maximized Structure | 150% of Target |

The Debtors believe that these goals are appropriate measures of participant performance and reflect key objectives for the Debtors. An expeditious emergence from Chapter 11 proceedings is in the Debtors' best interests, particularly given the administrative and other costs associated with bankruptcy proceedings. The "Target" date of December 2006 and "Threshold" date of July 3, 2007 reflect, respectively, what the Debtors believe is a reasonable average duration of Chapter 11 proceedings (one year) and the 18-month period specified under the Bankruptcy Code in which the Debtors may have the exclusive right to file a plan of reorganization. The "Maximum" date of July 31, 2006 reflects what the Debtors consider to be an expeditious emergence from Chapter 11 proceedings – within 7 months after filing – in accordance with the Debtors' present

25

Emergence Plan. The Debtors believe that recovery to trade creditors is an appropriate metric because, among other things, the support of and healthy relationships with trade creditors are of critical importance to the Debtors' successful emergence and their performance thereafter. The Debtors believe that capital structure is an appropriate metric because of its obvious effect on the short-term and long-term goals of the Debtors. In the Debtors' view, this measure necessarily has certain subjective elements because the extent of success with respect to capital structure is in substantial part a question of business judgment. At emergence, the Debtors' Board will qualitatively evaluate the level of success achieved for this goal.

The proposed target emergence bonuses for the seven participants, along with potential payouts at Threshold, Target and Maximum levels are as follows:

**Proposed Pliant Emergence Bonus**
Amounts in $000

| Participant | Position Title | Base Salary[1] | Target as a % of Base Salary | Threshold Emergence Bonus | Target Emergence Bonus | Maximum Emergence Bonus |
|---|---|---|---|---|---|---|
| Harold Bevis | President and CEO | $650.0 | 100% | $433 | $650 | $867 |
| Dave Corey | Chief Operating Officer | $367.5 | 50% | $123 | $184 | $245 |
| Steve Auburn | VP, General Counsel | $225.0 | 50% | $75 | $113 | $150 |
| James Kaboski | VP, Strategy/Corp Dev | $200.0 | 40% | $53 | $80 | $107 |
| Tom McShane | VP, Corporate Controller | $189.6 | 40% | $51 | $76 | $101 |
| Joe Kwederis | Chief Financial Officer | $225.0 | 40% | $60 | $90 | $120 |
| Chris Nielsen | VP and Treasurer | $135.0 | 40% | $36 | $54 | $72 |
| | | | Total: | $831 | $1,246 | $1,561 |

[1] These base salary figures do not include potential ordinary course annual salary increases for 2006.

The aggregate cost of emergence bonuses for the seven participants at Threshold, Target and Maximum Emergence Bonus levels, respectively, is approximately $831,000, $1,246,000 and $1,661,000 (as stated, these amounts could increase based upon normal 2006 market increases in base salary).

## G.    DEBT AND CAPITAL STRUCTURE OF THE COMPANY

1.    Prepetition Secured Credit Obligations.

(a)    Revolving Credit Facility Agreement

Pliant and certain of the Debtors are party to that certain Amended and Restated Credit Agreement, dated as of November 21, 2005, by and among Pliant and certain of its subsidiaries, as borrowers, General Electric Capital Corporation, as Domestic A Agent, Administrative Agent, Collateral Agent and Lender, and Morgan Stanley Senior Funding, Inc., as Domestic B Agent and Lender. Pursuant to the Revolving Credit Facility Agreement,[7] the Revolving Credit Facility Lenders committed to advance loans and provide letters of credit in an aggregate principal amount of up to $140 million to the Debtors.

As of the Petition Date, the Debtors were indebted to the Revolving Credit Facility Lenders in the aggregate principal amount of $130,953,697, plus accrued interest with respect thereto and any fees, costs and charges provided under the Revolving Credit Facility Agreement.

---

[7]  The Revolving Credit Facility refinanced the obligations owed pursuant to that certain $100 million revolving credit facility, dated February 17, 2004.

Each of the borrowers under the Revolving Credit Facility is a cross-guarantor of the indebtedness under the Revolving Credit Facility Agreement of each other borrower, and certain non-borrowers also guaranteed the indebtedness under the Revolving Credit Facility Agreement.[8] Additionally, the indebtedness under the Revolving Credit Facility Agreement is secured by a security interest in and lien upon certain of the Debtors' property, including a first priority security interest in, among other things, inventory, receivables, deposit accounts, the capital stock of, or other equity interests in, subsidiaries, investment property and certain other assets with respect to which a lien was granted as security for the indebtedness under the Revolving Credit Facility Agreement and a second priority security interest in the Debtors' real property, fixtures, equipment, intellectual property and all other types of property in which a first priority security interest or lien was granted to the First Lien Noteholders pursuant to the First Lien Notes Indenture.

(b)    Secured Note Obligations

As of the Petition Date, Pliant had two (2) outstanding tranches of secured notes: the First Lien Notes and the Second Lien Notes. Pursuant to the First Lien Notes Indenture, Pliant is indebted to the First Lien Noteholders on account of (i) the 11 5/8% senior secured notes due 2009 in the approximate principal amount of $269,755,013 as of the Petition Date and (ii) the remaining 11 1/8% senior secured notes due 2009 in the approximate principal amount of $7,032,673 as of the Petition Date. As collateral for the First Lien Notes Indenture, the Debtors granted a first priority security interest in and lien upon the Debtors' real property, fixtures, equipment, intellectual property and all other types of property as described in the First Lien Notes Indenture (the "First Lien Noteholder Collateral") and a second priority security interest and lien upon the Debtors' inventory, receivables, deposit accounts, the capital stock of, or other equity interest in, subsidiaries, investment property and certain other assets with respect to which a lien was granted as security under the Revolving Credit Facility Agreement (the "Revolving Credit Facility Collateral"). This indebtedness is guaranteed by certain of Pliant's domestic subsidiaries and by a Canadian subsidiary, Uniplast Industries Co.[9]

Pursuant to the Second Lien Notes Indenture, Pliant is indebted to the Second Lien Noteholders in the approximate amount of $250,000,000 plus additional accrued interest, fees, costs and expenses as of the Petition Date. As collateral for the Second Lien Notes Indenture, the Debtors granted a second priority security interest in and lien upon the First Lien Noteholder Collateral and the Revolving Credit Facility Collateral. This indebtedness is guaranteed by certain of Pliant's domestic subsidiaries.[10]

---

[8] The borrowers under the Revolving Credit Facility are: (i) Pliant Corporation; (ii) Pliant Packaging of Canada, LLC; (iii) Uniplast Holdings, Inc.; (iv) Uniplast U.S., Inc.; and (v) Uniplast Industries Co. Additional guarantors under the Revolving Credit Facility are: (i) Pliant Corporation International; (ii) Pliant Film Products of Mexico, Inc. and (iii) Pliant Solutions Corporation.

[9] The guarantors of indebtedness under the original first lien notes indenture, prior to its amendment, pursuant to which the 11 1/8% senior secured notes were issued, were (i) Pliant Corporation International; (ii) Pliant Film Products of Mexico, Inc.; (iii) Pliant Packaging of Canada, LLC; (iv) Uniplast Holdings, Inc.; (v) Uniplast U.S., Inc.; (vi) Uniplast Industries Co.; and (vii) Pliant Solutions Corporation. The guarantors of indebtedness under the First Lien Notes Indenture, as amended, pursuant to which the 11 5/8% senior secured notes were issued, are (i) Pliant Corporation International; (ii) Pliant Film Products of Mexico, Inc.; (iii) Pliant Packaging of Canada, LLC; (iv) Uniplast Holdings, Inc.; (v) Uniplast U.S., Inc.; and (vi) Uniplast Industries Co.

[10] The guarantors of the indebtedness under the Second Lien Notes Indenture are: (i) Pliant Corporation International; (ii) Pliant Film Products of Mexico, Inc.; (iii) Pliant Packaging of Canada, LLC; (iv) Pliant Solutions Corporation; (v) Uniplast Holdings, Inc.; and (vi) Uniplast U.S., Inc.

