Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any other cash that the Debtors held and generated during the assumed holding period stated in the Plan and after deducting the incremental expenses of operating the business pending disposition.

In general, as to each entity, liquidation proceeds would be allocated in the following priority:

- first, to the Claims of secured creditors to the extent of the value of their collateral;

- second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases, including tax liabilities;

- third, to the unpaid Administrative Expense Claims;

- fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code;

- fifth, to Unsecured Claims;  and

- sixth, to Interests.

The Debtors' liquidation costs in a Chapter 7 case would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the Chapter 7 cases and all unpaid Administrative Expense Claims that are allowed in the Chapter 7 case. The liquidation itself might trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its claims as Priority Tax Claims rather than asserting them in due course as is expected to occur under the Chapter 11 Cases. These Priority Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, Chapter 7 costs of administration and other Administrative Expense Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The following Chapter 7 liquidation analysis is provided solely to discuss the effects of a hypothetical Chapter 7 liquidation of the Debtors and is subject to the assumptions set forth below. The Debtors cannot assure you that these assumptions would be accepted by a Bankruptcy Court. The Chapter 7 liquidation analysis has not been independently audited or verified.

5.    Liquidation Analysis.

A liquidation analysis is attached to this Disclosure Statement as Exhibit B (the "Liquidation Analysis"). This analysis is based upon a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtors' control. Accordingly, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors assure you that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determinations under section 1129(a) of the Bankruptcy Code. **ACTUAL LIQUIDATION**

**PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN <u>EXHIBIT B</u>.  NO REPRESENTATION OR WARRANTY CAN OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS.  THE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A CHAPTER 7 LIQUIDATION OF THE ESTATE AND DO NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THESE VALUATIONS IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION OF THE DEBTORS FOR ANY OTHER PURPOSE.**

The Liquidation Analysis is based upon the Debtors' balance sheets as of December 31, 2005, and assumes that the actual December 31, 2005 balance sheets are conservative proxies for the balance sheets that would exist at the time the Chapter 7 liquidation would commence.

Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other duties, collect and convert the property of a debtor's estate to Cash and close the estate as expeditiously as is compatible with the best interests of the parties-in-interest.  Consistent with these requirements, it is assumed for purposes of the Liquidation Analysis that a liquidation of the Debtors would commence under the direction of a Chapter 7 trustee appointed by the Bankruptcy Court and would continue for a period of nine (9) months, during which time all of the Debtors' major assets would either be sold or conveyed to their respective lien holders, and the Cash proceeds of such sales, net of liquidation-related costs, would then be distributed to the Debtors' creditors.  Although the liquidation of some assets might not require nine months to accomplish, other assets would be more difficult to collect or sell and hence would require a liquidation period substantially longer than nine months.

As set forth in detail on the attached Liquidation Analysis at <u>Exhibit B</u>, the Debtors believe that the Plan will produce a greater recovery for the holders of Claims and Interests than would be achieved in a Chapter 7 liquidation.  Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the holders of Claims and Interests than would a Chapter 7 liquidation.

## VIII.  PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE

### A.     <u>PROJECTED FINANCIAL INFORMATION</u>

The Debtors have prepared certain consolidated financial projections, which are attached to this Disclosure Statement as <u>Exhibit D</u>.  The Debtors  have undertaken a thorough analysis of the Debtors' operations to develop a business plan.  The business plan reflects a bottom-up analysis of the operations of the Debtors and application of that analysis to develop projections for the years 2006-2009.  The analysis and development of the business plan considered historical and recent operational performance, opportunities for improving operational efficiency and reducing waste and costs, and published market research regarding forecast growth rates for the primary markets in which the Debtors participate.  The principal assumptions that are part of the business plan and that underlie the projections are set forth in <u>Exhibit D</u>.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of Reorganized Debtors and their Non-Debtor

Affiliates. The Debtors do not generally publish their business plans and strategies or make external projections of their anticipated financial position or results of operations. Accordingly, after the date of the Disclosure Statement, the Reorganized Debtors do not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation in March 2006 or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Furthermore, the Reorganized Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions. However, the Reorganized Debtors' regular quarterly and annual financial statements, and the accompanying discussion and analysis, contained in the Reorganized Debtors' Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, will contain disclosure concerning the Reorganized Debtors' actual financial condition and results of operations during the periods covered by these reports.

THE PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT D WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE COMPANY'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE COMPANY DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE COMPANY DOES NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE COMPANY BELIEVES THAT THE PROJECTIONS ARE BASED ON ESTIMATES AND ASSUMPTIONS THAT ARE REASONABLE. THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN ITS PROJECTIONS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X, "RISK FACTORS."

## B.    REORGANIZATION VALUE

In connection with certain matters relating to the Plan, the Debtors directed Jefferies & Company, Inc. ("Jefferies"), the financial advisors to the Debtors, to prepare an analysis of the going concern equity value of the Reorganized Debtors and their Non-Debtor Affiliates for the purposes of assisting the Debtors in evaluating (a) the relative recoveries of holders of Allowed Claims and Interests under the Plan, (b) whether the Plan satisfies the "best interests" test under the

Bankruptcy Code and (c) the value of the shares of stock to be issued under the Plan. The valuation analysis conducted by Jefferies is described below.

In preparing its analysis, Jefferies has, among other things: (i) reviewed certain internal financial and operating data of the Debtors and their Non-Debtor Affiliates; (ii) discussed with certain senior executives the current operations and prospects of the Debtors and their Non-Debtor Affiliates; (iii) reviewed certain operating and financial forecasts prepared by the Debtors and their Non-Debtor Affiliates, including the projections; (iv) discussed with certain senior executives of the Debtors key assumptions related to the projections; (v) prepared discounted cash flow analyses based on the projections, utilizing various discount rates and terminal value multiples; (vi) considered the market multiples of certain publicly-traded companies in businesses reasonably comparable to the operating businesses of the Debtors and their Non-Debtor Affiliates; (vii) considered the transaction multiples of acquisitions involving companies in businesses reasonably comparable to the operating businesses of the Debtors and their Non-Debtor Affiliates; and (viii) considered such other analyses as Jefferies deemed necessary under the circumstances.

Jefferies assumed, without independent verification, the accuracy, completeness and fairness of all of the financial and other information available to it from public sources or as provided to Jefferies by the Debtors or their representatives. Jefferies has not audited, reviewed or compiled the accompanying information in accordance with Generally Accepted Accounting Auditing Standards, or otherwise. Jefferies also assumed that the projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and judgment as to future operating and financial performance.

As a result of such analyses, review, discussions, considerations and assumptions, Jefferies presented to the Debtors estimates that the total enterprise value ("TEV") of the Debtors and their Non-Debtor Affiliates is a range of approximately $860.0 million to $980.0 million with a mid-point value of $920.0 million (the "TEV Range"). Jefferies reduced such mid-point TEV estimate by the estimated pro forma net debt levels of the Reorganized Debtors and their Non-Debtor Affiliates as of June 30, 2006 (approximately $676.2 million) to calculate the implied reorganized equity value, including both preferred and common equity, of the Reorganized Debtors and their Non-Debtor Affiliates of $243.8 million. In the event that the Holders of the Old Note Claims do not receive the Tack-On Notes in the aggregate principal amount of $20.0 million (subject to downward adjustment to reflect rounding of pro rata interests) pursuant to section 3.2(g)(i) of the Plan, the Holders of the Old Note Claims are to receive New Senior Subordinated Notes, in the aggregate principal amount of $35.0 million (subject to downward adjustment to reflect rounding of pro rata interests). As such, the pro forma net debt levels will increase by $15.0 million to $691.2 million, resulting in a reduction of the implied reorganized equity value from $243.8 million to $228.8 million.

|  | Midpoint Reorganization Valuation | |
|  | $20 million Tack-On | $35 million New Senior Subordinated Notes |
| --- | --- | --- |
| Reorganization Value | $920.0 million | $920.0 million |
| Less Debt | 676.2 million | 691.2 million |
| New Preferred and Common Equity Value | $243.8 million | $228.8 million |

Upon emergence, the equity portion of the reorganized capital structure will consist of: (i) new Series AA Redeemable Preferred Stock with a liquation preference of approximately $335.6 million; (ii) new Series M Preferred Stock and participations in the Deferred Cash Incentive Plan; and (iii) Common Stock. As the liquidation preference of the new preferred equity is greater than the total implied reorganized equity value, Jefferies estimates that there is no implied reorganized Common Stock value at the Effective Date of the Plan and all of the implied reorganized equity value of $243.8 million, or $228.8 million if the Holders of the Old Note Claims do not receive the Tack-On Notes, will be attributable to the new Series AA Redeemable Preferred Stock, the new Series M Preferred Stock and to the participations in the Deferred Cash Incentive Plan.