2.    Intercreditor Agreement.

The collateral agent for the Revolving Credit Facility Lenders,[11] the trustee under the First Lien Notes Indenture, the trustee under the Second Lien Notes Indenture and certain of the Debtors are parties to an Amended and Restated Intercreditor Agreement dated as of February 17, 2004. The Intercreditor Agreement delineates the rights and obligations of the parties with respect to the liens described above.

3.    DIP Financing and Use of Cash Collateral.

Prior to the Petition Date, the Debtors negotiated an agreement to obtain a commitment for postpetition financing that would allow them to satisfy their ongoing obligations to vendors and suppliers, purchase raw materials and new inventory, and otherwise finance their operations. On January 4, 2006, the Debtors entered into the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement (as may be subsequently modified or amended, the "DIP Facility Agreement"), by and among Pliant Corporation and the Domestic Subsidiary Borrowers parties thereto, as borrowers, General Electric Capital Corporation, as Administrative Agent and Collateral Agent, Morgan Stanley Senior Funding, Inc., as Syndication Agent, GE Capital Market, Inc., as Sole Lead Arranger and Sole Book Runner, and the Lenders parties thereto (collectively, the "DIP Facility Lenders"). Although the DIP Facility Agreement is nominally in the amount of $200 million, the availability is reduced by the aggregate borrowing base of $131.2 million under the Revolving Credit Facility Agreement, and therefore the DIP Facility Agreement provides for a maximum of approximately $68.8 million of additional postpetition financing.

On the Petition Date, the Debtors filed a Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to section 364 of the Bankruptcy Code; (II) Authorizing Limited Use of Cash Collateral; (III) Granting Liens, Including Priming Liens, and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; and (V) Scheduling the Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis and Approving the Form and Method of Notice Thereof (the "DIP Motion").

After a hearing held on February 2, 2006, the Bankruptcy Court entered an order on February 2, 2006 approving the DIP Motion on a final basis (as amended by order entered March 13, 2006 and as may be subsequently modified or amended, the "Final DIP Order"). The Final DIP Order approved the DIP Facility Agreement on a final basis and authorized the Debtors to use the cash collateral of the Revolving Credit Facility Agents, the Revolving Credit Facility Lenders, the trustee under the First Lien Notes Indenture, the First Lien Noteholders, the trustee under the Second Lien Notes Indenture and the Second Lien Noteholders (each as defined in the Plan, and collectively, the "Prepetition Entities"). As adequate protection for the use of their cash collateral, the Prepetition Entities were granted, among other things, certain replacement liens, administrative claims, and, in some cases, payment of certain interest, fees and expenses. The Debtors' obligations under the DIP Facility Agreement are secured by valid, binding, enforceable, first priority (i.e., priming) perfected security interests and liens in substantially all of the assets of the Debtors, as well as super-priority administrative expense claims having priority over all unencumbered prepetition or postpetition property of the Debtors.

---

[11] By that certain Consent and Amendment, dated March 8, 2004, General Electric Capital Corporation succeeded Deutsche Bank Trust Company Americas as Collateral Agent under the prior credit facility. General Electric Capital Corporation remains as the Collateral Agent under the Revolving Credit Facility Agreement.

4.     Unsecured Note Obligations.

(a)     Old Notes

In 2000, Pliant issued those certain 13% Senior Subordinated Notes due 2010 in the aggregate amount of $220 million (the "2000 Notes"). In 2002, Pliant issued those certain Senior Subordinated Notes due 2010 in the aggregate amount of $100 million (together with the 2000 Notes, the "Old Notes"). The Old Notes mature on June 1, 2010, and cash interest is payable on June 1 and December 1 of each year. The Old Notes are subordinated to all of Pliant's existing and future senior debt, rank equally with any future senior subordinated debt, and rank senior to any future subordinated debt. The Old Notes are unsecured, and are guaranteed by certain of Pliant's subsidiaries.

On November 4, 2005, Pliant entered into a First Supplemental Indenture with respect to each of the Old Notes Indentures. The Old Notes Indentures were amended to increase the amount of indebtedness permitted to be incurred thereunder by $25 million. In addition, on November 17, 2005, Pliant entered into a Second Supplemental Indenture with respect to each of the Old Notes Indentures. The Old Notes Indentures were amended to modify the anti-layering covenant and related definition of "senior indebtedness" in the Old Notes Indentures and to increase the amount of indebtedness permitted to be incurred under the Old Notes Indenture governing the 2000 Notes by an additional $20 million, thereby allowing Pliant to enter into the Revolving Credit Facility Agreement.

5.     Intercompany Claims.

In the normal operation of the Debtors' businesses, the Debtors and certain of their non-debtor affiliates engage in intercompany transactions involving intercompany trade and intercompany capital needs. As a result, there are numerous intercompany claims that reflect intercompany receivables and intercompany payables made and/or accrued in the ordinary course of the Debtors' businesses. These intercompany transactions include, but are not limited to, amounts on account of (1) trade receivables and payables resulting from the Debtors' centralized cash management systems, (2) centrally billed expenses that are allocated among the Debtors and non-debtor affiliates, (3) corporate expenses that are allocated among the Debtors and non-debtor affiliates, (4) advances between and among the Debtors and the non-debtor affiliates used for funding the respective entity's operations, and (5) interest on outstanding intercompany balances. Accordingly, at any given time, there may be intercompany claims owing among the Debtors and/or non-debtor affiliates. The Debtors maintain records of all intercompany transactions and can ascertain, trace and account for all intercompany transactions.

6.     Common Stock and Preferred Stock of Pliant.

(a)     Common Stock

Pliant's articles of incorporation authorize the issuance of 10,000,000 shares of common stock, of which 571,711 shares were outstanding as of the Petition Date. Pliant's common stock is not publicly traded. As of December 31, 2005, J.P. Morgan Partners (BHCA), L.P. and/or affiliates owned approximately fifty-five percent (55%) of Pliant's outstanding common stock. In addition to J.P. Morgan Partners (BHCA), L.P. and/or its affiliates, as of December 31, 2005, each of

The Christena Karen H. Durham Trust and Perry Acquisition Partners- 2, L.P. owned five percent (5%) or more of Pliant's common stock. All other holders owned less than five percent (5%) of the outstanding common stock of Pliant.

In addition, there are approximately 136,739 warrants outstanding for the purchase of Pliant's common stock. These warrants have an exercise price of .01 per share. As of December 31, 2005, J.P. Morgan Partners (BHCA), L.P. and/or its affiliates held approximately 64.3% of the warrants. Finally, Pliant has issued stock options to certain of its present and former employees for the purchase of its common stock.

(b)    Preferred Stock

In addition to its common stock, Pliant's articles of incorporation authorize the issuance of two series of preferred stock—Series A Preferred Stock and Series B Preferred Stock. As of the Petition Date, Pliant had approximately $253.6 million of Series A Preferred Stock outstanding. As of December 31, 2005, J.P. Morgan Partners (BHCA), L.P. and/or affiliates owned approximately fifty nine percent (59%) of Pliant's outstanding Series A Preferred Stock.

In 2004, Pliant issued the Series B Preferred Stock in connection with its 2004 Restricted Stock Incentive Plan, pursuant to which Pliant sold the Series B Preferred Stock to its Chief Executive Officer and certain other officers of the company. Pursuant to the terms of the 2004 Restricted Stock Incentive Plan, the interests in the Series B Preferred Stock vest over time. As of December 24, 2005, approximately 196 shares out of 628 shares were vested.

## H.    PENDING LITIGATION AGAINST THE DEBTORS.

As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code. In addition, as a consequence of three of the Debtors – Uniplast Industries Co., Pliant Corporation of Canada Ltd., and Pliant Packaging of Canada, LLC (the "Canadian Debtors") – commencement of proceedings recognizing their chapter 11 proceedings as "foreign proceedings" pursuant to section 18.6 of the CCAA, all pending claims and litigation against Uniplast Industries Co., Pliant Corporation of Canada Ltd., and Pliant Packaging of Canada, LLC in Canada have also been stayed by order of the Canadian Court.