The Series M Preferred Stock and participations in the Deferred Cash Incentive Plan shall initially be entitled, in the aggregate, to a maximum of 7.5% of the equity value of New Pliant. Such percentage may be increased to an aggregate of a maximum of 8.0% of the equity value of New Pliant under certain circumstances. As such, in order to estimate the midpoint reorganization value of the securities, 8% of the total implied midpoint reorganized equity value, or $19.5 million, has been allocated to the Series M Preferred Stock and participations in the Deferred Cash Incentive Plan, and 92% of the total implied midpoint reorganized equity value, or $224.3 million, has been allocated to the Series AA Redeemable Preferred Stock. If the Holders of the Old Note Claims do not receive the Tack-On Notes, the implied midpoint reorganization value of the Series M Preferred Stock and participations in the Deferred Cash Incentive Plan decreases to $18.3 million, and the implied midpoint reorganization value of the Series AA Preferred Stock decreases to $210.5 million.

|  | Midpoint Reorganization Value | | |
|  | $20 million Tack-On | $35 million New Senior Subordinated Notes | |
| Series AA Redeemable Preferred Stock | $224.3 million | $210.5 million | 92.0% |
| Series M Preferred Stock and Deferred Cash Incentive Plan | 19.5 million | 18.3 million | 8.0% |
| Common Stock | 0.0 million | 0.0 million | 0.0% |
|  | $243.8 million | $228.8 million | 100.0% |

The estimated range of values represents a hypothetical value that reflects the estimated intrinsic value of the Debtors derived through the application of various valuation methodologies. The equity value ascribed in the analysis does not purport to be an estimate of a post-reorganization trading value.

In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holding of pre-petition creditors, some of whom may prefer to liquidate their investment rather than hold such securities on a long-term basis; the fact that the securities are unregistered and not listed on any securities exchange and other factors that generally influence the prices of securities. Actual prices of such securities may also be affected by the bankruptcy case or by other factors not possible to predict. Accordingly, the going concern enterprise value does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

Jefferies' estimate is based on economic, market, financial and other conditions as they exist on, and on the information made available as of March 1, 2006. It should be understood that, although subsequent developments may affect Jefferies' conclusions, including the Company's actual operating performance versus the projections, Jefferies does not have any obligation to update, revise or reaffirm its estimate.

The summary set forth above does not purport to be a complete description of the analyses performed by Jefferies. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of implied equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of implied equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. Depending on the results of the Debtors' operations or changes in the financial markets, actual total enterprise value may differ from Jefferies' valuation analysis disclosed herein.

## IX. DESCRIPTION OF CAPITAL STOCK AND DEFERRED CASH INCENTIVE PLAN OF NEW PLIANT

### A.    INTRODUCTION

On the Effective Date, the authorized capital stock of New Pliant will consist of 335,600 shares of Series AA Preferred Stock, 8,000 shares of Series M Preferred Stock and a fixed number of shares of New Common Stock.  Set forth below is a summary of (i) the terms of the Series AA Preferred Stock, Series M Preferred Stock and the New Common Stock, which will be set forth in their entirety in the Amended and Restated Certificate of Incorporation of New Pliant (the "Certificate of Incorporation"), which will be substantially in the form attached as Exhibit A to the Plan, (ii) the terms of the Deferred Cash Incentive Plan, which will be in substantially the form attached as Exhibit E to the Plan, (iii) the terms of a Stockholders Agreement to which all holders of New Common Stock will become parties (the "New Pliant Stockholders Agreement"), which will be substantially in the form attached as Exhibit C to the Plan and (iv) the terms of a Registration Rights Agreement to which the holders of Series AA Preferred Stock will become parties (the "Series AA Registration Rights Agreement"), which will be substantially in the form attached as Exhibit D to the Plan.  To the extent that there is any inconsistency between this summary and the Certificate of Incorporation, Deferred Cash Incentive Plan, New Pliant Stockholders Agreement or Series AA Registration Rights Agreement, the terms of the Certificate of Incorporation, Deferred Cash Incentive Plan, New Pliant Stockholders Agreement or Series AA Registration Rights Agreement, as the case may be, shall control.

### B.    SERIES AA PREFERRED STOCK

The Series AA Preferred Stock will have an initial face amount of $1,000 per share, or an aggregate face amount of $335,600,000, and will accrue dividends at a rate of 13% per annum. Dividends on the Series AA Preferred Stock will cumulate quarterly.  New Pliant may not declare,

pay or set aside for payment any dividends on the New Common Stock unless it has paid, declared or set aside payments for full cumulative dividends on the shares of Series AA Preferred Stock.

Each share of Series AA Preferred Stock will be entitled to a liquidation preference equal to the $1,000 face amount plus accrued and unpaid dividends. The Series AA Preferred Stock is redeemable at the option of New Pliant at any time at an amount equal to its face amount plus accrued and unpaid dividends.

If the Series AA Preferred Stock has not been redeemed or repurchased by the fifth anniversary of the Effective Date of the Plan, the holders of at least 40% of the outstanding shares of Series AA Preferred Stock shall have the right to cause all of the outstanding class Series AA Preferred Stock to be converted into a number of shares of New Common Stock equal to 99.99% of (i) the excess of the fully diluted shares of New Common Stock at the time of conversion over (ii) the number of shares of New Common Stock, if any, issued pursuant to the Merger Exception described below. Any shares of New Common Stock issued in a transaction that qualifies for the Merger Exception will not be subject to dilution by the conversion of the Series AA Preferred Stock (e.g., if, after a merger that qualifies for the Merger Exception, shareholders of New Pliant prior to the merger own 70% of the New Common Stock and shareholders of the other party to the merger own 30% of the New Common Stock, then the Series AA Preferred would be convertible into 99.9% of 70% of the New Common Stock outstanding after the conversion).

Shares of Series AA Preferred Stock will not have general voting rights, but will have the right to elect 2 out of the 7 members of New Pliant's Board of Directors. If the Series AA Preferred is not redeemed or repurchased by the fourth anniversary of the Effective Date of the Plan, directors elected by the holders of Series AA Preferred Stock will have supermajority voting rights that will permit them to initiate a sale of New Pliant and give them majority control of any board vote related to a sale of New Pliant. If the Series AA Preferred Stock is not redeemed by the fifth anniversary of the Effective Date of the Plan, the holders of the Series AA Preferred Stock will be able to elect a majority of the Board of Directors without converting the Series AA Preferred Stock to New Common Stock. Holders of Series AA Preferred Stock are not entitled to cumulative voting rights in elections of directors.

In addition, there are a number of actions that New Pliant cannot take without the consent of certain of the holders of Series AA Preferred Stock. In particular:

(a) Without the consent of the holders of a majority of all the outstanding shares of Series AA Preferred Stock, voting separately as a class, New Pliant may not:

- create, authorize or issue shares of stock (other than the Series M Preferred Stock) that are either senior to or on a parity with the Series AA Preferred Stock with respect to liquidation or dividends; or

- redeem, purchase or otherwise acquire any New Common Stock or other capital stock that is junior to the Series AA Preferred Stock (other than certain purchases of stock from management upon termination of employment).

(b) Without the consent of the holders of at least two-thirds of all the outstanding shares of Series AA Preferred Stock, voting separately as a class, New Pliant may not:

- sell or dispose of all or substantially all of its assets unless, as part of such transaction, the Series AA Preferred Stock will be redeemed and any remaining balance on the Tack-On Notes or New Senior Subordinated Notes, as the case may be, will be paid in full;

- amend the terms of the Series AA Preferred Stock; or

- merge or consolidate with any other entity, other than (i) reincorporation and certain other mergers that qualify as a "reorganization" within the meaning of Section 368(a)(1) of the Internal Revenue Code of 1986, as amended and (ii) mergers that meet certain financial and other tests described in the following paragraph (the "Merger Exception").

Under the Merger Exception, a merger transaction will not require the approval of the holders of two-thirds of the outstanding shares of Series AA Preferred Stock if, after giving effect to the merger, (1) the pro forma ratio of EBITDA to total interest and dividend obligations (including cash or PIK interest on the New Senior Subordinated Notes and dividends on the Series AA Preferred Stock) for the most recent four fiscal quarters for which financial statements are available prior to signing is at least 10% higher than New Pliant's actual ratio of EBITDA to total interest and dividend obligations for the same period, (2) the pro forma ratio of total funded debt and Series AA Preferred Stock to EBITDA as of the end of the most recent fiscal quarter for which financial statements are available prior to signing is at least 10% less than New Pliant's actual ratio of total funded debt and Series AA Preferred Stock to EBITDA for the same period, (3) the conversion right described above will, if exercised, result in the Series AA Preferred Stock converting into at least 51% of the common equity of the surviving parent entity, and (4) holders of a majority of the Series AA Preferred Stock will be able to elect a majority of the board of directors of the surviving parent entity if the Series AA Preferred Stock is not redeemed prior to the fifth anniversary of the Effective Date of the Plan.

## C.    DEFERRED CASH INCENTIVE PLAN AND SERIES M PREFERRED STOCK

The Deferred Cash Incentive Plan and Series M Preferred Stock will represent a maximum of 7.5% of the equity value of New Pliant, subject to an increase to a maximum of 8% upon approval of the holders of a majority of the shares of New Common Stock distributed to the holders of Old Note Claims under the Plan (such percentage being hereinafter referred to as the "Maximum Percentage Interest").