The Debtors are involved from time to time in a variety of litigation that is incidental to their businesses. The material pending litigation related to prepetition causes of action of which the Debtors are currently aware and which may result in further litigation following the Effective Date are set forth on the attached Exhibit F. Exhibit F of the Disclosure Statement is not, and is not intended to be, a comprehensive list of all actions involving the Debtors and specifically excludes, among others, administrative actions, workers compensation actions and actions involving union grievances. Inclusion on Exhibit F is for disclosure purposes only and is not an admission, and is not intended to be an admission, of liability with respect to any claim or action.

The Debtors anticipate that, to the extent any of the litigation set forth on Exhibit F is not resolved prior to the Effective Date of the Plan and/or removed by the Debtors to federal court consistent with their powers under applicable law, such litigation will continue after the Effective Date in the forum(s) in which it was initiated. Any adverse judgment in any of these actions would constitute a Claim that would be treated in accordance with the provisions of the Plan, so long as

such Claim was otherwise allowable because it complied with the applicable requirements of these Chapter 11 Cases and the Bankruptcy Code.

## I.  EVENTS LEADING UP TO CHAPTER 11

    1.  Contraction in Trade Terms and Increase in Price of Raw Materials.

The Debtors commenced these Chapter 11 Cases as a result of several factors, including, primarily, a severe contraction in trade terms from their essential raw material suppliers in the months prior to the Petition Date. This contraction of trade terms ranged from severe tightening of payment periods to placing the Debtors on cash in advance payment terms. Some of these essential vendors threatened to cease shipments to the Debtors where the Debtors resisted the contracted trade terms. The actions of such trade vendors have severely impacted the Debtors' liquidity.

In addition, increases in raw material, freight, and energy costs that the Debtors could not immediately pass on to customers negatively impacted results of operations and reduced the cash provided by operations as compared with prior periods. The negative impact of these factors on the Debtors during the last half of 2005 was exacerbated by continued high prices of oil and natural gas (which directly impact the cost of the major raw material input to the Debtors' products) and the impact of Hurricanes Katrina and Rita on the cost and supply of Debtors' raw materials and on the availability and cost of freight for transporting their products. As a result of these conditions, the Debtors' highly-leveraged financial position, and an October 17, 2005 effective date for an amendment to the Bankruptcy Code which arguably created incentives for companies to initiate Chapter 11 proceedings prior to October 17, 2005, as explained above, many of the Debtors' key suppliers reduced or eliminated credit terms for raw material purchases which further exacerbated Debtors' liquidity situation. Additionally, the credit rating assigned to the Company's debt was downgraded by Standard & Poors and Moody's during the early part of September 2005, which further contributed to the continued tightening of credit terms from the Debtors' suppliers. As a result of these factors, the amount of cash that the Debtors were required to invest in working capital (i.e., accounts receivable plus inventory value minus accounts payable) increased significantly in the last 6 months of 2005 due to both the higher cost of the raw materials as well as reduced credit terms.

    2.  Restructuring Agreement with Certain Principal Stakeholders.

On December 28, 2005, the Company filed a Form 8-K with the United States Securities and Exchange Commission announcing that it had entered into Support Agreements (the "Support Agreements, " a form copy of which is attached hereto as Exhibit E) with the holders of more than 66 2/3% in amount of its 13% Senior Subordinated Notes, the holders of a majority of the outstanding shares of its mandatorily redeemable preferred stock and the holders of a majority of the outstanding shares of its common stock, pursuant to which such holders agreed, subject to the terms and conditions contained in the Support Agreements, to support the proposed financial restructuring described in the term sheet attached as an exhibit to the Support Agreements.

Under the terms of the proposed restructuring (i) $320 million in aggregate principal amount of Pliant's 13% Senior Subordinated Notes will be exchanged for a combination of 30% of new common stock, $260 million of new Series AA Preferred Stock, certain additional

consideration, and up to $35 million of new debt,[12] (ii) $289 million (as of December 31, 2005) of Pliant's mandatorily redeemable preferred stock will be exchanged for a combination of up to $75.5 million of a new Series AA Preferred Stock and a percentage of new common stock, (iii) holders of outstanding common stock will exchange their interest for a percentage of new common stock, and (iv) the Debtors' first lien and second lien noteholders claims and trade and other general unsecured creditors will remain unimpaired. The Debtors intend to complete the proposed restructuring through the Plan contemplated by this Disclosure Statement.

        3.      <u>Role of Certain Parties in Negotiating the Support Agreements and Plan of Reorganization.</u>

        The JP Morgan Entities, in their capacity as a holder of common stock and as a holder of preferred stock, participated in the negotiations that led to the execution of the Support Agreements. The JP Morgan Entities were represented throughout those negotiations by the law firm of O'Melveny & Myers LLP. Pliant was represented throughout those negotiations by the law firm of Sidley Austin LLP and the investment banking firm of Jefferies & Company, Inc. The Consenting Noteholders were represented throughout those negotiations by the law firm of Bingham McCutchen LLP and the investment banking firm of CIBC.

        JP Morgan's representatives participated in general Board of Directors meetings that were convened during the fourth quarter of 2005 and the first quarter of 2006. As discussed in Section III.D.3, in late December 2005, the Board of Directors formed a Special Committee consisting solely of independent directors. The Special Committee approved, on behalf of Pliant, the economic treatment of all current equityholders under the Plan.

        Pursuant to the terms of the Support Agreements, the Debtors agreed to pay the reasonable fees and expenses of the advisors to the Consenting Noteholders and the JP Morgan Entities in connection with the consummation of the transactions contemplated in the Support Agreements, including the confirmation of a plan or reorganization. Specifically, prior to the Petition Date, the Debtors entered into a fee letter, dated November 2, 2005, with Bingham McCutchen LLP (as counsel to the Consenting Noteholders) (the "<u>Bingham Fee Letter</u>"). The Debtors are assuming the Bingham Fee Letter pursuant to section 7.1 of the Plan. Under the terms of the Bingham Fee Letter and pursuant to the Plan, the Debtors shall pay on the Effective Date of the Plan or as soon as practicable thereafter, the reasonable professional fees and expenses incurred between the Petition Date and the Effective Date by Bingham. Since the Petition Date, Bingham has been involved in communicating with the Holders of Old Notes, reviewing and commenting on Plan documents on behalf of such parties and supporting the Debtors in their efforts to expeditiously confirm the Plan. Additionally, as mentioned above, the Debtors agreed to pay the reasonable fees and expenses of the JP Morgan Entities' legal advisors O'Melveny & Myers LLP ("<u>O'Melveny</u>"). O'Melveny has been principally involved in commenting on draft Plan related documents on behalf of JP Morgan (and for the benefit of all similarly-situated equityholders) as well as working with the Debtors to confirm the Plan on the time-frame contemplated by the Support Agreements.

---

[12] The new debt will consist of either $20 million of additional First Lien Notes issued in consideration of the accrued and unpaid interest on the 13% Senior Subordinated Notes or $35 million of new senior subordinated notes issued in exchange for the 13% Senior Subordinated Notes.

## IV.  EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under chapter 11 of title 11 the United States Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Mary F. Walrath and have been administratively consolidated under case number 06-10001 (MFW).

The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.

### A.    JOINT ADMINISTRATION OF DEBTORS' CHAPTER 11 CASES

On the Petition Date, the Debtors filed a motion seeking procedural consolidation of these Chapter 11 Cases for ease of administration.  The Bankruptcy Court approved the motion on January 4, 2006.

### B.    OTHER FIRST-DAY RELIEF

On the Petition Date, the Debtors brought a number of motions seeking typical "first-day" relief in their Chapter 11 Cases.  The purpose of such motions was to ensure that the Debtors were able to transition into the Chapter 11 process with as little disruption to their businesses as possible and enabling the Debtors' businesses to function smoothly while the Chapter 11 process was pending.