The Chief Executive Officer of New Pliant, and employees designated by the Chief Executive Officer of New Pliant and approved by the Board of Directors of New Pliant, are eligible to participate in the Deferred Cash Incentive Plan. Employees, consultants, advisors and agents approved by the administrator of New Pliant's 2006 Restricted Stock Incentive Plan (the "Stock Plan") are eligible to receive restricted shares of Series M Stock. The administrator of the Stock Plan will be the Board of Directors of Reorganized Pliant or a committee of the Board composed of non-employee directors.

Participants in the Deferred Cash Incentive Plan and the holders of Series M Preferred Stock will only receive distributions in the event of (i) the transfer of all or substantially all of New Pliant's assets, (ii) the transfer of a majority of the New Common Stock to one person or group of persons acting in concert (other than to J.P. Morgan Partners (BHCA), L.P. or any of its affiliates), (iii) a merger or consolidation of New Pliant (other than a merger in which the holders of New Common Stock immediately prior to such transaction own a majority in voting power of the

New Common Stock (or other voting securities of a successor corporation having the right to elect a majority of its board)), (iv) the liquidation of New Pliant (each of (i), (ii), (iii) and (iv), a "Liquidation Event") or (v) a redemption of any of the Series AA Preferred Stock.

Amounts payable with respect to Liquidation Proceeds or Redemption Proceeds (each as defined below) that are, in the aggregate, less than the Hurdle Amount (as defined below) will be paid under the Deferred Cash Incentive Plan, and any additional amounts will be payable in respect of the Series M Preferred Stock. The "Hurdle Amount" will be equal to $243.8 million and will be reduced in connection with any redemption of Series AA Preferred Stock by an amount equal to (x) the aggregate amount of redemption proceeds received by the holders of Series AA Preferred Stock divided by (y) the "Gross-Up Factor", which shall be 0.925 (if the Maximum Percentage Interest is 7.5%) or 0.92 (if the Maximum Percentage Interest is 8%). The initial Hurdle Amount of $243.8 million represents the implied reorganized equity value calculated by Jefferies based on the mid-point value of Jefferies' TEV Range.

Participants in the Deferred Cash Incentive Plan will receive percentage interests in distributions under that plan. Those percentage interests may not exceed, but may be less than, the Maximum Percentage Interest. Up to 8,000 shares of Series M Preferred Stock may be outstanding at any time. If all 8,000 shares have been issued and are vested, the Series M Preferred Stock will represent the Maximum Percentage Interest in proceeds of Liquidation Events and redemptions of Series AA Preferred Stock that exceed the Hurdle Amount. If fewer than 8,000 shares have been issued and are vested, then the percentage interest represented by the Series M Preferred Stock will decrease proportionately. For purposes of the remainder of this description, the term "Actual Percentage" means the actual percentage interest represented by the percentage interests in the Deferred Cash Incentive Plan and the shares of Series M Preferred Stock (which are assumed to be, but may not necessarily be, the same).

If, at the time a Liquidation Event occurs, there have been no prior redemptions of, or distributions with respect to, the Series AA Preferred Stock and New Common Stock, then participants in the Deferred Cash Incentive Plan will be entitled to receive an amount equal to the Actual Percentage of the Liquidation Proceeds (as defined below) up to the Hurdle Amount and the Series M Preferred Stock will be redeemable for an aggregate amount equal to the Actual Percentage of the portion of the Liquidation Proceeds (if any) that is in excess of the Hurdle Amount. The "Liquidation Proceeds" will be equal to (x) the aggregate net proceeds (whether paid in cash, securities or other property) received by the holders of Series AA Preferred Stock and New Common Stock in connection with the Liquidation Event plus, if applicable and without duplication, the value of any Series AA Preferred Stock and New Common Stock retained by the holders thereof following such transaction divided by (y) the Gross-Up Factor. If the Liquidation Proceeds consist (in whole or in part) of securities (including retained securities), it is contemplated that the holders of Series M Preferred Stock and participants in the Deferred Cash Incentive Plan will generally receive the same securities and proportions thereof as are received by the holders of the Series AA Preferred Stock and/or New Common Stock, as the case may be, although the participants in the Deferred Cash Incentive Plan will have a right to receive at least 40% of the payments under the Deferred Cash Incentive Plan in cash.

If any shares of Series AA Preferred Stock are redeemed and the aggregate amount of the proceeds (excluding proceeds from a Liquidation Event) with respect to such redemption and all prior redemptions of Series AA Preferred Stock exceeds $50 million, then participants in the

Deferred Cash Incentive Plan will receive payments equal to the Actual Percentage of the Redemption Proceeds (as defined below) up to the Hurdle Amount and dividends will be payable with respect to the Series M Preferred Stock in an aggregate amount equal to the Actual Percentage of the Redemption Proceeds which are in excess of the Hurdle Amount. The "Redemption Proceeds" will be equal to the amount obtained by dividing (x) the sum of the cash proceeds received by the holders of the Series AA Preferred Stock upon such redemption plus, if prior redemptions have been made but the aggregate proceeds paid to holders of Series AA Preferred Stock in such prior redemptions were less than or equal to $50 million, the aggregate proceeds paid in such prior redemptions, by (y) the Gross-Up Factor.

If there have been any redemptions of, or distributions with respect to, the Series AA Preferred Stock or New Common Stock prior to a Liquidation Event, then adjustments shall be made to ensure that the aggregate amount payable to participants under the Deferred Cash Incentive Plan and to holders of Series M Preferred Stock as a result of such Liquidation Event is equal to the excess of (A) the Actual Percentage of the sum of (i) the Liquidation Proceeds plus (ii) the amount obtained by dividing (x) the aggregate amount paid to holders of Series AA Preferred Stock and Common Stock in connection with such prior redemptions or distributions by (y) the Gross-Up Factor, minus (B) the aggregate amount actually paid to participants in the Deferred Cash Incentive Plan and holders of the Series M Preferred Stock in respect of such prior redemptions or distributions.

Upon consummation of a Qualified Public Offering and after giving effect to any distributions made to or redemptions of the Series AA Preferred Stock in connection with or as a result of the use of the proceeds thereof, the Series M Preferred Stock will be converted into the Actual Percentage of the aggregate number of shares of common stock and Series AA Preferred Stock (and any class of securities which are issued in exchange for such classes of stock in any recapitalization or similar transaction accomplished prior to or in connection with the Qualified Public Offering) of New Pliant outstanding immediately following the consummation of such Qualified Public Offering (but excluding any shares of common stock issued in the Qualified Public Offering). In addition, if any distributions (other than redemption or liquidation proceeds or shares of stock issued in a Qualified Public Offering) have been made with respect to the Series AA Preferred Stock and Common Stock prior to the Qualified Public Offering, the participants in the Deferred Cash Incentive Plan and the holders of the Series M Preferred Stock will be entitled to receive the Actual Percentage of (x) such distributions divided by (y) the Gross-Up Factor.

Participants in the Deferred Cash Incentive Plan and holders of Series M Preferred Stock will be subject to additional terms (such as eligibility requirements for cash awards under the Deferred Cash Incentive Plan and vesting and repurchase provisions and restrictions on transfer for the Series M Preferred Stock) that are designed to encourage retention of key employees. Certain of those terms are set forth in the Exhibits to the Plan and others will be determined by the Board of Directors of New Pliant. It is expected than any vesting schedule will provide for accelerated vesting upon the occurrence of a Liquidation Event.

The Series M Preferred Stock has no voting rights except as provided by law and, as such, is not entitled to vote in elections of directors.

D.    **NEW COMMON STOCK**

Holders of New Common Stock are entitled to elect 5 out of 7 of the members of the Board of Directors of New Pliant. Holders of New Common Stock are not entitled to cumulative voting rights in the election of directors.

In the event of the liquidation, dissolution or winding up of New Pliant, the holders of New Common Stock will be entitled to share ratably in all assets remaining after payment of all debts and other liabilities, including the liquidation preferences of the Series AA Preferred Stock and the Series M Preferred Stock described above. Holders of New Common Stock are entitled to receive such dividends as may be declared from time to time by the Board of Directors of New Pliant out of assets legally available therefor, subject to the preferential dividend rights of the Series AA Preferred Stock and Series M Preferred Stock. The Certificate of Incorporation also provides for restrictions on transfer that are designed to keep the number of record holders of New Common Stock below 500.

## E.    NEW PLIANT STOCKHOLDERS AGREEMENT

Under the terms of the New Pliant Stockholders Agreement, holders of New Common Stock who are "Permitted Holders" under the First and Second Lien Notes Indentures cannot transfer their New Common Stock to anyone other than another Permitted Holder as long as any First Lien Notes or Second Lien Notes are outstanding. Also, all transferees of New Common Stock must become a party to the New Pliant Stockholders Agreement.