In particular, the Debtors brought "first day" motions seeking authority to, among other relief, (i) pay prepetition wages and other benefits to their employees, (ii) honor prepetition customer obligations and continue customer programs, (iii) pay certain prepetition claims of shippers, warehousemen and other lien claimants,[13] (iv) make payments to certain prepetition creditors that were vital to the Debtors' uninterrupted operations, (v) continue use of their existing cash management system, bank accounts and business forms, (vi) make tax payments to federal, state and local taxing authorities on an uninterrupted basis (vii) pay the prepetition commissions of the Debtors' brokers, (viii) prohibit utility companies from discontinuing, altering or refusing service and (ix) obtain postpetition financing and use cash collateral.  All of the Debtors' first-day motions were ultimately granted by the Bankruptcy Court in the manner substantially requested by the Debtors in their "first day" motions.

### C.    APPROVAL OF DEBTOR-IN-POSSESSION FINANCING

On the Petition Date, the Debtors sought the Bankruptcy Court's authority to enter into an approximately $68.8 million postpetition financing facility with a syndicate of lenders led by General Electric Capital Corporation.  In addition, the Debtors sought the Bankruptcy Court's authority to use the cash generated in the ordinary course of their business, which constituted "cash collateral" securing the Debtors' obligations to their prepetition secured lenders and prepetition secured noteholders.  As adequate protection for the use of their cash collateral, the Debtors agreed to provide the prepetition secured lenders and prepetition secured noteholders with replacement liens, administrative claims and, in some cases, payment of certain interest, fees and expenses.  The

---

[13] By order entered February 21, 2006, the Bankruptcy Court increased the amount that it initially authorized the Debtors to pay on account of such prepetition claims.

Bankruptcy Court authorized the Debtors to enter into the postpetition financing facility on an interim basis on January 4, 2006, and on a final basis on February 2, 2006. On March 13, 2006, the Bankruptcy Court entered an order amending the Final DIP Order to correct an accounting error in the calculation of the principal amount of the Revolving Credit Facility Claims. Refer to Section III.F for a more detailed explanation of the postpetition financing.

## D.    RECOGNITION BY CANADIAN COURT

On January 3, 2006, three of the Debtors – Uniplast Industries Co., Pliant Corporation of Canada Ltd. and Pliant Packaging of Canada, LLC (the "Canadian Debtors") – obtained an Initial Order (the "Recognition Order") from the Ontario Superior Court of Justice (the "Canadian Court") recognizing their chapter 11 proceedings as "foreign proceedings" pursuant to section 18.6 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended. For various reasons, including the integrated management of the Canadian Debtors with the Debtors operating in the United States, as well as the role that Uniplast Industries Co. and Pliant Packaging of Canada, LLC play in the Debtors' overall prepetition debt structure and the requirements of the DIP Facility Agreement, the chapter 11 proceedings will function as the main proceedings with respect to the Canadian Debtors.

Nonetheless, the Recognition Order serves several crucial functions. First, the Recognition Order provides for a stay of all actions, proceedings, enforcement processes, or other rights or remedies (judicial or extra-judicial) that may be taken or exercised in Canada against any of the Canadian Debtors or their property. This includes the right of any claimant to commence or continue any seizure, attachment, realization or similar proceeding in Canada with respect to a claim or any encumbrance, lien, charge, mortgage or other security held in relation to the Canadian Debtors' property, except with prior leave of the Canadian Court.

Second, the Recognition Order provides a framework which allows certain orders of the Bankruptcy Court to be given full force and effect in the same manner and in all respects as if they had been made by the Canadian Court. For example, by Order dated January 4, 2006 (the "First Day Recognition Order"), the Canadian Court recognized each of the various "first day" orders described above in Section IV.B entered by the Bankruptcy Court, which Orders are deemed to be in full force and effect in Canada in the same manner and in all respects as if they had been made by the Canadian Court. In particular, and as set forth in greater detail in the First Day Recognition Order, the Canadian Court specifically authorized and empowered the Canadian Debtors to guarantee the obligations of the Debtors to the DIP Facility Agent and the DIP Facility Lenders (the "Guaranteed Obligations") under the DIP Facility Agreement and the documents delivered pursuant thereto or in connection therewith (the "DIP Facility Documents") and to grant security for such guarantees substantially on the terms and conditions set forth in the DIP Facility Documents.

The First Day Recognition Order also provides for, among other things, a lien and security interest in favor of the DIP Facility Agent and the DIP Facility Lenders on all of the Canadian Debtors' existing and after-acquired property and undertakings in Canada, with such security, having first-ranking priority over all of the existing and after-acquired property of the Canadian Debtors and any proceeds thereof and all other charges, encumbrances or security (subject to certain exceptions set forth in the First Day Recognition Order).

In addition, the First Day Recognition Order provides that the DIP Facility Lenders may exercise certain rights and remedies available upon default pursuant to the DIP Facility Agreement and related documents, with leave of the Canadian Court and having first provided five days' notice to the Canadian Debtors.

Finally, pursuant to the Recognition Order, RSM Richter Inc. was appointed as information officer (the "Information Officer") for the purpose of ensuring that Canadian stakeholders and the Canadian Court are apprised of developments in the chapter 11 proceedings. The Information Officer is required to report to the Canadian Court at least once every three months on the status of the chapter 11 proceedings, the development of any process for dealing with claims, and such other information it believes to be material. In addition, inquiries by creditors in Canada relating to the status of the proceedings may be directed to the Information Officer.

## E.    CASE ADMINISTRATION AND RELATED ACTIVITIES

1.    Retention of Professionals by the Debtors' Estates.

The Debtors applied for an order authorizing the retention of Sidley Austin LLP ("Sidley") as its general reorganization and bankruptcy counsel under section 327(a) of the Bankruptcy Code on January 18, 2006. The order approving Sidley's retention was entered on February 1, 2006. Sidley is to be compensated on an hourly fee basis.

The Debtors also retained Young Conaway Stargatt and Taylor LLP ("Young Conaway") as Delaware bankruptcy co-counsel in these Chapter 11 Cases and McMillan Binch Mendelsohn LLP ("MBM") as Canadian bankruptcy co-counsel. The applications to retain Young Conaway and MBM were both filed on January 18, 2006, and the retentions were approved by orders entered on February 1, 2006. Both Young Conaway and MBM are to be compensated on an hourly fee basis.

In addition, the Debtors have filed an application to retain Jefferies & Company, Inc. ("Jefferies") as their financial advisors. The application to retain Jefferies was filed on February 2, 2006. The order approving Jefferies retention was entered on March 13, 2006. Jefferies is to be compensated with a $150,000 monthly fee, plus expenses. In addition, in consideration for the services to be rendered by Jefferies to the Debtors, the Debtors will pay or cause to be paid to Jefferies a success fee (the "Success Fee") in an amount equal to the greater of (i) $2,500,000 or (ii) 1.0% of the aggregate principal amount of all restructured liabilities; provided, however, that the Success Fee shall in no event exceed $3,200,000. The first $200,000 of monthly fees actually paid to Jefferies shall be credited against any Success Fee.

To further assist them in carrying out their duties as debtors-in-possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval: (i) Ernst & Young LLP, as accountants and auditors, (ii) Sonnenschein Nath & Rosenthal LLP, as special counsel, (iii) Kekst and Company, Incorporated, as corporate communications consultant, (iv) Buck Consulting, as human resource consultant, (v) Bankruptcy Services, LLC, as claims, notice and balloting agent, and (vi) Mesirow Financial Consulting LLC, as financial advisors. In addition, by order entered February 2, 2006, the Bankruptcy Court authorized the Debtors to employ various "ordinary course professionals" to assist them in operating their businesses.