The New Pliant Stockholders Agreement also grants to certain holders of New Common Stock the right to purchase their pro rata share of any new equity securities issued by Company, subject to exceptions for acquisitions, management equity and certain other transactions. The New Pliant Stockholders Agreement also contains "drag-along rights" that require all holders of New Common Stock to participate in and vote in favor of any sale of the Company approved by the Board of Directors and the JP Morgan Entities; provided, that the holders of the New Common Stock issued to the Holders of Old Note Claims may not be required to participate unless the Series AA Preferred Stock and Tack-On Notes or New Senior Subordinated Notes, as the case may be, are paid in full.

Under the New Pliant Stockholders Agreement, the 5 members of the Board of Directors to be elected by the holders of New Common Stock will consist of the CEO of New Pliant and 4 members appointed by the JP Morgan Entities (as the holder of a majority of the New Common Stock held by the Permitted Holders under the First and Second Lien Notes Indentures).

Holders of a majority of the New Common Stock allocated under the Plan to the Holders of Old Note Claims, the JP Morgan Entities and certain other holders of Series A Preferred Stock will have demand registration rights following the third anniversary of the Effective Date of the Plan. Affiliates (such as the JP Morgan Entities) have additional demand and piggyback registration rights following an IPO of the New Common Stock.

The New Pliant Stockholders Agreement also provides that New Pliant cannot increase the Maximum Percentage Interest represented by the Deferred Cash Incentive Plan or Series M Preferred Stock without the prior approval of the holders of a majority of the shares of New Common Stock issued to Holders of Old Note Claims under the Plan.

**F.    SERIES AA REGISTRATION RIGHTS AGREEMENT**

New Pliant will take all actions reasonably required to permit the Series AA Preferred Stock to be quoted on the NASDAQ OTC Bulletin Board as soon as practicable following the Effective Date of the Plan. At any time after the nine month and prior to the second anniversary of the Effective Date of the Plan, the holders of a majority of the Series AA Preferred Stock issued to Holders of Old Note Claims can require New Pliant to register an underwritten public offering of the Series AA Preferred Stock.

## X.  RISK FACTORS

THE IMPLEMENTATION OF THE PLAN AND THE NEW COMMON STOCK, SERIES M PREFERRED STOCK, SERIES AA PREFERRED STOCK AND THE TACK-ON NOTES (OR TO THE EXTENT NECESSARY, THE NEW SENIOR SUBORDINATED NOTES) TO BE ISSUED ON THE EFFECTIVE DATE ARE SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE PRICES AT WHICH THE COMPANY CAN SELL ITS PRODUCTS, THE AVAILABILITY AND COST OF RESIN AND OTHER RAW MATERIALS, CHANGES IN CREDIT TERMS FROM SUPPLIERS, CURRENCY EXCHANGE RATE FLUCTUATIONS, THE DEVELOPMENT OF NEW TECHNOLOGIES, ECONOMIC DOWNTURN, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTORS OR THE REORGANIZED DEBTORS, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

A.    **GENERAL BANKRUPTCY LAW CONSIDERATIONS**

1.    Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Class 11. In the event that Classes 3, 7, 8, 9, 10 and/or 11 fail to accept the Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 12.9 thereof. While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

Confirmation of the Plan is subject to certain conditions as described in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being confirmed.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

2.    Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Effective Date may occur as soon as ten (10) Business Days after the Confirmation Date, there can be no assurance as to such timing. The occurrence of the Effective Date is also subject to certain conditions precedent as described in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

## B.    **OTHER RISK FACTORS**

   1.    Variances from Projections May Affect Ability to Pay Obligations.

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the pro forma financial statements attached as Exhibit D to this Disclosure Statement, in connection with the development of the Plan and in order to present the anticipated effects of the Plan and the transactions contemplated thereby. The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial position of the Reorganized Debtors for the periods indicated. The Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections. The Projections are based upon a variety of assumptions as set forth therein, and Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement many affect the actual financial results of the Reorganized Debtors' operations. Accordingly, actual results may vary materially from those shown in the Projections, which may adversely affect the ability of the Reorganized Debtors to pay the obligations owing to certain holders of Claims and Interests entitled to distributions under the Plan and other indebtedness incurred after confirmation of the Plan.

Management believes that the industries in which the Reorganized Debtors will be operating are volatile due to numerous factors, all of which make accurate forecasting very difficult. Although it is not possible to predict all risks associated with the Projections and their underlying assumptions, there are some risks which management is presently able to identify. The Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the bankruptcy proceeding contemplated by the Plan will not adversely affect the Reorganized Debtors' operating results. There can be no assurance that these two assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Debtors' businesses, results of operations and financial condition.

Moreover, the Projections were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. Rather, the Projections were developed in connection with the planning, negotiation and development of the Plan. The Reorganized Debtors do not undertake any obligation to update or otherwise revise the Projections to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. In management's view, however, the Projections were

prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Reorganized Debtors after the Effective Date. Nevertheless, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, New Pliant, the Reorganized Debtors or any other person that the Projections will be achieved and holders are therefore cautioned not to place undue reliance on the projected financial information contained in this Disclosure Statement.

2.    Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations.

Although the Plan will result in the elimination of $320 million of subordinated debt and approximately $298 million (as of December 31, 2005) of mandatorily redeemable preferred stock of Pliant, the Reorganized Debtors will continue to have a significant amount of indebtedness.

Such levels of indebtedness may limit the ability of the Reorganized Debtors to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes. Such levels of indebtedness may also limit the ability of the Reorganized Debtors to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Debtors vulnerable in a downturn in general economic conditions or in their businesses or unable to carry out capital spending that is important to their growth and productivity improvement programs.

3.    Uncertainty Regarding Exit Facility Credit Agreement May Adversely Affect Success of Reorganization.

Although a term sheet setting forth the expected terms of the Exit Facility Credit Agreement to be entered into by the Reorganized Debtors is set forth as Exhibit I to this Disclosure Statement, the exact terms of the Exit Facility Credit Agreement have not yet been finalized. In addition, even if an Exit Facility Credit Agreement is entered into on substantially the terms set forth in such term sheet, any inability of New Pliant to satisfy the financial covenants and maintain sufficient inventory and receivables levels could restrict the ability of New Pliant to fully access the maximum amount that may be borrowed under the Exit Facility Credit Agreement. Moreover, covenants contained in the First Lien Notes Indenture and the Second Lien Notes Indenture may further restrict the ability of New Pliant to fully utilize the Exit Facility Credit Agreement. These uncertainties with respect to the Exit Facility Credit Agreement may adversely affect the success of the reorganization of the Reorganized Debtors.

4.    Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be determined as of the Effective Date. This determination will be based on an independent valuation. Although the Debtors do not presently expect this valuation to result in values that are materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

5.      Historical Financial Information May Not Be Comparable.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

6.      Market and Business Risks May Adversely Affect Business Performance.

In the normal course of business, the Debtors are subject to the following types of risks and variables, which the Debtors anticipate may materially affect their business performance following the Effective Date:[21]

- The Debtors' ability to generate cost savings and manufacturing and operational efficiencies sufficient to achieve the financial performance set forth in the Projections, including, but not limited to, initiatives to obtain new business and to generate and manage working capital consistent with the Projections and the underlying assumptions thereto;

- Variations in the financial or operational condition of the Debtors' significant customers;

- Material shortages, transportation systems delays or other difficulties in markets where the Debtors purchase supplies for the manufacturing of their products;

- Significant work stoppages, disputes or any other difficulties in labor markets where the Debtors obtain materials necessary for the manufacturing of their products or where their products are manufactured, distributed or sold;

- Increased development of competitive alternatives to the Debtors' products;

- Fluctuations in interest rates;

- Unscheduled plant shutdowns;

- Increased operating costs;

- Changes in prices and supply of raw materials;

- Changes in credit terms offered by the Debtors' suppliers;

- The Debtors' ability to obtain cash adequate to funds their needs, including the borrowings available under the Exit Facility Credit Agreement;

- Various worldwide economic and political factors, changes in economic conditions, currency fluctuations and devaluations, credit risks in foreign markets or political instability in foreign countries where the Debtors and the Affiliates have manufacturing operations or suppliers;

---

[21] See also Pliant's Annual Report on Form 10-K for the year ended December 31, 2005 (attached as Exhibit C hereto) and the additional "Risk Factors" contained therein.

- Physical damage to or loss of significant manufacturing or distribution property, plant and equipment due to fire, weather or other factors beyond the Debtors' control;

- Legislative activities of governments, agencies and similar organizations, both in the United States and in foreign countries, that may affect the operations of the Debtors and their Affiliates;

- The Debtors' ability to comply with government regulations, including public market disclosure requirements such as those contained within the Sarbanes-Oxley Act;

- Legal actions and claims of undetermined merit and amount involving, among other things, product liability, recalls of products manufactured or sold by the Debtors and environmental and safety issues involving the Debtors' products or facilities; and

- Possible terrorist attacks or acts of aggression or war, which could exacerbate other risks such as slowed production or interruptions in the transportation system.