2.    The Committee and its Advisors.

On January 13, 2006, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee"). The Committee is comprised of the following parties: Bank of New York, Fidelity Management and Research, Total Petrochemicals USA, Inc., Sun Chemical Corporation, Paper Converting Machine Company, BASF Corporation and Oxy Vinyls, LLP. On February 8, 2006, the Committee applied for an order authorizing the retention of Lowenstein Sandler, PC ("Lowenstein") as its counsel under sections 328(a) and 1103 of the Bankruptcy Code. In addition on February 15, 2006, the Committee applied for an order authorizing the retention of Ashby & Geddes, P.A. ("Ashby") as Delaware bankruptcy co-counsel. The orders approving the retentions of Lowenstein and Ashby were entered on March 9, 2006. On February 22, 2006, the Committee applied for an order to retain Kramer Capital Partners, LLC ("Kramer") as its financial advisors. The order approving the retention of Kramer was entered on March 29, 2006.

3.    Other Creditor Constituencies and their Advisors.

In addition to the Committee, three unofficial ad hoc committees of noteholders are represented in these Chapter 11 Cases. The Ad Hoc Committee of First Lien Noteholders is comprised of Blackport Capital Fund Ltd., Concordia Advisors LLC, Credit Suisse First Boston, Deutsche Bank Securities Inc., Fortress Investment Group LLC, Morgan Stanley, Gruss & Co., Troob Capital Management LLC, Venor Capital Management LP, and Watershed Asset Management LLC. The Ad Hoc Committee of First Lien Noteholders is represented by Stroock & Stroock & Lavan LLP, and their financial advisors are Houlihan, Lockey, Howard & Zukin. The Ad Hoc Committee of Second Lien Noteholders is comprised of Apollo DIF Management, and certain funds managed by Tennenbaum Capital Partners, LLC. This ad hoc committee is represented by Klee, Tuchin, Bogdanoff & Stern LLP, and their financial advisor are Chanin Capital Partners. The indenture trustee under the Second Lien Notes Indenture is separately represented in these cases by Arent Fox LLP. As noted above, the Consenting Noteholders are represented by Bingham McCutchen LLP. The JP Morgan Entities are represented by O'Melveny & Myers LLP.

Pursuant to the terms of either the Final DIP Order, the Support Agreements or certain fee letters, the Debtors are obligated to pay the reasonable fees and expenses of the aforementioned legal advisors. The Debtors have received the following estimates of amounts accrued to date from the legal advisors:[14]

| Professional | Estimated Accrued Fees and Expenses |
|---|---|
| Stroock & Stroock & Lavan LLP | $320,000 (Petition Date – April 2006) |
| Houlihan, Lockey, Howard & Zukin | $503,758 (January 7, 2006 –May 6, 2006) |
| Klee, Tuchin, Bogdanoff & Stern LLP | $433,724 (Petition Date – March 31, 2006) |
| Chanin Capital Partners | $506,069 (Petition Date – April 30, 2006) |
| Arent Fox LLP | $32,742 (January 12, 2006 – February 28, 2006) |
| Bingham McCutchen LLP | $275,000 (Petition Date – March 31, 2006) |
| O'Melveny & Myers LLP | $172,000 (Petition Date – March 31, 2006) |

---

[14] These estimates do not include amounts that may have accrued before the Petition Date.

4.     Trade Vendor Treatment and Payments to Vendors.

(a)     Critical Trade Vendors

As part of their "first day" relief, by order entered on or about January 4, 2006 (the "Critical Vendor Order"), the Bankruptcy Court authorized the Debtors to pay the prepetition claims of certain vendors where a failure to pay such creditor's prepetition claims would have a material impact on the Debtors' operations (the "Critical Vendors"). Such payments to the Critical Vendors were authorized in a total amount not to exceed $18.2 million. Under the terms of the Critical Vendor Order, in return for payment of their prepetition claims, such Critical Vendors were required to provide the Debtors with terms that were as or more favorable to the Debtors as the most favorable trade terms, practices and programs in effect between the Debtors and the Vendors in the six months prior to the Petition Date or such other favorable trade terms as were agreed upon by such parties (the "Trade Terms"). In accordance with the Critical Vendor Order, the Debtors are in the process of negotiating such Trade Terms through written agreements in an effort to normalize trade terms with the Critical Vendors.

(b)     Administrative Priority to Non-Critical Goods

By order entered on or about February 8, 2006, the Bankruptcy Court authorized the Debtors, in their discretion, to pay the undisputed obligations of non-critical vendors for goods received by the Debtors within the twenty day period prior to the Petition Date in the ordinary course, as such obligations come due in an amount not to exceed $4 million, provided, that upon notice to the Committee and the United States Trustee, such $4 million limit may be increased to $5 million. Such obligations are entitled to administrative priority status pursuant to section 503(b)(9) of the Bankruptcy Code.

(c)     Postpetition Payments to Vendors on Account of Prepetition Claims

As of April 14, 2006, the Debtors had made the following postpetition payments to suppliers on account of prepetition claims: (i) $5.9 million to Critical Vendors, (ii) $500,000 to non-Critical Vendors, (iii) $6.9 million to shippers and warehouseman, and (iv) $2.4 to lien claimants.

5.     Schedules of Assets and Liabilities; Statements of Financial Affairs.

On or about March 9, 2006, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with respect to each of the Debtors.

6.     Disposition of Certain Executory Contracts and Unexpired Leases.

The Debtors have not yet assumed or rejected any executory contracts or unexpired leases.

7.     Employees.

(a)     Payment of Employee Reimbursement Expenses

37

On January 4, 2006 the Bankruptcy Court entered an order authorizing the Debtors to pay prepetition wages and other benefits to their employees (the "Wage Order"). The Wage Order authorized, among other things, the Debtors to reimburse employees for expenses incurred prior to January 3, 2006 on behalf of the Debtors in the scope of their employment, and to continue to reimburse employees for any and all such expenses incurred on or after January 3, 2006 (as routinely done prior to the Petition Date). With respect to expenses incurred prior to January 3, 2006 (the "Prepetition Reimbursements"), the Wage Order provided that (i) the Debtors could reimburse such expenses up to a total cap of $150,000 and (ii) the Debtors could only pay each of their employees a maximum of $10,000 on account of Prepetition Reimbursements, wages and other forms of compensation and benefits that are directly payable to the employee.

On January 13, 2006, the Debtors filed a supplemental motion (the "Supplemental Reimbursement Motion") because upon further consideration, it appeared that (i) certain employees may have had claims for Prepetition Reimbursements that exceeded $10,000 and (ii) the Debtors actually owed over $150,000 in Prepetition Reimbursements. Accordingly, by the Supplemental Reimbursement Motion, the Debtors requested authority to fully reimburse employees for prepetition reimbursable expenses up to a revised cap of $500,000, even where doing so would result in having to pay individual employees more than $10,000. By order entered on or about February 1, 2006, the Bankruptcy Court granted the relief requested in the Supplemental Reimbursement Motion.

(b)     Approval of Certain Employee Severance Plans

On January 31, 2006, the Debtors filed a supplemental motion (the "Supplemental Severance Motion") further clarifying the scope of their severance program and requesting authority to make severance payments to certain of their non-union, non-insider U.S. employees on the terms set forth in the Supplemental Severance Motion. By order entered February 21, 2006, the Bankruptcy Court granted the Supplemental Severance Motion.

(c)     Approval of Certain Management Incentive Plan Payments

On February 23, 2006, the Debtors filed a motion (the "MIP Motion") seeking approval to make certain incentive payments to 100 management-level employees consistent with the Debtors' 2005 Management Incentive Compensation Plan ("MIP"). On March 14, 2006, over the objections of the United States Trustee and the Ad Hoc Committee of Second Lien Noteholders, the Bankruptcy Court granted substantially all of the relief requested by the Debtors in the MIP Motion. Although the Debtors were not permitted to pay the full MIP award to certain employees, the Bankruptcy Court's order permitted the Debtors to seek payment of such unpaid portions pursuant to the Plan.