7.    Failure to Maintain Customer Relationships May Adversely Affect Financial Results.

The loss of one or more major customers, or a material reduction in sales to these customers as a result of competition from other film manufacturers, in-sourcing of film requirements or other factors, would have a material adverse effect on the Company's results of operations.

8.    Foreign Currency Risk May Adversely Affect Financial Results.

The Debtors are subject to the risk of changes in foreign currency exchange rates due to their global operations. The Company manufactures and sells its products in North America, Latin America, Europe and Australia. As a result, the Debtors' financial results could be significantly affected by factors such as changes in foreign currency exchange rates or weak economic conditions in foreign markets in which the Debtors manufacture and distribute their products. The Debtors' operating results are primarily exposed to changes in exchange rates between the U.S. dollar and Canadian currency.

9.    Failure to Attract and Maintain Employees May Adversely Affect Financial Results.

Among the Debtors' most valuable assets are their highly skilled professionals who have the ability to leave the Debtors and so deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Chapter 11 Cases, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from Chapter 11. Further attrition may hinder the Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

10.    Cost of Compliance with Government Regulation May Adversely Affect Financial Results.

The Debtors are subject to various foreign, federal, state and local laws and regulations that affect the conduct of their operations, including environmental laws. The Debtors cannot assure you that compliance with these laws and regulations or the adoption of modified or additional laws and regulations will not require large expenditures by the Debtors or otherwise have a significant effect on the Debtors' financial condition or results of operations. Among other laws, a change in the tax laws of the United States or Canada could materially affect the consequences of the Plan as described herein to the Debtors and the holders of Claims and Interests. See Article XI, "Certain Federal Income Tax Consequences of the Plan."

11.    Volatile Resin Prices May Affect Ability to Recover Raw Material Costs.

Polyethylene, PVC, polypropylene and other resins and additives constitute the major raw material for the Debtors' products. While the Debtors are diversifying their supply base, today the Debtors still purchase most of their resin from major oil companies and petrochemical companies in North America. The price of resins is a function of, among other things, manufacturing capacity, demand, and the price of crude oil and natural gas. Resin shortages or significant increases in the price of resin have had and could continue to have a significant adverse effect on the Debtors' businesses. High crude oil and natural gas pricing have had significant impact on the price and supply of resins. If high resin pricing continues, the Debtors may be limited in their ability to pass through such costs to their customers.

12.    Intellectual Property May Not Be Adequately Protected.

The Debtors rely on patents, trademarks and licenses to protect their intellectual property, which is significant to their businesses. The Debtors also rely on unpatented proprietary know-how, continuing technological innovations and other trade secrets to develop and maintain their competitive position. The Debtors routinely seek to protect their patents, trademarks and other intellectual property, but their precautions may not provide meaningful protection against competitors or protect the value of their trademarks. In addition to their own patents, trade secrets and proprietary know-how, the Debtors license from other parties, the right to use some of their intellectual property. The Debtors routinely enter into confidentiality agreements to protect their trade secrets and property know-how. However such agreements may be breached, may not provide meaningful protection or may not contain adequate remedies for the Debtors if they are breached.

13.    Other Manufactures May Have a Competitive Advantage.

The markets in which the Company operates are highly competitive on the basis of service, product quality, product innovation and price. Small and medium-sized manufacturers that compete primarily in regional markets service a large portion of the film and flexible packaging market, and there are relatively few large national manufacturers. In addition to competition from many smaller competitors, the Company faces competition from a number of large film and flexible packaging companies. Some of the Company's competitors are substantially larger, are more diversified and have greater resources, creating certain competitive advantages.

## C.    RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES

The ultimate recoveries under the Plan to holders of Class 7, 9, 10 and 11 Claims and Interests that receive New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) pursuant to the Plan will depend on the realizable value of the New Common Stock, Series M Preferred Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes). The securities to be issued pursuant to the Plan, including the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes), are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each holder of Class 7, 9, 10 and 11 Claims and Interests should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan.

1.    Lack of Established Market for the Securities May Adversely Affect Liquidity.

There can be no assurance that an active market for the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) will develop, nor can any assurance be given as to the prices at which such securities might be traded. The New Common Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange. Although the Company has agreed to take all steps reasonably required to permit the Series AA Preferred Stock to be traded on the NASDAQ OTC Bulletin Board, only market makers can apply to quote securities on such service. Even if the Series AA Preferred Stock is quoted for trading on the NASDAQ OTC Bulletin Board, there can be no assurance that an active or liquid trading market will develop for the Series AA Preferred Stock.

The New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) to be issued under the Plan have not been registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Common Stock, Series M Preferred Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Section XI (Certain Securities Law Considerations), most recipients of New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) will be able to resell such securities without registration pursuant to the exemption provided by Section 4(1) of the Securities Act.

2.    Value of New Common Stock May be Significantly Diluted.

If the Series AA Preferred Stock has not been redeemed or repurchased by the fifth anniversary of the Effective Date of the Plan, the holders of at least 40% of the outstanding shares of Series AA Preferred Stock will have the right to cause all of the outstanding Series AA Preferred Stock to be converted into a number of shares of New Common Stock that will dilute the ownership interest of the New Common Stock to be issued pursuant to the Plan to .01% or less. Thus, if New Pliant is unable to redeem or repurchase the Series AA Preferred Stock by the fifth anniversary of

the Effective Date of the Plan, the New Common Stock issued pursuant to the Plan may be rendered essentially worthless by such conversion. The terms of the First Lien Notes Indenture and Second Lien Notes Indentures currently prohibit, and the terms of the Exit Facility Credit Agreement are expected to prohibit, New Pliant from redeeming or repurchasing the Series AA Preferred Stock.

Although no options or warrants will be issued under the Plan and there are restrictions on New Pliant's ability to issue options or warrants in the future, the issuance of options or warrants to purchase New Common Stock or the issuance of additional shares of New Common Stock following the Effective Date would dilute the ownership percentage represented by the New Common Stock distributed pursuant to the Plan (regardless of whether the Series AA Preferred Stock is converted into Common Stock) .

3.    Lack of Dividends on Securities May Adversely Affect Liquidity.

The Debtors do not anticipate that cash dividends or other distributions will be made by New Pliant or the Reorganized Debtors with respect to the New Common Stock or Series AA Preferred Stock in the foreseeable future. In addition, covenants in certain debt instruments to which New Pliant or the Reorganized Debtors will be a party may restrict the ability of New Pliant or the Reorganized Debtors to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for New Common Stock or Series AA Preferred Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

4.    Holders of Options Who Elect to Exercise May Not Realize a Positive Return on Their Investment.

The holders of Options may exercise such Options and receive shares of New Common Stock in New Pliant upon tender of the contractual exercise price of such Options on or prior to the Effective Date of the Plan. The exercise price of such Options may greatly exceed the value on the Effective Date of the Plan of the shares of New Common Stock that may be purchased in connection therewith and the value of such shares of New Common Stock may never equal or exceed the exercise price paid for such shares of New Common Stock. In addition, the value of the New Common Stock received in connection with the exercise of an Option is subject to dilution as set forth above in the risk factor entitled "RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES – Value of New Common Stock May be Significantly Diluted." Accordingly, holders of Options who elect to exercise such Options to purchase shares of New Common Stock may not realize a positive return on such investment.

5.    Interest of J.P. Morgan Partners, LLC as Controlling Stockholder May Differ from Interests of Other Securities Holders.

Affiliates of J.P. Morgan Partners, LLC currently own approximately 55% of Pliant's outstanding common stock, 74% of Pliant's detachable warrants to purchase common stock issued in connection with our preferred stock and 59% of Pliant's outstanding preferred stock. Following consummation of the Plan, affiliates of J.P. Morgan Partners, LLC will own approximately 13% of the Series AA Preferred Stock and approximately 40% of the New Common Stock of Pliant Holdings. Under the terms of the New Pliant Stockholders Agreement, those affiliates will have the

right to designate 4 out of the 7 members of the New Pliant Board of Directors and thereby will have effective control of New Pliant. As the holders of a significant percentage of the New Common Stock, the interests of the affiliates of J.P. Morgan Partners, LLC may not in all cases be aligned with the interests of recipients of securities of the Tack-On Notes (or, if necessary, the New Subordinated Notes) or other recipients of Series AA Preferred Stock pursuant to the Plan. As the holders of a significant percentage of the Series AA Preferred Stock, the interests of the affiliates of J.P. Morgan Partners, LLC may not in all cases be aligned with the interests of other recipients of New Common Stock pursuant to the Plan.

## XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

Any discussion of United States federal tax issues set forth in this Disclosure Statement is written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any United States federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

## A.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

1.    Cancellation of Indebtedness Income.

Under the IRC, a taxpayer generally must recognize income from the cancellation of debt ("COD Income") to the extent that its indebtedness is discharged during the taxable year. Section 108(a)(1)(A) of the IRC provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved, by the bankruptcy court. In this case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the IRC, to reduce certain of its tax attributes by the amount of COD Income. The

attributes of the taxpayer are to be reduced in the following order: net operating losses ("NOLs"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes"). Section 108(b)(5) of the IRC permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above. In addition to the foregoing, Section 108(e)(2) of the IRC provides a further exception to the realization of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes. The effect of Section 108(e)(2) of the IRC, where applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and to avoid any reduction of its Tax Attributes.