8.     Funding of Certain Non-Debtor Subsidiaries.

By order entered on or about February 1, 2006, the Bankruptcy Court authorized the Debtors to continue to advance funds in an aggregate amount not to exceed $2.1 million to certain of their non-debtor foreign subsidiaries including: Aspen Industrial, S.A. de C.V., Jacinto Mexico, S.A. de C.V., Pliant de Mexico, S.A. de C.V. and Pliant Film Products GmbH.

9.    Insurance Motion.

By order entered on or about February 1, 2006, the Bankruptcy Court authorized the Debtors to continue to make installment payments to AFCO Credit Corporation ("AFCO") pursuant to that certain prepetition insurance premium financing arrangement between Pliant and AFCO. This agreement is necessary to enable the Debtors to maintain essential insurance coverage on favorable terms.

10.    Filed Claims and Bar Date.

By order entered March 9, 2006, the Bankruptcy Court set May 5, 2006 at 4:00 p.m. (EST) as the final date and time for filing certain proofs of claim in these Chapter 11 Cases.

## V. THE PLAN OF REORGANIZATION

## A.    **GENERAL**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders. In addition to permitting rehabilitation of the debtor, another goal of Chapter 11 is to promote equality of treatment of creditors and equity security holders, respectively, who hold substantially similar claims or interests with respect to the distribution of the value of a debtor's assets. In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, section 362 of the Bankruptcy Code generally provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's Chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of prepetition equity security holders.

The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in this Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH**

**IS ATTACHED HERETO AS <u>EXHIBIT A</u>. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS SECTION V OF THE DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS SECTION V OF THE DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

**B.**     **<u>CLASSIFICATION AND ALLOWANCE OF CLAIMS & EQUITY INTERESTS GENERALLY.</u>**

1.     <u>Classification and Allowance.</u>

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests. Only holders of Allowed Claims and Interests are entitled to vote on and receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

**C.**     **<u>PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS</u>**

1.     <u>Administrative Expense Claims.</u>

Administrative Expense Claims are any claims for the payment of administrative expenses, defined in the Plan as any Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors in Possession (such as wages, salaries and

commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code; (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Chapter 11 Cases; (d) any payment to be made under the Plan or otherwise to cure a default on an assumed executory contract or unexpired lease; (e) the indenture trustees' reasonable fees and expenses under the terms of the respective indentures and pursuant to section 12.5 of the Plan; and (f) all fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code.

The Bankruptcy Code does not require that administrative expense claims be classified under a plan. It does, however, require that allowed administrative expense claims be paid in full in cash in order for a plan to be confirmed, unless the holder of such claim consents to different treatment.

Pursuant to the Plan and subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code and the Interim Compensation Order, each Allowed Administrative Expense Claim shall be paid by the Debtors, at their election, in full, in Cash, at the Debtors' option: (i) on the Effective Date, (ii) on the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) in the ordinary course of business as such claims become due; provided, however, that Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations or (iv) on such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Debtors.

Notwithstanding anything to the contrary, Allowed Administrative Expense Claims representing the Debtors' postpetition liabilities incurred in the ordinary course of business will continue to be paid by the Debtors during the Chapter 11 Cases in accordance with the terms and conditions of the particular transactions and any agreement or Court order relating thereto.

Each Allowed Administrative Expense Claim will be paid from, and to the extent of available assets of, the respective Debtor's Estate to which such Claim applies or has been allocated. To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Claim.

As set forth in Section II.B, the Debtors estimate that the Allowed amount of Administrative Expense Claims as of their emergence from Chapter 11 will be approximately $114.6 million. This amount is comprised of approximately $17.9 million of Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code and approximately $96.8 million of post-petition accounts payable and accrued liabilities. Of the $96.8 million attributable to accounts payable and accrued liabilities, approximately 73% of such amount is on account of raw materials and packaging, approximately 5% is on account of freight, approximately 8% is on account of utilities, approximately 1% is on account of MRO (Maintenance, Repair and Operating Supplies),

and the remaining 13% is on account of miscellaneous accounts payable, including, among other items, commissions and lease payments.

      2.    DIP Facility Claims.

      Pursuant to the Plan, on the Effective Date, all amounts owed by any Debtor under the DIP Facility Agreement (including, without limitation, all loans and all fees and expenses payable thereunder) shall be paid in full in Cash and the Commitments (as defined in the DIP Facility Agreement) under the DIP Facility Agreement shall be cancelled. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility Agreement shall be either (i) returned to the applicable DIP Facility Lender and cancelled without having been drawn or (ii) replaced with back-to-back letters of credit and/or cash collateralized in an amount equal to 105% of the aggregate letter of credit exposure (i.e., the sum of (x) the aggregate undrawn amount of all outstanding letters of credit and (y) all amounts drawn under such letters of credit and not then reimbursed), in each case as provided for in accordance with the DIP Facility Agreement.

      3.    Priority Tax Claims.

      Priority Tax Claims are Allowed Claims of governmental units for taxes owed by the Debtors that are entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

      The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements of section 507(a)(8)(A), (b) property taxes meeting the requirements of section 507(a)(8)(B), (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C), (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(4), to the extent such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E), (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F), and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).

      The Bankruptcy Code does not require that priority tax claims be classified under a plan. It does, however, require that such claims receive the treatment described below in order for a plan to be confirmed unless the holder of such claims consents to different treatment.

      Pursuant to the Plan, on or as soon as reasonably practicable after (i) the Effective Date if such Priority Tax Claim is an Allowed Priority Tax Claim or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax claim shall receive in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, at the election of the Debtors: (a) Cash equal to the amount of such Allowed Priority Tax Claim; (b) such other treatment as to which the Debtors or the Reorganized Debtors and the Holder of such Allowed Priority Tax Claims shall have agreed upon in writing; or (c) such Claim will be otherwise treated in any other manner such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code; further provided, any Allowed Priority Tax Claim not due and owing on the Effective Date will be paid when such Claim becomes due and owing.

**D.    NON-SUBSTANTIVE CONSOLIDATION AND CLASSIFICATION OF CLAIMS**

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' estates, and on the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for purposes thereof. Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds shall be advanced to the relevant Debtors by the Estate of Pliant. Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.

Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate claim against each Debtor's estate, provided, however, that no Holder shall be entitled to received more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan.

The categories of Claims and Interests listed below, which exclude Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims in accordance with section 1123(a)(1) of the Bankruptcy Code, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired[15] | Yes |
| Class 4 | First Lien Note Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Second Lien Note Claims | Unimpaired | No (deemed to accept) |
| Class 6 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 7 | Old Note Claims | Impaired | Yes |
| Class 8 | Intercompany Claims | Impaired | Yes |
| Class 9 | Series A Preferred Stock Interests | Impaired | Yes |
| Class 10 | Series B Preferred Stock Interests | Impaired | Yes |
| Class 11 | Outstanding Common Stock Interests | Impaired | Yes |
| Class 12 | Other Outstanding Common Stock Interests | Impaired | No (deemed to reject) |

## E.   PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

The classification and treatment of Claims against and Interests in the various Debtors are set forth in detail in the Plan. A summary of that treatment is provided below.

---

[15] The Debtors reserve the right to seek a determination at the hearing on Confirmation that the Revolving Credit Facility Claims are Unimpaired and deemed to have accepted the Plan.

1.    Priority Non-Tax Claims (Class 1).

Priority Non-Tax Claims are Claims other than Administrative Expense Claims, DIP Facility Claims or Priority Tax Claims, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

All Holders of Allowed Claims in this Class will have their Claims Reinstated.  Such Claims are unimpaired under the Plan, and the Holders of such Claims are not entitled to vote on the Plan.

2.    Other Secured Claims (Class 2).

Other Secured Claims are Claims (other than an Administrative Expense Claim, DIP Facility Claim or Revolving Credit Facility Claim) that are secured by a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of the setoff, pursuant to section 553 of the Bankruptcy Code.