As a result of having their debt reduced in connection with their bankruptcy, the Debtors generally will not recognize COD Income from the discharge of indebtedness pursuant to the Plan; however, certain Tax Attributes of the Debtors will be reduced or eliminated. The Debtors currently do not expect to make the election under the IRC to apply any required attribute reduction first to the basis of the Debtors' depreciable property.

To the extent that the Debtors are required to reduce their Tax Attributes, the mechanics of such attribute reduction will be governed by Treasury Regulation §1.1502-28, which contains rules that apply where the debtor corporation is a member of a group filing a consolidated return. These rules generally provide that the Tax Attributes attributable to the debtor corporation are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member pursuant to the consolidated return regulations, and also include the basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group must be reduced. In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be reduced by Tax Attributes attributable to other members of the consolidated group. In addition, to the extent that the debtor corporation is required to reduce its basis in the stock of another group member, the lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member. Any required attribute reduction will take place after the Debtors have determined their taxable income, and any federal income tax liability, for the taxable year in which the Effective Date occurs.

2.    Net Operating Losses and Other Attributes.

Following the Effective Date, the Debtors expect to have consolidated NOLs. As of December 31, 2005, the Debtors had approximately $304 million of consolidated NOLs, and in addition the Debtors expect to generate additional consolidated NOLs through the Effective Date. The amount of such consolidated NOLs remains subject to adjustment by the IRS. As explained above, however, the Debtors' consolidated NOLs and other Tax Attributes may be reduced or eliminated as of the beginning of the taxable year following the year in which the Effective Date occurs as a result of the COD Income expected to be realized on implementation of the Plan. Assuming a reorganized equity value for the Debtors consistent with that used in Section VIII.B. of this Disclosure Statement, the COD Income expected to be realized on implementation of the Plan is estimated to be in the range of approximately $98 million to approximately $188 million. It is

expected that all or substantially all of the realized COD Income will be applied against the Debtors' consolidated NOLs described above. Accordingly, there can be no assurance that the Reorganized Debtors will have NOLs following the year in which the Plan is implemented.

As a general rule, an NOL incurred by a taxpayer during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years and the remainder can be carried forward and deducted from the taxpayer's taxable income over the 20 succeeding taxable years.

3.    Annual Section 382 Limitation on Use of NOLs.

Section 382 of the IRC contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in the years following an "ownership change" (the "Annual Section 382 Limitation"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) that takes place during the three year period ending on the date on which such change in ownership is tested. Certain of the Debtors' NOLs may be subject to an Annual Section 382 Limitation triggered by a prior ownership change.

As a general rule, a loss corporation's Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (4.26% for ownership changes that occurred during April 2006). Assuming a reorganized equity value for the Debtors consistent with that used in Section VIII.B. of this Disclosure Statement and the long-term tax-exempt rate set forth above, the Debtors' Annual Section 382 Limitation is estimated to be in the range of approximately $7.2 million to approximately $12.9 million per year. The Debtors' Annual Section 382 Limitation may be increased by any net unrealized built-in gain, if any, inherent in the assets of the Debtors immediately prior to the implementation of the Plan as described below. Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. The Annual Section 382 Limitation is increased if the loss corporation has net unrealized built-in gains, i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. Such a corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those net unrealized built-in gains for United States federal income tax purposes in the five years following the ownership change. A correlative rule applies to a corporation that has net unrealized built in losses, i.e., losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount. Such a corporation's ability to deduct its built-in losses (in addition to its NOLs) following an ownership change is limited. If a loss corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the corporation's Annual Section 382 Limitation is zero. In this regard, the Debtors expect, but have not yet conclusively determined, that they will have a net unrealized built-in gain as of the Effective Date.

Section 382(l)(5) of the IRC provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(l)(5) Bankruptcy Exception"). The 382(l)(5) Bankruptcy Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as

defined by applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change.

If the 382(l)(5) Bankruptcy Exception applies, a corporation's pre-change losses and excess credits that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued on certain debt converted to stock in the reorganization. In addition, under the 382(l)(5) Bankruptcy Exception, a subsequent ownership change of the corporation within a two-year period will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the subsequent ownership change.

If a corporation qualifies for the 382(l)(5) Bankruptcy Exception, the use of its NOLs will be governed by that exception unless the corporation affirmatively elects for the provisions not to apply. If a corporation that is eligible for the 382(l)(5) Bankruptcy Exception elects out of that provision, a special rule under Section 382(l)(6) of the IRC will apply in calculating the Annual Section 382 Limitation. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the Debtor's assets (determined without regard to liabilities) immediately before the ownership change.

It is unclear whether the Debtors will qualify for the 382(l)(5) Bankruptcy Exception because its "qualified creditors" may not own 50 percent or more of the stock of New Pliant. Even if the Debtors qualified for the 382(l)(5) Bankruptcy Exception, its usefulness would be limited by the rule described above relating to the reduction for interest paid or accrued on certain debt converted into stock in the reorganization. Accordingly, if the Debtors actually qualify for the 382(l)(5) Bankruptcy Exception, it is expected they will elect to apply the special rule under Section 382(l)(6) described above.

4.    Accrued Interest.

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the IRC, as discussed above.

5.    Federal Alternative Minimum Tax.

A corporation may incur alternative minimum tax liability even where NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Reorganized Debtors will be liable for the alternative minimum tax.

6.    Consequences of the Merger.

It is expected that the Merger will constitute a tax-free reorganization for United States federal income tax purposes under Section 368 of the IRC.

B.    **FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS**

The United States federal income tax consequences of the transactions contemplated by the Plan to Claim holders that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a holder of a Claim that is a United States Person. The general United States federal income tax consequences to Claim holders that are Non-United States Persons are discussed below under Section XI.B.8 of this Disclosure Statement.

The United States federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

1.    General.

A Holder who receives Cash or other consideration (including, without limitation, stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such

109

accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent, consistent with the Plan, to allocate for United States federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for United States federal income tax purposes.

If not otherwise so required, a Holder that receives Series AA Preferred Stock, New Common Stock or Series M Preferred Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of such stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

2.    Holders of Class 3 Claims.

Holders of Class 3 Claims will realize and recognize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between their adjusted tax bases in their Claims immediately prior to the Effective Date and the amount of Cash they receive pursuant to the Plan.

3.    Holders of Class 7 Claims.

(a)    Consequences of the Exchange

Holders of Class 7 Claims will realize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between their adjusted tax bases in the Old Notes surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the amount of Cash, (ii) the fair market value of the New Common Stock and Series AA Preferred Stock, and (iii) the "issue price" of the Tack-On Notes or, if issued, New Subordinated Notes, it receives in the exchange. The "issue price" of the Tack-On Notes (or New Subordinated Notes) is generally expected to equal the fair market value of such notes on the date they are issued.

The United States federal income tax treatment to Holders of Class 7 Claims depends upon whether the Old Notes and Tack-On Notes or, if issued, New Subordinated Notes, are "securities" for United States federal income tax purposes. The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for United States federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the instrument. These authorities have indicated that an initial term of less than five years is evidence

110

that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

If the Old Notes do not constitute "securities" for United States federal income tax purposes, an exchanging Holder will be required to recognize the full amount of the gain or loss it realized on the exchange. An exchanging Holder's initial tax basis in the New Common Stock, Series AA Preferred Stock and Tack-On Notes (or New Subordinated Notes) it receives in the exchange will equal the respective fair market values of such property on the Effective Date. An exchanging Holder's holding period in the New Common Stock, Series AA Preferred Stock and Tack-On Notes (or New Subordinated Notes) it receives in the exchange will commence on the day after the Effective Date.

If the Old Notes and Tack-On Notes (or New Subordinated Notes) constitute "securities" for United States federal income tax purposes, an exchanging Holder that realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized and (ii) the amount of Cash it receives in the exchange. An exchanging Holder that realizes a loss on the exchange will not be permitted to recognize such loss. An exchanging Holder's initial aggregate tax basis in the New Common Stock, Series AA Preferred Stock and Tack-On Notes (or New Subordinated Notes) it receives in the exchange should equal the sum of (x) such Holder's adjusted tax basis in the Old Notes exchanged therefor and (y) the amount of gain it recognizes on the exchange, reduced by the amount of Cash it receives in the exchange. Such tax basis would be allocated among the New Common Stock, Series AA Preferred Stock and Tack-On Notes (or New Subordinated Notes) it receives based on the relative fair market values of such property on the Effective Date. An exchanging Holder's holding period for the New Common Stock, Series AA Preferred Stock and Tack-On Notes (or New Subordinated Notes) it receives in the exchange will include the Holder's holding period for the Old Notes.