All Holders of Allowed Claims in this Class will have their Claims Reinstated.  Such Claims are unimpaired under the Plan, and the Holders of such Claims are not entitled to vote on the Plan.

3.    Revolving Credit Facility Claims (Class 3).

Revolving Credit Facility Claims are all Claims of the Revolving Credit Facility Lenders under the Revolving Credit Facility Agreement, which Claims shall be deemed, pursuant to section 506 of the Bankruptcy Code, Allowed pursuant to this Plan in the aggregate principal amount of $130,953,697, plus (a) (i) unpaid interest thereon through the Effective Date at the non-default contract rate and (ii) all fees and expenses payable in respect of such Claims under the Revolving Credit Facility Agreement and minus (b) amounts repaid prior to the Effective Date, if any.

All Holders of Allowed Claims in this Class will be paid in full, including, without limitation, all interest accrued at the non-default contract rate and any unpaid professionals fees and expenses, as provided for in the Revolving Credit Facility Agreement.

The Debtors have treated such Claims as Impaired under the Plan, and the Holders of such Claims are entitled to vote on the Plan.  However, the Debtors reserve the right to seek a determination at the hearing on Confirmation that the Revolving Credit Facility Claims are Unimpaired and deemed to have accepted the Plan.

4.    First Lien Note Claims (Class 4).

First Lien Note Claims are Claims arising under or evidenced by the 11 5/8% senior secured notes due 2009 in the aggregate principal amount of approximately $269,755,013 as of the Petition Date and the remaining 11 1/8% Senior Secured Notes due 2009 in the aggregate principal amount of approximately $7,032,673 as of the Petition Date, or the First Lien Notes Indenture and related documents, including any Claim of the First Lien Indenture Trustee.

All Holders of Allowed Claims in this Class will have their Claims Reinstated by way of a reaffirmation by the Reorganized Debtors of the First Lien Notes Indenture and the First Lien Notes in accordance with their terms, and compliance on the Effective Date with section 1124 of the Bankruptcy Code, including, without limitation, the payment of all reasonable fees, costs and charges owing to each Holder of a First Lien Note Claim. In addition, to the extent the reasonable fees and expenses of counsel to the ad hoc committee of Holders of First Lien Note Claims are not paid pursuant to the Final DIP Order, such fees shall be paid on the Effective Date of the Plan or as soon as practicable thereafter.

5.    Second Lien Note Claims (Class 5).

Second Lien Note Claims are Claims arising under or evidenced by the 11 1/8% senior secured notes due 2009 or the Second Lien Notes Indenture and related documents, including any Claim of the Second Lien Indenture Trustee.

All Holders of Allowed Claims in this Class will have their Claims Reinstated by way of a reaffirmation by the Reorganized Debtors of the Second Lien Notes Indenture and the Second Lien Notes in accordance with their terms, and compliance on the Effective Date with section 1124 of the Bankruptcy Code, including, without limitation, the payment of Cash on the Effective Date in an amount equal to interest accrued at the contract rate (together with interest on overdue installments of interest at the same rate, to the extent allowable) as specified in the Second Lien Notes Indenture and the Second Lien Notes through the last payment date immediately preceding the Effective Date and the payment of all reasonable fees, costs and charges owing to the Second Lien Indenture Trustee and each Holder of a Second Lien Note Claim to the extent provided for, and allowable, under the Second Lien Notes Indenture or provided for under the Final DIP Order.

6.    General Unsecured Claims (Class 6).

General Unsecured Claims are Claims against the Debtors that are not Administrative Expense Claims, DIP Facility Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Revolving Credit Facility Claims, First Lien Note Claims, Second Lien Note Claims, Intercompany Claims or Old Note Claims, and shall not include Claims that are disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

All Holders of Allowed Claims in this Class will have their Claims Reinstated and shall receive payment in full. Moreover, all potential preference actions arising under section 547 of the Bankruptcy Code against creditors in this Class shall be waived as provided in Section 10.5 of the Plan. General Unsecured Claims are not Impaired under the Plan, and the Holders of such Claims are not entitled to vote on the Plan.

7.    Old Note Claims (Class 7).

Old Note Claims are Claims arising under or evidenced by the 13.0% unsecured senior subordinated notes due 2010 and other claims arising under the Old Notes Indentures and related documents, including any Claim of the Old Indenture Trustee.

All Holders of Allowed Claims in this Class will receive:

(a)     their Pro Rata share of the additional First Lien Notes to be issued by New Pliant as of the Effective Date in the aggregate principal amount of $20 million, subject to downward adjustment to reflect rounding of Pro Rata interests to the nearest $1,000, (the "Tack-On Notes") as consideration for the accrued and unpaid interest payment due on December 1, 2005 under the Old Notes Indentures; provided, however, that in the event the grant of Tack-On Notes as provided in section 3.2(g) of the Plan results in a determination by the Bankruptcy Court that the First Lien Note Claims or the Second Lien Note Claims are impaired within the meaning of section 1124 of the Bankruptcy Code, each such Holder shall not receive the Tack-On Notes but shall instead receive its Pro Rata Share of new 13% unsecured senior subordinated notes in the aggregate principal amount of $35 million, subject to downward adjustment to reflect rounding of Pro Rata interests to the nearest $1,000, due 2010, to be issued by New Pliant (the "New Senior Subordinated Notes") which, together with the consideration identified in (b) and (c) below, shall be in exchange for the Old Notes;

(b)     their Pro Rata share of 77.5% of the aggregate amount of issued and outstanding Series AA Preferred Stock as of the Effective Date; provided, however, that if the grant of Bondholder Additional Consideration (as defined below in subsection (d)) results in a determination by the Bankruptcy Court that the First Lien Note Claims or the Second Lien Note Claims are impaired within the meaning of section 1124 of the Bankruptcy Code, then Holders will receive their Pro Rata share of 80% of the aggregate amount of issued and outstanding Series AA Preferred Stock as of the Effective Date (the "Bondholder Series AA Preferred Stock");

(c)     their Pro Rata share of thirty percent (30%) of New Common Stock; and

(d)     if Class 7 accepts the Plan, an amount in Cash equal to one percent (1%) of the principal amount of Old Notes held by a Holder of an Old Note Claim (the "Bondholder Additional Consideration"); provided, however, that in the event that the grant of Bondholder Additional Consideration pursuant to this section results in a determination by the Bankruptcy Court that the First Lien Note Claims or the Second Lien Note Claims are impaired within the meaning of section 1124 of the Bankruptcy Code, such Holder shall not be entitled to any Bondholder Additional Consideration.

In addition, Class 7 shall receive Cash in an amount equal to the Consenting Noteholders' Professional Fees, which Cash shall be paid directly by Pliant to the professionals incurring such fees; provided, however, that in the event the payment of the Consenting Noteholders' Professional Fees is challenged and the Bankruptcy Courts finds First Lien Impairment or Second Lien Impairment then the Consenting Noteholders' Professional Fees shall not be paid.

Old Note Claims are Impaired under the Plan, and the Holders of such Claims are entitled to vote on the Plan.

**The Plan provides for alternative treatments of Old Note Claims in the event the Bankruptcy Court makes certain determinations concerning the impairment under the Plan of the First Lien Note Claims and Second Lien Note Claims. Accordingly, based upon the outcome of these determinations, in addition to other consideration, the Holders of Old Notes could receive any combination of the following:**

**1.      $20 million of First Lien Tack-On Notes, which are secured notes, OR $35 million of New Senior Subordinated Notes, which are unsecured notes; AND**

46

> **2. if Class 7 accepts the Plan, Cash equal to 1% of the principal amount of your Old Notes OR an additional 2.5% of Series AA Preferred Stock.**

8. <u>Intercompany Claims (Class 8).</u>

Intercompany Claims are all prepetition Claims against any of the Debtors held by a Debtor or a Non-Debtor Affiliate.