If the Old Notes constitute "securities" but the Tack-On Notes (or New Subordinated Notes) do not constitute "securities" for United States federal income tax purposes, an exchanging Holder that realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized and (ii) the sum of (a) the fair market value of the Tack-On Notes (or New Subordinated Notes) and (b) the amount of Cash it receives in the exchange. An exchanging Holder that realizes a loss on the exchange will not be permitted to recognize such loss. An exchanging Holder's initial tax basis in the New Common Stock and Series AA Preferred Stock it receives in the exchange should equal the sum of (x) such Holder's adjusted tax basis in the Old Notes exchanged therefor and (y) the amount of gain it recognizes on the exchange, reduced by the amount of Cash and the fair market value of the Tack-On Notes (or New Subordinated Notes) it receives in the exchange. An exchanging Holder's initial tax basis in the Tack-On Notes (or New Subordinated Notes) it receives in the exchange will equal the fair market value of such property on the Effective Date. An exchanging Holder's holding period for the New Common Stock and Series AA Preferred Stock it receives will include the Holder's holding period for the Old Notes. An exchanging

111

Holder's holding period in the Tack-On Notes (or New Subordinated Notes) it receives in the exchange will commence on the day after the Effective Date.

The foregoing discussion is based on the Debtors' intention not to treat the Series AA Preferred Stock as nonqualified preferred stock for purposes of Section 356(e) of the IRC. The Debtors intend to follow this treatment because the Series AA Preferred Stock should be considered to participate in corporate growth to a significant extent. If this treatment were not respected by the IRS, the amount of realized gain, if any, that a Class 7 Claim Holder would be required to recognize would be increased by the fair market value of the Series AA Preferred Stock it receives, and, in addition, different rules for determining the Holder's tax basis and holding period in the Series AA Preferred Stock would apply.

        (b)      Consequences of Holding Tack-On Notes or, if issued, New Subordinated Notes

New Pliant will be required to pay interest on the Tack-On Notes or, if issued, New Subordinated Notes, through the issuance of additional Tack-On Notes or New Subordinated Notes, as the case may be. As a result, the Tack-On Notes (or New Subordinated Notes) will be treated as being issued with original issue discount ("OID") for United States federal income tax purposes. OID on a Tack-On Note (or New Subordinated Note) will equal the excess of such note's "stated redemption price at maturity" over its issue price (as determined above) by more than a statutory de minimis amount. A debt instrument's "stated redemption price at maturity" is the sum of all payments provided by the debt instrument (whether designated as interest or as principal) other than payments of qualified stated interest. For these purposes, qualified stated interest does not include interest paid in debt instruments of the issuer. Accordingly, OID on the Tack-On Notes (or New Subordinated Notes) will include the amount of any interest payable on such notes.

Because the Tack-On Notes or, if issued, New Subordinated Notes, will be treated as being issued with OID, Holders of Tack-On Notes (or New Subordinated Notes) will be required to include any OID in income as it accrues in accordance with a constant yield method, regardless of their regular method of tax accounting. The amount of OID allocable to an accrual period will be an amount equal to the product of the "adjusted issue price" of the Tack-On Note (or New Subordinated Note) at the beginning of such accrual period and its yield-to-maturity. The "adjusted issue price" of a Tack-On Note (or New Subordinated Note) at the start of any accrual period will equal its issue price increased by the accrued OID for each prior accrual period and reduced by any prior payments.

As a result of the OID rules, Holders of Tack-On Notes (or New Subordinated Notes) generally will recognize taxable income in advance of the receipt of cash payments attributable to such income. The Holder's tax basis in its Tack-On Notes (or New Subordinated Notes) will be increased by the amount of OID included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to such notes.

    4.     Holders of Class 9 and Class 11 Interests.

A Holder of a Class 9 or Class 11 Interest (each, an "Impaired Interest," and a Holder of such a Interest, an "Impaired Interest Holder") will realize gain or loss for United States federal income tax purposes on the exchange of its Impaired Interest for Series AA Preferred Stock and/or New Common Stock, as the case may be, equal to the difference between (i) the adjusted tax basis in the Impaired Interest surrendered in the exchange, determined immediately prior to the Effective

Date, and (ii) the fair market value of the Series AA Preferred Stock and/or New Common Stock it receives in the exchange. The exchange of an Impaired Interest should qualify as a transaction subject to Section 368 or 1036 of the IRC for United States federal income tax purposes. Accordingly, an Impaired Interest Holder should not recognize any gain or loss realized for United States federal income tax purposes with respect to the exchange of its Impaired Interest.

An Impaired Interest Holder's initial tax basis in the Series AA Preferred Stock and/or New Common Stock it receives in exchange for its Impaired Interest should equal its adjusted tax basis in such Impaired Interest. Such tax basis would be allocated among the Series AA Preferred Stock and/or New Common Stock it receives based on the relative fair market values of such property on the Effective Date. An Impaired Interest Holder's holding period in the Series AA Preferred Stock and/or New Common Stock it receives in the exchange will include the holding period in the Impaired Interest surrendered.

The foregoing discussion is based on the Debtors' intention not to treat the Series AA Preferred Stock as nonqualified preferred stock for purposes of Section 356(e) and 1036(b) of the IRC. The Debtors intend to follow this treatment because the Series AA Preferred Stock should be considered to participate in corporate growth to a significant extent. If this treatment were not respected by the IRS, the amount of realized gain, if any, that an Impaired Interest Holder would be required to recognize would be increased by the fair market value of the Series AA Preferred Stock it receives, and, in addition, different rules would apply for determining the Holder's tax basis and holding period in the Series AA Preferred Stock.

     5.    <u>Holders of Class 10 Interests.</u>

     (a)    Holders of Class 10 Interests Receiving Cash

A Holder of a Class 10 Interest receiving Cash pursuant to the Plan will realize and recognize gain or loss for United States federal income tax purposes on the exchange of its Interest equal to the difference between its adjusted tax basis in its Class 10 Interest surrendered in the exchange, determined immediately prior to the Effective Date, and the amount of Cash it receives pursuant to the Plan.

     (b)    Holders of Class 10 Interests Receiving Series M Preferred Stock

In the event that the Reorganized Debtors issue Series M Preferred Stock to Holders of vested Class 10 Interests eligible to participate in one or more of the Reorganized Debtors' incentive programs, the following tax consequences may apply to such Holder. A Holder that receives Series M Preferred Stock will realize gain or loss for United States federal income tax purposes on the exchange equal to the difference between (i) its adjusted tax basis in the vested Class 10 Interest surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the vested Series M Preferred Stock it is deemed to receive in exchange for its vested Class 10 Interest and not in connection with the Holder's employment. The Holder should not recognize any gain or loss realized for United States federal income tax purposes on such exchange.

A Class 10 Interest Holder's initial tax basis in the vested Series M Preferred Stock it is deemed to receive in exchange for its vested Class 10 Interest should equal its adjusted tax basis in such Interest. A Class 10 Interest Holder's holding period in the vested Series M Preferred Stock it

is deemed to receive in exchange for its vested Class 10 Interest will include the holding period in the vested Class 10 Interest surrendered.

A Class 10 Interest Holder that is deemed to receive vested Series M Preferred Stock in connection with the Holder's employment and not with respect to its vested Class 10 Interest should consult its own tax advisor with respect to the United States federal income tax consequences of receiving such vested Series M Preferred Stock.

6.    Holders of Class 12 Interests.

Pursuant to the Plan, all Class 12 Interests will be cancelled, annulled and extinguished, and Holders of Class 12 Interests will receive nothing in exchange for such Interests. As a result, each Holder of a Class 12 Interest generally should recognize a loss equal to the Holder's tax basis in its Class 12 Interest extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting. In general, if the Holder held its Class 12 Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset. Capital loss will be long-term if the Class 12 Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

7.    Series AA Preferred Stock.

Under Section 305 of the IRC, Holders of Series AA Preferred Stock after the consummation of the Plan may be required to accrue the "redemption premium" on such stock in income as a dividend using OID principles (as described in more detail above) to the extent that New Pliant has current or accumulated earnings and profits. Generally, the "redemption premium" on redeemable preferred stock is equal to the difference between the price at which the stock is redeemable and the issue price of the stock. The Series AA Preferred Stock is redeemable at its principal amount plus accrued dividends. Therefore, if the issue price of the Series AA Preferred Stock is less than the principal amount of the stock, Holders of the stock may be required to accrue the difference in income as OID. In addition, it is possible that the amount of accrued but unpaid dividends on the Series AA Preferred Stock may be treated as "redemption premium" for these purposes.

The foregoing rules will not apply to the extent that the Series AA Preferred Stock is considered to participate in corporate growth to any significant extent. The Company intends to treat the Series AA Preferred Stock as participating in corporate growth to a significant extent and, accordingly, if this treatment is respected by the IRS, Holders of Series AA Preferred Stock will not be required to accrue any "redemption premium" in their income as described above.