Pursuant to the terms of the Plan, on the Effective Date, at the option of the Debtors, all Intercompany Claims in Class 8 shall either be (i) Reinstated, in full or in part, or (ii) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan, provided, however, that prior to such discharge and extinguishment such Intercompany Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Debtors. Any and all Class 8 Claims, or portions thereof, being extinguished and, to the extent, if any, such Claims are being contributed to capital or treated in another manner as permitted in the Plan, are set forth in <u>Exhibit M</u> to the Plan.

As set forth on <u>Exhibit M</u> to the Plan, the Debtors have determined as of the filing of this Disclosure Statement to contribute to capital certain net intercompany balances owing to Pliant by each of Pliant Film Products of Mexico, Inc., Pliant Solutions Corporation and Uniplast Holdings Inc. As set forth in the Plan, in the event the Debtors decide to extinguish any additional intercompany balances and/or contribute any additional intercompany balances to capital, they will supplement <u>Exhibit M</u> to the Plan.

9. <u>Series A Preferred Stock Interests (Class 9).</u>

Series A Preferred Stock Interests are Interests relating to (i) Series A Cumulative Exchangeable Redeemable Preferred Stock of Pliant and (ii) all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such preferred stock.

All Holders of Allowed Interests in this Class will receive their Pro Rata share of: (i) 22.5% of the aggregate amount of issued and outstanding Series AA Preferred Stock as of the Effective Date, provided, however, that if the grant of Bondholder Additional Consideration as provided in Section 3.2(g) of the Plan results in a determination by the Bankruptcy Court that the First Lien Note Claims or the Second Lien Note Claims are impaired within the meaning of section 1124 of the Bankruptcy Code, Holders of Allowed Interests in this Class will receive 20% of the aggregate amount of issued and outstanding Series AA Preferred Stock as of the Effective Date, and (ii) 28% of New Common Stock, provided, however, that in the event that any of the Stock Options are exercised pursuant to section 5.16 of the Plan and the exercise thereof would cause a "Change of Control," as defined by either the First Lien Notes Indenture or the Second Lien Notes Indenture, to occur upon consummation of the Plan, then such percentage may be decreased by up to 2.5% of New Common Stock to avoid such Change of Control. Such decrease will be limited to no more than the percentage necessary to avoid a Change of Control under both the First Lien Notes Indenture and the Second Lien Notes Indenture.

Series A Preferred Stock Interests are impaired under the Plan, and the Holders of such Interests are entitled to vote on the Plan.

10.    Series B Preferred Stock Interests (Class 10).

Series B Preferred Stock Interests are Interests relating to (i) Series B Redeemable Preferred Stock of Pliant and (ii) all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such preferred stock.

Pursuant to the terms of the Plan, all former directors or officers of the Debtors who are Holders of Allowed Interests in this Class shall receive an amount equal to $5,258 per share in Cash on account of each vested share, or portion thereof, of Series B Preferred Stock held by such Holder. Holders of Series B Preferred Stock who are current directors or officers of the Debtors as of the Effective Date shall agree to forego any distribution as provided for in Section 3.3(b) of the Plan in consideration for their eligibility to participate in one or more of the Reorganized Debtors' incentive programs. All unvested Series B Preferred Stock Interests shall be cancelled, annulled and extinguished, and the Holders thereof shall not be entitled to any distribution on account of such unvested shares.

The amount of Cash attributed to each share of Series B Preferred Stock is based upon the liquidation preference such Holders would receive pursuant to Pliant's articles of incorporation, which generally governs the rights and preferences of the Series B Preferred Stock. The Debtors' calculation of the Cash attributed to each share of Series B Preferred Stock is based upon the implied reorganization equity value of the Debtors, which is derived from the midpoint of the TEV Range set forth in Part VIII.B. The Debtors estimate that the actual amount to be paid on account of all Allowed Interests in this Class will be approximately $75,000.

Such Series B Preferred Stock Interests are impaired under the Plan, and the Holders of such Interests are entitled to vote on the Plan.

11.    Outstanding Common Stock Interests (Class 11).

Outstanding Common Stock Interests are Interests of each owner of the common stock of Pliant issued and outstanding as of the Petition Date. In addition, Outstanding Common Stock Interests include warrants for the purchase of common stock of Pliant that have not expired by their terms or by agreement of Pliant and the Holder thereof (the "Warrants"). The Warrants have an exercise price of .01 per share. The Warrants shall be deemed to be exercised pursuant to section 5.16 of the Plan. Outstanding Common Stock Interests also include any Claims that are subordinated pursuant to section 510(b) of the Bankruptcy Code to the same priority as common stock. Finally, Outstanding Common Stock Interests include the exercised and vested options to purchase common stock of Pliant that were granted by Pliant to certain present and former employees, which have not expired by their terms or by agreement between Pliant and the Holder thereof (the "Stock Options"). Pursuant to Section 5.16 of the Plan, the Holder of a Stock Option may exercise its Stock Option by tendering to Pliant the contractual exercise price on or prior to the Effective Date of the Plan and by complying with certain other requirements (as set forth in Section 5.16 of the Plan). Accordingly, Class 11 only includes the following categories of Interests: (i) Pliant common stock; (ii) the Warrants, which shall be deemed to be exercised; (iii) claims that are subordinated pursuant to section 510(b) of the Bankruptcy Code; and (iv) vested and exercised Stock Options.

All Holders of Allowed Interests in this Class will receive their Pro Rata share of 42% of New Common Stock (the "New Equity Common Stock"). However, in the event that any of

the Stock Options are exercised pursuant to section 5.16 of the Plan and the exercise thereof would cause a "Change of Control," as defined by either the First Lien Notes Indenture or the Second Lien Notes Indenture, to occur upon consummation of the Plan, then such percentage distributed to Holders of Outstanding Common Stock Interests may be increased up to 2.5% of New Common Stock to avoid such Change of Control. Such increase will be limited to no more than the percentage necessary to avoid a Change of Control under both the First Lien Notes Indenture and the Second Lien Notes Indenture. In addition, each Holder of an Allowed Outstanding Common Stock Interest resulting from the subordination under section 510(b) of the Bankruptcy Code of a Claim shall be only entitled to receive a distribution of New Equity Common Stock in respect of the capital stock held by such Holder that is related to such Claim. Such Interests are impaired under the Plan, and the Holders of such Interests are entitled to vote on the Plan.

      12.      <u>Other Outstanding Common Stock Interests (Class 12).</u>

      Other Outstanding Common Stock Interests are any calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the common stock of Pliant, but do not include Outstanding Common Stock.

      No distributions shall be made on account of Interests in this Class, and all such Interests shall be cancelled, annulled and extinguished on the Effective Date. Such Interests are impaired and do not receive or retain any property under the Plan. Accordingly, Holders of such Interests are conclusively presumed to reject the Plan and are not entitled to vote.

      Nothing contained in section 3.2(d) of the Plan shall impact a party's right to assert valid defenses related to Other Outstanding Common Stock Interests, if any, pursuant to applicable law; <u>provided, however,</u> that no affirmative recovery may be obtained on account of such defenses.

**F.**      **<u>IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS THAT ARE IMPAIRED; ACCEPTANCE OR REJECTION OF THE PLAN</u>**

      1.      <u>Holders of Claims and Interests Entitled to Vote.</u>

      Each of Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 4 (First Lien Note Claims), Class 5 (Second Lien Note Claims) and Class 6 (General Unsecured Claims) is Unimpaired by the Plan and the holders of Allowed Claims in each of such Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

      Each of Class 3 (Revolving Credit Facility Claims), Class 7 (Old Note Claims), Class 8 (Intercompany Claims), Class 9 (Series A Preferred Stock Interests), Class 10 (Series B Preferred Stock Interests) and Class 11 (Outstanding Common Stock Interests) is Impaired and the holders of Allowed Claims and Interests in such Classes are entitled to vote to accept or reject the Plan.

      Class 12 (Other Outstanding Common Stock Interests) is Impaired by the Plan, and the Holders of Interests in this Class will not receive or retain any property under the Plan on account of such Interests. Accordingly, Holders of Interests in Class 12 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.