8.    Market Discount.

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having OID, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon

the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. If a Holder has accrued market discount with respect to its Claims and such Holder receives Tack-On Notes or, if issued, New Subordinated Notes, in an exchange pursuant to the Plan, such Holder may not be required immediately to include in income the accrued market discount to the extent such accrued market discount is allocable to the Tack-On Notes (or New Subordinated Notes). In this event, such portion of the accrued market discount should carry over to the Tack-On Notes (or New Subordinated Notes). Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

       9.     <u>Non-United States Persons.</u>

      A holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

       10.    <u>Information Reporting and Backup Withholding.</u>

      Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

## C.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

      THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## D.    RESERVATION OF RIGHTS

      This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further

modify, revise or supplement this Article XI and the other tax related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XII.  CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion identifies certain Canadian federal income tax considerations pursuant to the provisions of the *Income Tax Act* (Canada) (the "Canada Tax Act") that are relevant to holders of certain Classes of Claims under the Plan.  For the purposes of the following discussion, the term "Holder" shall mean a holder of a Claim that is resident in Canada for the purposes of the Canada Tax Act.  In addition, for the purposes of the following discussion, all Stock Interests in Pliant currently held by a Holder are assumed to constitute capital property of the Holder for the purposes of the Canada Tax Act.

This discussion is based on the current provisions of the Canada Tax Act, the regulations thereunder, and the published administrative practices and policies of the Canada Revenue Agency available prior to the date hereof and also takes into account all specific proposals to amend the Canada Tax Act and the regulations thereunder publicly announced by the Minister of Finance (Canada) prior to the date hereof.  Except for the foregoing, this discussion does not take into account or anticipate any changes in law, whether by legislative, regulatory, administrative or judicial action.  Furthermore, this discussion does not take into account provincial or foreign income tax legislation or considerations.

The following discussion is of a general nature only and is not intended to constitute legal or tax advice to any particular Holder.  EACH HOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED IN THE PLAN.

## A.  CANADIAN FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS

1.  Holders of Class 6 Claims.

A Holder that is an existing creditor of Pliant, which exchanges its Class 6 Claims for new debt claims against New Pliant, may recognize income, a gain or a loss as a result of the exchange, depending upon the Holder's circumstances.  A Holder may also incur income, a gain or a loss upon the receipt of Cash or other consideration in satisfaction of its Class 6 Claims.  **Holders of Class 6 Claims should consult their own tax advisors to determine the Canadian tax implications of the execution of the Plan in light of their own circumstances.**

2.  Holders of Class 9, 10 and 11 Claims.

Holders of Stock Interests in Pliant will generally be considered to have disposed of such Interests for the purposes of the Canada Tax Act upon the execution of the Plan.  A gain or loss for Canadian tax purposes may arise upon any such disposition unless the Merger constitutes a "foreign merger" for the purposes of the Canada Tax Act and certain designated elections are not made by the relevant Holder.  **All Holders of Series A Preferred Stock Interests, Series B Preferred Stock Interests and Outstanding Common Stock Interests should consult with their own tax advisors to determine the Canadian tax implications of an exchange of their interests for new Stock Interests upon the execution of the Plan in light of their own circumstances.**

116

B.    **IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

THE FOREGOING DISCUSSION IS INTENDED TO SERVE ONLY AS A SUMMARY OF CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS RELEVANT TO THE EXECUTION OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE PRECEDING DISCUSSION IS PRESENTED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES RESULTING FROM THE EXECUTION OF THE PLAN ARE, IN MANY INSTANCES, UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE CANADIAN AND FOREIGN TAX CONSEQUENCES THAT WILL ARISE AS A RESULT OF THE EXECUTION OF THE PLAN.

C.    **RESERVATION OF RIGHTS**

The preceding tax summary is subject to change (possibly substantially) based on subsequent changes to the provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XII and the other tax-related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

### XIII.  CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS

A.    **FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS**

1.    Exemption from Registration Requirements for New Securities.

Upon consummation of the Plan, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes), from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Debtors believe that New Pliant is a successor to Pliant under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

2.    Subsequent Transfers of New Securities.

In general, recipients of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) will be able to resell the New Common Stock and Series AA Preferred Stock and the Tack-On Notes (or the extent necessary, the New Senior Subordinated Notes) without registration under the Securities Act or other

federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) under the Plan are deemed to be "underwriters," the resale of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) or other securities without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK, SERIES AA PREFERRED STOCK AND THE TACK-ON NOTES (OR TO THE EXTENT NECESSARY, THE NEW SENIOR SUBORDINATED NOTES), THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK, SERIES AA PREFERRED STOCK AND THE TACK-ON NOTES (OR TO THE EXTENT NECESSARY, THE NEW SENIOR SUBORDINATED NOTES) ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

3.    Reinstatement of Existing Securities.

The Debtors are of the view that the reinstatement of the First Lien Notes and the Second Lien Notes under the Plan does not constitute the offer or sale of a new security requiring

registration under the federal securities laws. Accordingly, the First Lien Notes and the Second Lien Notes will retain their unrestricted status to the same extent as in effect immediately prior to such reinstatement.

4.      Periodic Reports.

Pliant currently files periodic reports with the Securities and Exchange Commission (the "Commission") pursuant to Section 15(d) of the Securities Exchange Act of 1934, as amended. As successor to Pliant, New Pliant intends to continue to file such periodic reports with the Commission.

## B.      CANADIAN SECURITIES LAW CONSIDERATIONS

1.      Exemption from Registration and Prospectus Requirements.

The issuance of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) to holders of Claims resident in Canada, other than to certain holders of Claims resident in the Yukon Territory, may take place in reliance on exemptions from the dealer registration requirements and prospectus requirements of the securities laws in such jurisdictions. Section 2.11 of National Instrument 45-106 provides that the dealer registration requirements and prospectus requirements do not apply in respect of a trade in a security in connection with a reorganization that is under a statutory procedure. The Canadian securities regulatory authorities interpret the phrase "statutory procedure" broadly; it includes procedures done under any statutes of a foreign jurisdiction under which the entities involved exist or under which the transaction is taking place. The Debtors believe that the offer and sale of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) under the Plan to Debtors resident in Canada would constitute trades made in connection with a reorganization that is under a statutory procedure and would therefore be exempt from the registration requirements of provincial and most territorial securities laws in Canada.

2.      Subsequent Transfers of Securities.

Recipients of the New Common Stock, Series AA Preferred Stock and the Tack-On Notes (or to the extent necessary, the New Senior Subordinated Notes) resident in Canada will be subject to certain restrictions on resale imposed by Canadian provincial and territorial securities laws. Recipients of securities under the Plan are encouraged to seek legal advice prior to any resale of such securities. In general, recipients of securities under the Plan resident in Canada may not resell their shares to Canadian purchasers and must resell their shares outside of Canada.

THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON RESIDENT IN CANADA TO TRADE IN THE SHARES OF NEW COMMON STOCK, SERIES M PREFERRED STOCK, SERIES AA PREFERRED STOCK AND THE TACK-ON NOTES (OR TO THE EXTENT NECESSARY, THE NEW SENIOR SUBORDINATED NOTES) ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS RESIDENT IN CANADA CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE APPLICABLE SECURITIES LAWS IN THE JURISDICTION IN WHICH THEY ARE RESIDENT.

## XIV.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### A.      CONTINUATION OF THE CHAPTER 11 CASES

If the Debtors remain in Chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors-in-Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 cases.  The Debtors could have difficulty operating with the high costs, operating financing and the eroding confidence of their customers and trade vendors, if the Debtors remained in Chapter 11.  It is highly unlikely that the Debtors would be able to find alternative bank financing if the DIP Facility Agreement were terminated.  If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under Chapter 7 or Chapter 11.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### B.      LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under Chapter 7 of the Bankruptcy Code.  In Chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under Chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates.  The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization.  In a liquidation under Chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under Chapter 7.  Thus, Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed.  Any distributions to the holders of Claims or Interests under a Chapter 11 liquidation plan probably would be delayed substantially.

## XV.  CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to holders of Claims against any of the Debtors.  In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, the Debtors urge all holders of Claims and Interests entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than [____] p.m., prevailing Eastern Time, on [_____], 2006.

Dated:  April 18, 2006

Respectfully submitted,

PLIANT CORPORATION (for itself and on behalf of
the Affiliate Debtors, as Debtors and Debtors-in-
Possession)

By: _____

Stephen T. Auburn
Vice President and General Counsel


SIDLEY AUSTIN LLP                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

James F. Conlan                      Robert S. Brady (No. 2847)
Larry J. Nyhan                       Edmon L. Morton (No. 3856)
William A. Evanoff                   Kenneth J. Enos (No. 4544)
Jessica C. Knowles                   The Brandywine Building
Laura B. Franzon                     1000 West Street, 17th Floor
One South Dearborn Street            P.O. Box 391
Chicago, Illinois 60603              Wilmington, Delaware 19899-0391
Telephone:  (312) 853-7000           Telephone:  (302) 571-6600
Facsimile: (312) 853-7036            Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors-in-Possession

CH1 3486063v.4